No. 2025-1884

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

_____

KOTIS ASSOCIATES, LLC, KOTIS HOLDINGS, LLC,
WESTOVER TERRACE II, LLC,
*Plaintiffs-Appellees*

v.

UNITED STATES,
*Defendant-Appellant.*

_____

Appeal from the Court of Federal Claims
No. 1:20-cv-00932 (Hon. Loren A. Smith)

_____

**OPENING BRIEF FOR THE UNITED STATES**

_____

ADAM R.F. GUSTAFSON
  *Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
  *Deputy Assistant Attorney General*
CHRISTOPHER ANDERSON
  *Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 353-1834
christopher.anderson3@usdoj.gov

# TABLE OF CONTENTS

Table of Authorities ........................................................................ iii

Introduction ..................................................................................... 1

Jurisdictional Statement .................................................................. 2

Issues Presented .............................................................................. 3

Statement of the Case ...................................................................... 4

    A.   Statutory and Regulatory Background ...................................... 4

        1.   STB Regulation of rail lines under the Transportation Act ........................................................ 4

        2.   Railbanking under the Trails Act ...................................... 6

        3.   Fifth Amendment takings ............................................... 10

    B.   Factual Background .................................................................. 11

    C.   Procedural History ................................................................... 13

Summary of Argument ................................................................... 16

Standard of Review ........................................................................ 19

Argument ....................................................................................... 20

   I.   The dimensions of the right-of-way now held by the City are the same as the dimensions of the right-of-way held by NSR. ........................................... 20

    A.   Section 8(d) authorizes the transfer of established rights-of-way, not the condemnation of new easements. ............................................. 21

    B.   The United States cannot be estopped by a position the STB did not take. ................................................. 27

    C.   The easements now held by the City can be no larger than the easements formerly held by NSR. ............................... 31

        1.   The width of the right-of-way in this case is a disputed question of fact. ............................................ 31

        2.   The CFC cannot rely on the record in a different case to determine the width of the easements in this case. ................................................................... 33

i

D.    The CFC erred by refusing to reopen the trial
        record to admit evidence of the STB's clarification of
        the NITU. ................................................................................ 35

II.    The Trails Act does not confer on the City authority to
        remove improvements in existence at the time of
        railbanking. ............................................................................. 38

III.   An award of just compensation must be based on a
        real-world assessment of fair market value, not
        hypotheticals. ......................................................................... 44

A.    Just compensation is measured by fair market value
        on the date of the taking. ..................................................... 45

B.    The CFC erred by rejecting evidence of post-NITU
        sales of other properties affected by the NITU. ........................ 52

Conclusion ................................................................................................ 55

# TABLE OF AUTHORITIES

## Cases

*Agapion v. United States,*
 167 Fed. Cl. 761 (2023) ........................................................ 33, 34, 53, 54

*Almota Farmers Elevator & Warehouse Co. v. United States,*
 409 U.S. 470 (1973) ..................................................... 47, 50-51

*Atl. & N.C. R. Co. v. Way,*
 90 S.E.2d 937 (N.C. 1916) ...................................................... 37

*Atl. Thermoplastics Co. v. Faytex Corp.,*
 5 F.3d 1477 (Fed. Cir. 1993) ................................................ 35

*Bd. of Cnty. Supervisors v. United States,*
 276 F.3d 1359 (Fed. Cir. 2002) ............................................. 19

*Bos. Chamber of Com. v. City of Bos.,*
 217 U.S. 189 (1910) ............................................................. 48

*Caldwell v. United States,*
 391 F.3d 1226 (Fed. Cir. 2004) ......................................... 10, 23

*Cedar Point Nursery v. Hassid,*
 594 U.S. 139 (2021) ............................................................. 24

*Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.,*
 450 U.S. 311 (1981) .......................................................... 4, 6

*First Eng. Evangelical Lutheran Church v. Cty. of L.A.,*
 482 U.S. 304 (1987) ......................................................... 10, 36

*Fla. Rock Indus., Inc. v. United States,*
 791 F.2d. 893 (Fed. Cir. 1986) ............................................ 51

*Fla. Rock Industries, Inc. v. United States,*
 18 F.3d 1560 (Fed. Cir. 1994) .................................... 49, 50, 54

*Gadsden Indus. Park, LLC v. United States,*
 956 F.3d 1362 (Fed. Cir. 2020) ........................................... 45

*Goos v. ICC,*
 911 F.2d 1283 (8th Cir. 1990) .............................................. 9

*Haggart v. Woodley,*
    809 F.3d 1336 (Fed. Cir. 2016) .................................................... 28, 29, 31

*Harrow v. Dep't of Def.,*
    601 U.S. 480 (2024) ............................................................... 22

*Hayfield N. Railroad v. Chi. & Nw. Transp.,*
    467 U.S. 622 (1984) ............................................................... 37

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.,*
    467 U.S. 51 (1984) ........................................................... 28-29

*Independence Park Apartments v. United States,*
    449 F.3d 1235 (Fed. Cir. 2006) ........................................... 36

*Loveridge v. United States,*
    174 Fed. Cl. 379 (2024) ........................................................ 46

*Narramore v. United States,*
    960 F.2d 1048 (Fed. Cir. 1992) ....................................... 14, 20

*Nat'l Wildlife Fed'n v. ICC,*
    850 F.2d 694 (D.C. Cir. 1988) ............................................. 22

*Neb. Trails Council v. STB,*
    120 F.3d 901 (8th Cir. 1997) ................................................. 6

*Olson v. United States,*
    292 U.S. 246 (1934) .............................................................. 45

*Preseault v. ICC,*
    494 U.S. 1 (1990) .................................... 5, 6, 9, 10, 22, 38, 40

*Preseault v. United States,*
    100 F.3d 1525 (Fed. Cir. 1996) (en banc) ................... 10, 23, 24

*Qingdao Taifa Grp. Co. v. United States,*
    581 F.3d 1375 (Fed. Cir. 2009) ........................................... 38

*Rasmuson v. United States,*
    807 F.3d 1343 (Fed. Cir. 2015) ........................ 19, 32, 45, 47, 48, 49, 52

*Rumsfeld v. United Technologies Corp.,*
    315 F.3d 1361 (Fed. Cir. 2003) ........................................... 35

*Sauer West LLC v. United States,*
  151 F.4th 1339 (Fed. Cir. 2025) ................................................................ 19

*Toews v. United States,*
  376 F.3d 1371 (Fed. Cir. 2004) ............................................. 23, 24, 31, 52

*United States v. Carmack,*
  329 U.S. 230 (1946) ................................................................................ 42

*United States v. Dow,*
  357 U.S. 17 (1958) .................................................................................. 23

*U.S. Forest Service v. Cowpasture River Pres. Ass'n,*
  590 U.S. 604 (2020) ............................................................................ 6, 41

## **Constitution and Statutes**

U.S. Const. amend. V ................................................................................ 10

15 U.S.C. § 717f ........................................................................................ 27

16 U.S.C. § 1242 ......................................................................................... 6

16 U.S.C. § 1247 ................................................................... 6, 7, 21, 22, 40

28 U.S.C. § 1295 ......................................................................................... 2

28 U.S.C. § 1491 ......................................................................................... 2

49 U.S.C. § 10501 ....................................................................................... 4

49 U.S.C. § 10903 ....................................................................................... 4

49 U.S.C. § 11101 ........................................................................................ 4

49 U.S.C. §§ 10502 ................................................................................... 5, 6

## **Regulations**

49 C.F.R. 1152.50 ....................................................................................... 5

49 C.F.R. § 1152.29 ............................................................................. 7, 8, 25

49 C.F.R. § 1152.50 ..................................................................................... 5

49 C.F.R. §§ 1152.29 ................................................................................... 9

## Court Rules

Fed. Cl. R. 52 ............................................................... 35

Fed. Cl. R. 54 ................................................................ 2

## Surface Transp. Bd. Decisions

*Mo. Pac. R.R. Co.—Abandonment—In Red River & Bowie Ctys., Tex.,*
*Docket No. AB-3* (Sub-No. 137X),
 2011 WL 4630030 (Oct. 6, 2011) .............................................  38

*Wis. Cent., Ltd.—Abandonment Exemption—In Price & Taylor Ctys., Wis.,*
*Docket No. AB-303* (Sub-No. 1X),
1989 ICC Lexis 359 at *2-3 (Dec. 13, 1989) ..................................  9

**INTRODUCTION**

In this rails-to-trails case, Norfolk Southern Railway Company (NSR) transferred its property interests in a portion of a rail line to the City of Greensboro, North Carolina (City), for use as a trail. Plaintiffs sued alleging that NSR's easements across their properties would have terminated but for the operation of section 8(d) of the Trails Act and that they were therefore entitled to just compensation for a taking of their property.

The Court of Federal Claims (CFC) found in favor of Plaintiffs in an extraordinary judgment. Jettisoning decades of precedent, the court reconceptualized rails-to-trails cases as direct condemnation actions, in which the railroad and the trail sponsor are empowered to issue "condemnation filings" and the Surface Transportation Board (STB or Board) sits as a "condemnation court," whose judgment is binding on the CFC (and the United States) in any subsequent suit for compensation. Remarkably, the CFC took that course on its own initiative, unprompted by any party. And because it proceeded without the benefit of briefing, the CFC predictably made numerous errors with regard to the nature and effect of the STB's actions in this case. If allowed to stand, the CFC's judgment would have significant ramifications not only for the government's liability in rails-to-trails cases, but also for the rights of private property owners abutting railroad rights-of-way.

Just as extraordinary was the CFC's assessment of the amount of compensation due. Without any analysis of the text of the Trails Act, the court held that a landowner loses all property rights within the area burdened by a railbanked easement and that therefore the burdened area and any overlapping improvements have no value. As a result, the CFC awarded Plaintiffs compensation as though any overlapping improvements had been destroyed, despite uncontroverted evidence that Plaintiffs continue to own the improvements and to receive millions of dollars of rent from them annually. That judgment is at odds with precedents of this Court and the Supreme Court and handed a windfall to Plaintiffs at the public's expense. That judgment should be reversed.

## JURISDICTIONAL STATEMENT

The CFC had jurisdiction under the Tucker Act, 28 U.S.C. § 1491, because Plaintiffs bring a claim against the United States founded upon the Constitution. The CFC entered a judgment under Court of Federal Claims Rule 54(b) on April 23, 2025, Appx42, and the United States filed a timely notice of appeal on June 20, 2025, Appx80. This Court has jurisdiction under 28 U.S.C. § 1295(a)(3).

# ISSUES PRESENTED

1.a Whether the CFC erred by analyzing railbanking transactions as direct condemnation actions for the taking of a new easement and treating the STB's issuance of a Notice of Interim Trail Use or Abandonment (NITU) as a condemnation judgment that is binding on the CFC.

b. Holding that the United States is judicially estopped based on an erroneous interpretation of an STB action taken in the Board's adjudicatory capacity.

c. Finding that the dimensions of the easements claimed by Plaintiffs are correct for reasons given in a different case concerning different properties with different evidence; and

d. Refusing to reopen the record to consider an order from the STB releasing a portion of the right-of-way from federal jurisdiction, thereby rendering any taking of the affected property temporary.

2. Whether the CFC erred in holding that the Trails Act confers on the City, as trail sponsor, the authority to require removal of preexisting improvements that encroach on the right-of-way, even though those improvements did not interfere with active rail service and do not impede trail use.

3. Whether the CFC erred in assessing the amount of compensation due by:

a. Basing compensation on a hypothetical scenario in which all improvements were removed and Plaintiffs retained no value in the area burdened by the easements, rather than on what a willing buyer would have paid for the properties in the condition they were in at the time of the taking; and

b. Disregarding all proffered post-railbanking sales as evidence of market value based on a blanket assumption that those buyers were uninformed.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

#### 1.    STB Regulation of rail lines under the Transportation Act

Congress vested exclusive authority in the STB to regulate rail transportation over nearly all the nation's rail lines. 49 U.S.C. § 10501(b); *see also* Transportation Act of 1920, Pub. L. No. 66-152, § 402, 41 Stat. 477-78; *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981). Rail carriers under the Board's purview must "provide ... transportation or service on reasonable request," 49 U.S.C. § 11101(a), unless the Board agrees to a temporary discontinuance of operations or to the permanent abandonment of the rail line, *id.* § 10903. Abandonment permanently removes a rail line

from the national transportation system and from federal jurisdiction. *Preseault v. ICC* (*Preseault I*), 494 U.S. 1, 5 n.3 (1990).

Railroads seek authority from the STB to abandon rail lines by filing an application or petition for exemption, or in the case of lines that have been out-of-service for some time, by using a streamlined class exemption process. 49 U.S.C. §§ 10502 (exemption), 10903 (application); 49 C.F.R. 1152.50(b) (establishing class exemption). If a railroad meets the criteria for a class exemption—for example, if no local traffic has moved over the line for two years—the railroad can invoke the class exemption by simply filing a verified notice with the Board. 49 C.F.R. § 1152.50(d)(2). If the notice of exemption is complete, the Board will publish a notice in the Federal Register that confers discretionary authority on the railroad to consummate abandonment of the line thirty days after publication, absent intervening events that may affect its effective date. *See id.* § 1152.50(d)(3).

Abandonment of a rail line and termination of the Board's jurisdiction may have ramifications for property rights in the right-of-way associated with the rail line. In many cases, railroads hold fee title to land in the right-of-way, but in others railroads hold only an easement over land owned by a third party. Property rights within the right-of-way are governed by state law, but the Board's plenary jurisdiction over rail lines preempts any state law

purporting to interfere with the railroad's common carrier obligation while the rail line remains under the Board's jurisdiction. 49 U.S.C. §§ 10501(b), 10903(a); *Kalo Brick*, 450 U.S. at 318; *see also Preseault I*, 494 U.S. at 8. After the railroad consummates abandonment and the Board's jurisdiction is terminated, state law governs the disposition of any easements held as part of the right-of-way.

### 2.    Railbanking under the Trails Act

The National Trails System Act (Trails Act) "among other things, establishes [a system of] national scenic and national historic trails," which includes, for instance, the Appalachian National Scenic Trail. *U.S. Forest Service v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 610 (2020); see 16 U.S.C. § 1242(a) (defining what composes "[t]he national system of trails"). In 1983, Congress amended the Act by adding Section 8(d). *See* National Trails System Act Amendments of 1983, Pub. L. No. 98-11, § 208(2), 97 Stat. 42, 48. Section 8(d) created a new option for railroads seeking to discontinue service on a rail line: railbanking. Railbanking is "the preservation of [a] railroad corridor for future rail use." *Neb. Trails Council v. STB*, 120 F.3d 901, 903 n.1 (8th Cir. 1997). It occurs through the transfer of the railroad's interests in an "established right-of-way" to a trail sponsor for "interim use ... in a manner consistent with [the Trails Act]." 16 U.S.C. § 1247(d); *Preseault I*,

494 U.S. at 6-7. Under Section 8(d), interim trail use in accordance with the Act "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d).

Railbanking is entirely voluntary on the part of the railroad. *See* 49 C.F.R. § 1152.29(d)(1). When a rail carrier seeks Board authorization to abandon a rail line through the notice of exemption process, a "state, political subdivision, or qualified private organization" may initiate the railbanking process by filing a comment with the Board indicating an interest "in acquiring or using a right-of-way of a rail line ... for interim trail use and rail banking." *Id*. § 1152.29(a). Along with its request, the would-be trail sponsor must certify that it will meet the requirements of section 8(d), i.e., that it will "assume full responsibility for: (1) [m]anaging the right-of-way; (ii) [a]ny legal liability arising out of the transfer or use of the right-of way ...; and (iii) [t]he payment of any and all taxes that may be levied or assessed against the right-of-way." *Id*. § 1152.29(a)(2).

If the railroad decides to explore railbanking and the prospective sponsor meets the necessary requirements, the "Board will issue a Notice of Interim Trail Use or Abandonment [NITU] to the railroad and to the interim trail sponsor for the portion of the right-of-way as to which both parties are

willing to negotiate," 49 C.F.R. § 1152.29(d)(1). In practice, railroads and trail sponsors sometimes enter into negotiations before the railroad takes steps to abandon the line and may execute an agreement to transfer the right-of-way contingent upon successful railbanking. *E.g.*, Appx2088. In such cases, the railroad and trail sponsor must follow the same steps to initiate the railbanking process.

The NITU initially grants the railroad and the prospective trail sponsor a period of one year to negotiate a trail use agreement.[1] 49 C.F.R. § 1152.29(d)(1). The NITU does not mark the beginning of any use of the right-of-way as a trail, nor does it indicate that a railroad and trail sponsor have reached a trail-use agreement. Thirty days after the NITU issues, the railroad may "discontinue service, cancel any applicable tariffs, and salvage track and materials"—steps consistent with either abandonment of the rail line or railbanking. 49 C.F.R. § 1152.29(d)(1). But the rail line remains subject to federal jurisdiction, and the railroad may not consummate abandonment of the line unless the NITU expires on its own terms or is vacated by the Board. *Id*.

If the railroad and the prospective trail sponsor reach a trail-use agreement, they notify the Board and the line is railbanked, remaining under

---

[1] At the time the NITU in this case was issued, the period was 180 days.

Board jurisdiction. If the railroad and trail sponsor do not reach an interim trail-use agreement during the NITU period, the NITU expires, and the carrier may then decide whether to exercise its discretion to abandon the line. *Id.* §§ 1152.29(d)(1), (e)(2).

The STB's role in railbanking transactions is "essentially ministerial." *Goos v. ICC*, 911 F.2d 1283, 1295 (8th Cir. 1990) The Board "lack[s] any discretion to decide whether rail banking and use of the right-of-way as a trail is desirable for a particular line." *Rail Abandonments—Use of Rights-of-Way as Trails—Supplemental Trails Act Procedures*, 4 I.C.C.2d 152, 156 (1987). Its only role is to verify "that the Trails Act has been properly invoked and that its requirements will be met." *Id.* Absent unusual circumstances, the Board can and does perform its duties without inquiring into the nature of the property rights transferred from the railroad to the trail sponsor. *Wis. Cent., Ltd.—Abandonment Exemption—In Price & Taylor Ctys., Wis.*, Docket No. AB-303 (Sub-No. 1X), 1989 ICC Lexis 359 at *2-3 (Dec. 13, 1989).

As with rail abandonment, railbanking may have implications for state-law property rights in the right-of-way. Railbanking maintains the STB's jurisdiction over the rail line even though it is being used as a trail rather than a railroad. *Preseault I*, 494 U.S. at 7. As such, state laws that may interfere with the railroad's common carrier obligation continue to be

preempted, including any state laws that would result in abandonment and termination of railroad easements needed for the restoration of rail service. *Id.* at 8; *see also Preseault v. United States* (*Preseault II*), 100 F.3d 1525, 1537 (Fed. Cir. 1996) (en banc).

### 3.    Fifth Amendment takings

Under the Fifth Amendment, private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. The Just Compensation Clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *First Eng. Evangelical Lutheran Church v. Cty. of L.A.*, 482 U.S. 304, 314 (1987). The Supreme Court has recognized that in some cases section 8(d) may cause a taking by "prevent[ing] property interests [held as railroad easements] from reverting under state law." *Preseault I*, 494 U.S. at 8. Accordingly, any takings liability under Section 8(d) turns on a determination of the nature and scope of any property rights asserted by the servient landowners that Section 8(d) purportedly prevents the landowners from obtaining. *See also Caldwell v. United States*, 391 F.3d 1226, 1233 (Fed. Cir. 2004).

**B.    Factual Background**

NSR operated the rail line at issue until around 2014. Appx524, Appx1054-1055. NSR held the portion of the right-of-way affecting Plaintiffs' properties in the form of easements for railroad purposes only.

On April 12, 2019, the City and NSR executed an Agreement of Purchase and Sale (Agreement) for the City to acquire NSR's right-of-way over a 3.1-mile portion of the line, which the City intended to convert to trail use as part of the City's Downtown Greenway project. Appx2088. In furtherance of the Agreement, NSR filed a verified Notice of Exemption with the STB in August 2019. Appx501. The City then filed a petition for railbanking, Appx588, and the STB issued a NITU on October 11, 2019. Appx605. Less than a month later, NSR executed a non-warranty deed transferring its interests to the City. Appx2099.

Attached to the deed were a metes-and-bounds description of the right-of-way and a survey map of the right-of-way (Survey Map). Appx2113. Under the Agreement, the City was responsible for preparing the Survey Map. Appx2089. A representative of the City testified that, to the best of his recollection, NSR provided the metes-and-bounds description to the City, but he could not recall whether NSR provided any documents to support the metes-and-bounds description. Appx2048.

W. Marshall "Marty" Kotis is an experienced real estate developer and the majority owner of the three plaintiff LLCs. Appx1038-1043. Through the plaintiff LLCs, Mr. Kotis owns the thirteen properties at issue in this case. Appx1043. Mr. Kotis acquired all but two of the properties before 2015, while NSR was still operating the rail line, and acquired the remaining two properties by 2017.[2] All the properties abut the rail line and were burdened by NSR's railroad easement when Mr. Kotis acquired them.

With one exception (601-623 Spring Street), each of the properties is improved with one or more commercial buildings and parking areas, some of which encroach on the easement shown on the Survey Map. Appx2141-2153. In fact, Mr. Kotis built several of the encroaching buildings after acquiring the properties. *E.g.*, Appx1123, Appx1312-1313, Appx140-141, Appx1209. All the buildings were in existence before 2019, when NSR filed its notice of exempt abandonment. Mr. Kotis testified that several of the properties were subject to leases from NSR allowing use of portions of the right-of-way. Appx1144, Appx1153, Appx1208, Appx1214, Appx2315-2346.

---

[2] The history of Mr. Kotis's acquisition and development of the properties may be found at Appx1102, Appx1122-23, Appx1128, Appx1133, Appx1140-1141, Appx1143, Appx1152, Appx1209, Appx1212, Appx1249, Appx1254, Appx1257, Appx1261, Appx1312-1313, Appx2157-2158, Appx2170-2171, Appx2180, Appx2191-2192, Appx2202-2203, Appx2213-2215, Appx2224-2226, Appx2236, Appx2244-2247, Appx2257-2258, Appx2270, Appx2280-2281, Appx2289-2290.

At the time of the NITU, all the buildings except one were leased to tenants. Appx2305-2314. Mr. Kotis testified that he was receiving rent from those tenants at the time of the NITU, that he continued to receive rent as of the date of his trial testimony, and that he anticipated receiving rent in the future. Appx1319, Appx1327-1328, Appx1337.

### C.    Procedural History

Plaintiffs brought claims against the United States for just compensation, alleging that the railbanking of the right-of-way caused a taking of their properties by preventing the termination of NSR's easements and by imposing a new trail use condition on those easements. Appx74-75. The United States stipulated to a taking, but disputed the amount of compensation due on both factual and legal grounds.

The CFC held a five-day trial from December 2022 to February 2023. After the close of trial, the STB issued an order releasing a portion of the right-of-way across one property from federal jurisdiction, Appx702, and the government moved to reopen the record to admit that order. The CFC denied that motion. Appx29.

The CFC issued an Opinion and Order on April 22, 2025, in which it held the United States liable for a taking and awarded Plaintiffs $42.6 million in compensation plus interest.

The CFC's opinion adopts a novel analysis of railbanking transactions under the Fifth Amendment. Rather than assessing whether section 8(d) had preempted state-law abandonment of NSR's easements (and thus deprived Plaintiffs of unencumbered fee interests), the CFC approached railbanking transactions as "direct condemnations." Appx23. The CFC treated the City's petition for railbanking and NSR's agreement as "condemnation filings," Appx24, and the STB's issuance of the NITU as a "condemnation court's judgment," Appx23. The effect of that "judgment," in the CFC's view is the taking of an entirely new easement, Appx23, which the CFC dubbed an "interim trail use and railbanking easement" or "ITUR easement," Appx1.

Applying that understanding of railbanking transactions, the CFC rejected most of the United States' arguments. First, the court held that the Survey Map is determinative of the dimensions of the easements because the STB supposedly adopted the map in its capacity as a condemnation court. Appx23-24. Accordingly, the CFC held that it lacked jurisdiction to consider the government's arguments that the Survey Map is erroneous. Appx24 (citing *Narramore v. United States*, 960 F.2d. 1048 (Fed. Cir. 1992)). The court further held that the dimensions of the easements held by NSR were irrelevant because the railbanking transaction created and took a new easement, rather than merely preventing the termination of NSR's easements. Appx27.

In a footnote, the CFC said that it would alternatively find that the Survey Map accurately depicts the width of the easements for the reasons it gave in a related case concerning different properties. Appx27 n.16.

The CFC went on to reject the United States' remaining arguments. The CFC ruled that the easement held by the City is "exclusive," by which it meant that Plaintiffs lost all value in the land burdened by the easement, including any existing improvements. Appx30-31. The court then denied the government's motion to introduce evidence that NSR would not have abandoned the rail line had it not reached a railbanking agreement with the City. Appx35-36. Finally, the CFC rejected the government's arguments that Plaintiffs' expert applied unreliable methodologies in assessing the amount of compensation owed. Appx39-40.

The United States filed a timely notice of appeal. The government asks this Court to reaffirm its well-established precedent on when and how railbanking transactions may result in Fifth Amendment takings and to reject the CFC's "direct condemnation" theory, which led that court to hold erroneously that the easement obtained by a trail sponsor may be geographically larger than the easement held by the railroad. The United States also asks the Court to reverse the CFC's holding that the easements held by the City are "exclusive" and to reverse the CFC's judgment on the amount of

15

compensation due. The United States does not appeal the CFC's other hold-
ings, although in declining to appeal it does not concede the correctness of
those holdings.

## SUMMARY OF ARGUMENT

1. The CFC erred in holding that it was without power to consider the
government's argument that the dimensions of the easements now held by
the City are smaller than those shown on the Survey Map.

a. The Trails Act does not authorize the railroad and the trail sponsor,
or the STB, to condemn a new easement. Rather, as the Supreme Court has
held, the Trails Act preempts state law abandonment of existing railroad
easements while those easements are railbanked. Accordingly, the dimen-
sions of a railbanked easement can be no larger than the dimensions of the
easement held by the railroad.

b. The CFC's alternative grounds for rejecting the government's argu-
ments on the width of the easements also fail. First, the government is not
judicially estopped from arguing that the easements are smaller because the
STB granted the City's post-NITU petition to narrow the rail line across one
property. The STB had no occasion to consider, much less adjudicate, the
width of the easements when reviewing that petition. There is thus no

inconsistency between the STB's action on the petition and the government's position in this case, and there is no basis for estoppel.

c. Second, the CFC's rejection of the government's arguments "on the merits" for reasons given in another case cannot be sustained. The width of the easements is a question of fact. The CFC cannot rely on its findings in another case concerning different properties to determine the width of the easements in this case, in which the government presented different evidence. The judgment must therefore be reversed and the case remanded for further findings.

d. The CFC also erred in refusing to reopen the trial record to admit the STB's order narrowing the width of the right-of-way subject to federal jurisdiction. The court grounded its refusal in an erroneous understanding of the STB's order, based on arguments made by no party. The STB's order reduced the scope of the taking on one property and was therefore material to the determination of just compensation.

2. The Trails Act does not confer on the City authority to remove improvements that existed at the time of railbanking. Section 8(d) is silent regarding the rights conferred on trail sponsors and any such rights must therefore be related to the purposes of the Act, which is to preserve railroad rights-of-way for possible future reactivation. In this case, the improvements

on Plaintiffs' properties all predate railbanking of the right-of-way and most previously coexisted with active rail service. Accordingly, removal of the improvements could not be necessary to preserve the right-of-way for future reactivation, and section 8(d) does not confer on the City the power to do so.

3. The CFC's determination of the amount of compensation due is based on errors of law and should be reversed. Just compensation must be grounded in fair market value, which is what a willing buyer would have paid for the property in the condition it was in at the time it was taken. The CFC largely adopted the opinions of Plaintiffs' expert appraiser on the amount of compensation due. But Plaintiffs' appraiser did not offer an opinion on the market value of the properties at the time of the taking. Rather, he valued the properties in a hypothetical condition in which any improvements within the right-of-way have been removed. That methodological error yielded a windfall for Plaintiffs by effectively awarding them compensation for the full value of any encroaching improvements even though Plaintiffs continue to own and receive substantial rents from those improvements.

Compounding its error, the CFC approved the appraiser's refusal to consider recent sales of other properties burdened by the same right of way, which would have provided concrete evidence as to how the Greensboro real estate market views the effect of railbanking on property values. The CFC did

so based on its speculation that the sales likely did not reflect the judgment of informed buyers. This Court has held, however, that a court may not substitute its own judgment of value for that of the market. The CFC thus erred as a matter of law in accepting the opinions of Plaintiffs' expert.

The judgment of the CFC should be reversed.

## STANDARD OF REVIEW

This Court reviews the CFC's legal conclusions de novo and its factual findings for clear error. *Sauer West LLC v. United States*, 151 F.4th 1339, 1344 (Fed. Cir. 2025). "Whether a taking has occurred is a question of law based on factual underpinnings." *Id.*

The landowner bears the burden of proving the value of the land taken for purposes of obtaining just compensation. *Bd. of Cnty. Supervisors v. United States*, 276 F.3d 1359, 1364 (Fed. Cir. 2002). "[A] finding on the value of a railway corridor that 'is derived from the application of an improper legal standard to the facts' must be remanded for new factual findings for application of the correct legal standard." *Rasmuson v. United States*, 807 F.3d 1343, 1345 (Fed. Cir. 2015) (quotation omitted).

# ARGUMENT

## I. The dimensions of the right-of-way now held by the City are the same as the dimensions of the right-of-way held by NSR.

The parties dispute the width of the right-of-way held by the City after railbanking. Plaintiffs claim that the dimensions of the right-of-way are accurately reflected on the Survey Map and extend 100 feet from the railroad centerline across most Kotis properties. The United States, however, presented evidence that the right-of-way held by NSR, and now by the City is narrower, extending no more than sixty-five feet across the properties. The dispute is material, not only because a smaller easement would affect a smaller area, but also because almost all the existing improvements would lie outside of a 65-foot easement.

The CFC held that it lacked the power to determine the width of the easement based on its view that the NITU should be considered the "judgement" of a "condemnation court" that is binding on the court in a suit to determine just compensation. Appx22-23 (citing *Narramore*, 960 F.2d 1048). Alternatively, the CFC held that the United States is "judicially estopped" from arguing that Survey Map is incorrect because the STB supposedly exercised jurisdiction over the full right-of-way claimed by the City when it considered the City's request to clarify that a portion of the right-of-way may be narrowed. Finally, and almost as an afterthought, the CFC said in a footnote

that if it could, it would find that "the Survey Map accurately depicts the width" of the easement for reasons it gave in a different case. Appx27 n. 16. Each of those holdings was wrong.

### A. Section 8(d) authorizes the transfer of established rights-of-way, not the condemnation of new easements.

Much of the CFC's judgment flowed from its novel view that railbanking transactions are properly analyzed as direct condemnation actions for the taking of a new easement. *See* Appx22-23. To the government's knowledge, that view has never previously been articulated in a judicial decision, and no party argued it to the court in this case. The CFC's direct condemnation approach is without basis in statute or precedent, and the court's reliance on it fatally undermines its opinion.

The CFC's direct condemnation theory lacks any basis in the text of the Trails Act. Congress's purpose in enacting section 8(d) was to further "the national policy to preserve established railroad rights-of-way for future reactivation of rail service." 16 U.S.C. § 1247(d). To that end, section 8(d) provides that "interim use of any *established railroad right[]-of-way*" as a trail "shall not be treated ... as an abandonment of the use of such rights-of-way for railroad purposes," provided the statute's other requirements are met. *Id.* (emphasis added). The Supreme Court has interpreted that provision to

"prevent[] property interests from reverting [to the servient owners] under state law" "[b]y deeming interim trail use to be like discontinuance [of the line for railroad purposes] rather than abandonment." *Preseault I*, 494 U.S. at 8.

Section 8(d) is thus directed at "preserv[ing] established railroad rights-of-way," and nothing in the text suggests that it authorizes the taking of a brand-new easement unrelated to the right-of-way held by the railroad. *Cf. Nat'l Wildlife Fed'n v. ICC*, 850 F.2d 694, 700 (D.C. Cir. 1988) ("The language of § 8(d) … not only does not authorize the Commission to 'condemn' or to 'take' railroad property, it does not specify any procedures to be used in appropriating such property and provides no guarantee of just compensation."). Further, the statute applies when interim trail use occurs "*pursuant to* donation, transfer, lease, sale, or otherwise" of an existing right-of-way from a railroad to a trail sponsor. 16 U.S.C. § 1247(d) (emphasis added). Congress's use of the words "pursuant to" to describe the manner in which trail use will occur indicates that the rights held by the trail sponsor are derivative of the right-of-way held by the railroad. *See Harrow v. Dep't of Def.*, 601 U.S. 480, 486 (2024) (observing that "pursuant to" "often functions as a legalese synonym for 'under'").

When articulating its direct condemnation theory, the CFC did not even cite—much less analyze—section 8(d). Instead, it relied on this Court's decision in *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004), which held that the statute of limitations for inverse condemnation claims arising from railbanking begins to run on the date of the NITU, *id.* at 1233. The CFC interpreted *Caldwell* to equate the NITU with a condemnation court's judgment. Appx23. But the only reference in *Caldwell* to a "judgement" is in its recitation of the facts of *United States v. Dow*, 357 U.S. 17 (1958), which the Court cited for the proposition that a taking occurs when "the government enter[s] into physical possession of the land," not when title formally passes, *id.* at 1235. Nor did this Court say that a NITU "impose[s]" an easement, as the CFC suggested. Appx23. Rather, *Caldwell* followed the Supreme Court's view that the NITU "operates to *prevent abandonment* of the corridor and to *preclude the vesting* of state law reversionary interests." *Caldwell*, 391 F.2d at 1233 (emphasis added).

In a different section of its opinion, the CFC also cited statements by this Court that railbanking results in a "new and different easement" or a "new easement for [a] new use." Appx4 (quoting *Toews v. United States*, 376 F.3d 1371, 1381 (Fed. Cir. 2004) and *Preseault II*, 100 F.3d at 1550). From those statements, the CFC appeared to deduce that railbanking takes an

23

entirely new easement separate from the railroad's easement. Appx4. The CFC misconstrued this Court's opinions. In both cases, this Court used the quoted language to describe the effect of establishing trail use in a right-of-way limited to railroad purposes. Such expansion of the use of the right-of-way, this Court said, "was *in effect* a taking of a new easement for that new use." *Preseault II*, 100 F.3d at 1550 (emphasis added); *see also Toews*, 376 F.3d at 1381 ("[T]he easement for railroad purposes *was converted* into a new and different easement." (emphasis added)). Because of that "effect," trail use may work a physical taking of private property for which compensation is due, but to have that effect, it need not literally condemn a new easement as a matter of state property law. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 155 (2021) ("[T]he government can commit a physical taking either by appropriating property through a condemnation proceeding or by simply entering into physical possession of property .... In the latter situation, the government's intrusion does not vest it with a property interest recognized by state law." (quotation omitted)). The CFC was thus wrong when it held that a railbanking transaction can confer on a trail sponsor a new and larger easement unrelated to the easement held by the railroad.

The CFC also erred as a matter of fact when it found that the STB approved the taking of a larger easement when it issued the NITU. Appx23. A

NITU is not a condemnation "judgment," nor does it adjudicate any state law property interests. *Contra* Appx23. A NITU is a regulatory action that (1) authorizes the railroad to discontinue its common carrier obligations and salvage track, (2) imposes on the trail sponsor the conditions required by section 8(d), and (3) maintains federal jurisdiction over the line during interim trail use so that the line may be reactivated for rail service. *See* 49 C.F.R. § 1152.29; *see also* Appx607. Because the STB's role in railbanking transactions is largely ministerial, there is rarely any need for the Board to inquire into the nature of the property interests transferred to the trail sponsor, much less to adjudicate them. Indeed, a NITU typically defines the affected rail line only in terms of the distance between mileposts. *See, e.g.*, Appx605.

The CFC was also wrong that the NITU in this case "adopted the Survey Map."[3] Appx24. The CFC reached that conclusion based on its mistaken assumption that the City attached the Survey Map to its petition for interim rail use, but the City attached a different map to the petition, which does not clearly indicate the width of the right-of-way. *Compare* Appx594 (attached map) *with* Appx2113 (Survey Map). Indeed, the Survey Map is dated October 2, 2019, almost two weeks *after* the City filed its petition for interim trail use,

---

[3] It bears repeating that no party argued to the CFC that the NITU is dispositive of the dimension of the easements. Accordingly, the parties had no opportunity to correct these numerous errors.

Appx2113, and there is no indication in the STB docket that the Survey Map was submitted to the Board before it issued the NITU. Rather than referencing the Survey Map (or any map), the City's petition defines "the Line" as "an approximately 3.1-mile rail line in the City of Greensboro, N.C., extending between milepost CF-65.6 and milepost CF-68.7," Appx605.

The CFC also relied on the fact that NSR's notice of exemption says that the width of the right-of-way "ranges from 50 feet to 200 feet along the main track centerline," Appx24; Appx532, and that the Board's environmental assessment prepared in conjunction with the NITU assumes a 50- to 200-foot wide right-of-way, Appx24; Appx596, but neither of those statements establishes the width of the right-of-way at any particular point. Nor can the STB be said to have *adjudicated* the width of the right-of-way simply because NSR claimed the right-of-way to be up to 200 feet wide at some points or because the Board's environmental staff assumed that claim was correct.

Rather than "clearly adopt[ing]" the Survey Map, Appx23, review of the NITU and the filings leading to it shows that the width of the right-of-way was not before the Board because that issue was simply not germane to the exemption proceeding or the NITU. And certainly the STB cannot be said to have adopted the Survey Map when the map was not before it.

Anticipating that the United States would argue the STB did not adjudicate the width of the right-of-way because the Board's role in railbanking transactions is essentially ministerial, the CFC alternatively held that if the STB did not approve the Survey Map, then "Congress has essentially pre-approved whatever description of the new easement railroads and trail sponsors choose to include in their condemnation filings." Appx24. That holding has no basis in law. As explained above, pp. 9-10, Congress in the Trails Act prevented the state-law abandonment of existing rights-of-way; it did not authorize the condemnation of new easements. Had Congress intended to delegate eminent domain power to railroads and trail sponsors it certainly would have used more explicit language. *Cf.* 15 U.S.C. § 717f(h) (explicitly delegating eminent domain power to private parties under the Natural Gas Act). The CFC's holding that it was bound by the Survey Map therefore cannot be sustained on this basis either.

## B.    The United States cannot be estopped by a position the STB did not take.

The CFC alternatively held that the United States is judicially estopped from arguing that the easements held by the City are narrower than those depicted on the Survey Map. In the CFC's view, when the STB entertained the City's petition to clarify that the right-of-way may be narrowed without impeding future rail service, the STB "necessarily decided that it had

jurisdiction" over the full extent of the right-of-way as shown on the Survey Map. Appx26. The CFC's legal premise is incorrect. There was no need for the STB to determine the width of the right-of-way before acting on the City's petition, and nothing in the STB's decision suggests that it considered, much less decided, that the Survey Map is correct. Because the CFC raised this issue *sua sponte* and did not request briefing, the United States was unable to correct the CFC's misunderstandings before it issued its judgment.

Judicial estoppel applies to prevent "a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Haggart v. Woodley*, 809 F.3d 1336, 1345 (Fed. Cir. 2016) (quotation omitted). The "main factors" that a court considers in applying the doctrine are whether "(1) a party's later position is 'clearly inconsistent' with its prior position, (2) the party successfully persuaded a court to accept its prior position, and (3) the party would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* (quotations omitted).

As this Court has observed, the Supreme Court has never applied judicial estoppel against the federal government, *id.* at 1345 n.10, but it has advised that estoppel doctrines should be applied against the government cautiously, *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51,

60 (1984). The United States is aware of no case in which the government has been held judicially estopped by the decision of an independent agency acting in an adjudicatory capacity, and the doctrine appears to have no application in that context. The role of an adjudicator is to resolve disputes between the parties, not to formulate litigation positions for its own advantage. But the purpose of judicial estoppel is to prevent a litigant from taking inconsistent positions to further its own interests. *Haggart*, 809 F.3d at 1345. The problem that judicial estoppel seeks to solve thus does not arise when an agency acts as an adjudicator, and the CFC erred in holding that the government could be estopped by the STB's adjudication.

In any event, the CFC was also wrong on the facts. The basic prerequisite for judicial estoppel—the taking of inconsistent positions by the same party—is lacking in this case. The STB has plenary jurisdiction over *rail lines*; its jurisdiction is not defined by state-law property rights. *See Norfolk S. Rwy. Co.—Abandonment Exemption—In the City of Greensboro, N.C.*, Docket No. AB 290 (Sub-No. 404X) (June 28, 2023), Appx691-692. In the exercise of its jurisdiction, the STB has the authority to determine whether a proposed narrowing of a railroad right-of-way could impede rail service over the line. It can perform that function without needing to establish the outer bounds of the state law property interests in the right-of-way.

In its petition (brought to benefit Mr. Kotis), the City sought a ruling that a 264-foot portion of the right-of-way could be narrowed to no more than 65 feet in total width, and supported that request with an engineering evaluation showing that a 50-foot corridor is sufficient to maintain rail service on that portion of the line.[4] Appx619. The petition stated that the "claimed corridor width is 100 feet from center line [i.e., 200 feet in total width] based on documented rail easements ... and varies throughout the corridor," Appx622, but it did not otherwise attempt to establish the dimensions of the easements.

The STB granted the City's petition and issued an order clarifying that the narrowed right-of-way "would leave sufficient room to support the reactivation of rail service." Appx702. The Board's decision was based on the engineering evaluation submitted by the City and NSR's agreement to the modification. Appx702. There was no need for the Board to determine whether the City's easement extended the full 100 feet from the centerline; it only needed to decide that a 65-foot right-of-way was sufficient. Indeed, as the CFC noted, the STB acknowledged in an earlier order that the dimensions of

---

[4] The City initially sought to narrow the necessary right-of-way to 50 feet, but NSR objected. The City and NSR settled, and the City modified its petition to seek an order that the right-of-way may be narrowed to a total of 65 feet. Appx696.

the City's easements are disputed, Appx690 n.3, but the Board found no need to resolve the dispute. Accordingly, the STB did not implicitly decide—or even take a position on—the extent of the City's easement.[5] The United States' position in this case therefore does not conflict with a position previously taken by the STB and the essential requirements for judicial estoppel are not met. *Haggart*, 809 F.3d at 1346.

### C.     The easements now held by the City can be no larger than the easements formerly held by NSR.

Because railbanking involves the transfer of an "established right[]-of-way" from a railroad to a trail sponsor, the dimensions of the right-of-way held by the trail sponsor cannot be larger than the dimensions of the right-of-way held by the railroad. *See Toews*, 376 F.3d at 1376 ("[T]he railroad cannot give what it does not have.").

### 1.     The width of the right-of-way in this case is a disputed question of fact.

In this case, there is a dispute of fact as to the size of the right-of-way held by NSR. As with other aspects of their claims, Plaintiff "have the burden

---

[5] The CFC engaged in unfounded speculation as to what the STB believes the result of its clarification order may be on the City's and Plaintiffs' state-law property rights. Appx26. As explained below, pp. 35-38, once the Board releases a portion of the right-of-way from federal jurisdiction, disposition of the state-law property rights is no longer affected by federal law, and the Board took no position regarding the effect of its order on those rights.

of establishing the value of the railway corridor," which necessarily includes the corridor's dimensions. *Rasmuson*, 807 F.3d at 1345.

Plaintiffs primarily rely on the Survey Map to support their claim that the right-of-way across their properties extends 100 feet from the railroad center line. A representative of the City testified that the Survey Map was based on the metes-and-bounds description, which he understood to have been prepared by NSR, but no supporting documents, such as the original easement grants, were introduced. Appx2048. The government, for its part, introduced multiple strands of evidence showing that the easements held by NSR on Plaintiffs' properties were narrower than those shown on the Survey Map. That evidence included a Railroad Valuation Map prepared by NSR's corporate predecessor and submitted to the ICC in 1927 showing the width of the right-of-way across the Kotis properties to be 65 feet from the center-line, Appx3001,[6] as well as leases between NSR and prior owners of some of the subject properties indicating 65-foot easements. Appx2320, 3236. Mr.

---

[6] Under the Valuation Act of 1913, the Interstate Commerce Commission (ICC) used these maps to help evaluate railroad corporate property. This valuation was used as a basis for fixing rates that would yield a reasonable profit to the railroads. Railroad companies prepared these maps and filed them with the ICC. *See* National Archives and Records Administration, *Records Relating to Railroads in the Cartographic Section of the National Archives* 54-55 (2010), *available at* https://www.archives.gov/files/research/rail-roads/reference-info-paper.pdf.

Kotis himself also testified that he previously understood NSR's easement to extend 65 feet from the center line across certain properties. Appx1313, Appx2086-2087. That evidence was more than sufficient to raise a substantial question of fact as to the accuracy of the Survey Map, which the CFC was bound to resolve on the evidence presented.

### 2. The CFC cannot rely on the record in a different case to determine the width of the easements in this case.

In rejecting the government's arguments on the width of the right-of-way, the CFC relied primarily on its legal holdings regarding the effect of the NITU and judicial estoppel. In a footnote, however, the CFC said that "[a]lternatively, on the merits, plaintiffs are correct that the Survey Map accurately depicts the width of the ITUR easement taken … for the reasons explained in *Agapion*." Appx27 n.16. That conclusion is unsupported by the record in *this* case.

*Agapion v. United States*, 167 Fed. Cl. 761 (2023), was a rails-to-trails case concerning different properties affected by the same railbanked right-of-way in Greensboro. Initially in *Agapion*, the United States did not dispute the accuracy of the Survey Map, and the CFC criticized the government for waiting until post-trial briefing to "fully raise [its] theory" regarding the width of the right-of-way. *Agapion*, 167 Fed. Cl. at 774. The CFC also rejected

the government's arguments in *Agapion* on legal grounds similar to its holding in this case, i.e., that the railbanking transaction took a new easement defined by the agreement between NSR and the City. *Id*. The CFC also criticized the government for not offering expert testimony to "discuss the import and effect of its proffered collection of property records." *Id*. Finally, the CFC stated simply that "[i]n view of all the evidence" Plaintiffs met their burden of proving that the Survey Map "governs the dimensions of the new easement." *Id*. Those reasons are insufficient to resolve "on the merits" the dispute over the size of the easements in this case.

The CFC's legal conclusions in *Agapion* cannot support its judgment in this case for three reasons: First, if the CFC in *Agapion* rejected the government's evidence because it thought the agreement between NSR and the City could grant the City new easements with larger dimensions than the easements held by NSR, the errors in that holding are explained above, pp. 21-27. Second, to the extent the CFC relied in *Agapion* on forfeiture, there was none in this case. The government introduced evidence and questioned witnesses at trial regarding the width of the right-of-way and discussed that evidence in its post-trial brief. Third, the CFC in *Agapion* erred by dismissing the government's title evidence for lack of expert testimony. Questions of title involve the interpretation of legal instruments, which is a

matter for the court. *See Rumsfeld v. United Technologies Corp.*, 315 F.3d 1361, 1369 (Fed. Cir. 2003).

More fundamentally, the CFC's findings in *Agapion* cannot support its judgment in this case because this case involves different properties with different evidence. As such, the CFC was bound to consider the government's evidence *in this case* and "find the facts specially" based on *that* evidence. Fed. Cl. R. 52(a)(1); *Atl. Thermoplastics Co. v. Faytex Corp.*, 5 F.3d 1477, 1479 (Fed. Cir. 1993) ("Although Rule 52(a) does not require elaborate, detailed findings on every factual issue raised, it does require that the findings of the trial court include as many of the subsidiary facts as are necessary to disclose to the appellate court the steps by which the trial court determined factual issues and reached its ultimate conclusions."). Accordingly, the CFC's judgment cannot be affirmed on this proffered alternate ground.

### D. The CFC erred by refusing to reopen the trial record to admit evidence of the STB's clarification of the NITU.

The CFC also erred by refusing to reopen the trial record to admit the STB's order clarifying the NITU and releasing a portion of the right-of-way across Plaintiffs' property from federal jurisdiction. The STB's order ended federal jurisdiction over a portion of Plaintiffs' property and rendered any taking temporary. Appx702. Moreover, the order definitively established that certain improvements no longer encroach on a right-of-way subject to

federal jurisdiction (if they ever did). The CFC awarded Plaintiffs $6,733,013 in compensation for the affected property, largely on the assumption that encroaching improvements have no value (see below pp. 45-52). The clarification order fatally undermined that assumption and the compensation award along with it.

The CFC acknowledged that it had the discretion to reopen the record, and it did not dispute the settled proposition that events subsequent to an ostensibly permanent taking can render the taking temporary, thereby reducing the compensation due. Appx28-29; *see also, e.g.*, *First English Evangelical Lutheran Church*, 482 U.S. at 320-21; *Independence Park Apartments v. United States*, 449 F.3d 1235, 1237 (Fed. Cir. 2006) (finding that a both temporary measure and a permanent measure that is repealed to constitute temporary takings). The CFC denied the motion, however, because it believed that the clarification decision somehow "hands the non-railbanked property over to the sponsor." Appx29. Again, the CFC invented that argument, which was not briefed by any party, and again the CFC was wrong.

The order clarifying the NITU determined that a 65-foot-wide right-of-way would be sufficient to reestablish rail service over a portion of the right-of-way across the 1310 Westover Terrace Property and released from federal jurisdiction any portion of the right-of-way more than 26 feet south or 39

36

feet north of the center line. Appx701-702. As a result, federal law no longer preempts North Carolina law outside the narrowed right-of-way. *See Hayfield N. Railroad v. Chi. & Nw. Transp.*, 467 U.S. 622, 632 (1984). The order did not consider or adjudicate its effects on the City's or the Plaintiffs' state-law property rights. It may be that the release of jurisdiction caused the City's easement to terminate, *see Atl. & N.C. R. Co. v. Way*, 90 S.E.2d 937, 939 (N.C. 1916), but regardless the question of what rights are held by the City and Mr. Kotis is no longer affected by the STB's jurisdiction. As a result, there is not basis to hold the United States liable for a permanent taking of the released portion of the property.

The CFC based its contrary holding on the City's representation that it would sell the released area to Mr. Kotis. Appx29. The basis of the City's claim to have a right to sell the land is not in the record, but it cannot come from the Trails Act. As explained above, pp. 21-27, section 8(d) only prevents the abandonment of railroad rights-of-way during interim trail use. It does not convey new property rights to a trail sponsor that the sponsor may subsequently sell. Thus, once a portion of the right-of-way is removed from the STB's jurisdiction, the City's rights can be no greater than the rights transferred from NSR.

Nor does the fact that the clarification order relied on the STB's *Missouri Pacific* decision support the CFC's conclusion. That decision, like the clarification order, did not address the property rights of the trail sponsor or any affected landowners. Moreover, an earlier STB decision in the *Missouri Pacific* docket states that the trail sponsor "own[ed]" the right-of-way, which suggests that it held the right-of-way in fee rather than as an easement. *Mo. Pac. R.R. Co.—Abandonment—In Red River & Bowie Ctys., Tex.*, Docket No. AB-3 (Sub-No. 137X), 2011 WL 4630030, at *1 (Oct. 6, 2011). If that is the case, the release of federal jurisdiction in *Missouri Pacific* would not have affected the trail sponsor's property interests. *See Preseault I*, 494 U.S. at 16.

By relying on an erroneous legal conclusion to deny the motion to reopen, the CFC abused its discretion, and its holding should be reversed. *Qingdao Taifa Grp. Co. v. United States*, 581 F.3d 1375, 1379 (Fed. Cir. 2009) ("An abuse of discretion may be established under Federal Circuit law by showing that the court … exercised its discretion based on an error of law.").

## II.    The Trails Act does not confer on the City authority to remove improvements in existence at the time of railbanking.

The CFC also erred in holding that the City, as trail sponsor, has the right to require Plaintiffs to remove any preexisting improvements that may encroach on the easements now held by the Cit, Appx30, and the court compounded that error by relying on that holding to assess just compensation as

38

though the encroaching improvements did not exist, below pp. 45-52. Nothing in section 8(d), however, confers a right on trail sponsors to prohibit servient landowners from using their properties in ways that do not interfere with either trail use or the potential for railroad reactivation. Most of the encroaching improvements in this case coexisted with active rail service, so there is no basis to conclude that they could interfere with reactivation of the rail line.[7] And City officials testified that the City has no plans to disturb existing improvements, so it cannot be argued that removing them is necessary to facilitate trail use. Accordingly, section 8(d) provides no basis for the City to seek to remove the improvements, and the CFC erred in holding otherwise.

Assuming that section 8(d) grants trail sponsors the right to use a railbanked right-of-way as a trail, this Court has not previously considered the extent of that right, nor is it necessary to address the question comprehensively in this case.[8] To resolve this case, the Court need only consider whether section 8(d) confers on a trail sponsor the power to require servient property owners to remove improvements from a railbanked right-of-way when those

---

[7] The only building that was built after the railroad ceased operations is the CoreLife building at 1430 Westover Terrace. *See* Appx2170-2171.

[8] The United States has not disputed in this case that section 8(d) confers on trail sponsors the right to use the transferred right-of-way as a trail. The United States reserves its right to argue in future cases that section 8(d) does not confer an automatic right to trail use. This Court should not address that issue in this case.

improvements previously coexisted with active rail service and are compatible with trail use. This Court should hold that it does not.

The text of section 8(d) is silent on the scope of a trail sponsor's rights to use a transferred right-of-way as a trail.[9] The scope of any rights conferred on trail sponsors by the Trails Act therefore must be inferred from the statute's structure and purpose. Congress declared that the purpose of section 8(d) is to further "the national policy to preserve established railroad rights-of-way for future reactivation of rail service." 16 U.S.C. § 1247(d). While section 8(d) also suggests that Congress also wanted to "encourage the development of additional trails," *Preseault I*, 494 U.S. at 17, the focus of the statute is on trails as a means of preserving established railroad rights-of-way. *See* 16 U.S.C. § 1247(d) (providing "*in the case of* interim [trail] use … such interim use shall not be treated … as an abandonment of the use of such rights-of-way for railroad purposes." (emphasis added)). Neither of those purposes suggest that Congress intended to confer broad powers on trail sponsors to transform established rights-of-way in a manner inconsistent with the right-

---

[9] The question of what rights section 8(d) confers on a trail sponsor only arises if the trail sponsor obtains the right to use the right-of-way as a trail by virtue of federal law, i.e., when the railroad held the right-of-way in the form of easements for railroad use only. If the railroad held the right-of-way in fee simple, then the trail sponsor enjoys all the rights of a landowner, and if the railroad held an easement that is broad enough to encompass trail use, then the trail sponsor's rights are defined by the terms of the easement.

of-way's use during railroad operations or to displace the rights of servient owners unnecessarily. *Cf. Cowpasture River*, 590 U.S. at 621-22 ("Our precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property."). Rather, it indicates a focus on preservation of the right-of-way as it existed at the time of railbanking. Nor is any such power necessary to achieve the statute's objectives.

In this case, the improvements on Plaintiffs' properties that allegedly encroach on the City's right-of-way all preexisted NSR's notice of exemption, *see* sources cited above p. 12 n.2, and there is no evidence that the maintenance of those improvements interfered with rail use. Indeed, the evidence shows that NSR affirmatively permitted some of those improvements by entering into leases with Plaintiffs or their predecessor owners. Appx2315-2346. There could therefore be no need to remove those improvements to preserve the right-of-way for possible future rail use, and conferring that power on the City would not further the purposes of the Trails Act.

Nor in this case is there any evidence that the existing improvements would interfere with trail use. Indeed, the representatives of the City expressly disclaimed any need or intention to remove existing improvements in the right-of-way. Appx2022, Appx2034. Reading section 8(d) to confer

such authority on the City thus would not further the purpose of the Act to encourage trails. The CFC thought the City's present intentions were irrelevant because its plans might "change in the future." Appx30. But that assumes that section 8(d) grants the City the authority to make any use of the right-of-way it chooses in furtherance of trail use, and that assumption is not supported by the text of section 8(d). It would be extravagant to presume—in the absence of any statutory text to that effect—that Congress intended to delegate to trail sponsors the power to displace servient landowners' existing uses of their properties. *Cf. United States v. Carmack*, 329 U.S. 230, 243 n.13 (1946) ("[Delegations of eminent domain power to private parties] are, in their very nature, grants of limited powers. They do not include sovereign powers greater than those expressed or necessarily implied."). The record in this case shows that the right-of-way can be converted to trail use without the need to disturb existing improvements. Absent some evidence to suggest that circumstances might change in the future such that those improvements would impede use of the right-of-way as a trail, there was no basis for the CFC to conclude that section 8(d) empowers the City to require their removal now or in the future.

The CFC was also wrong to conclude that the City or the STB has the power to require Plaintiffs to remove the improvements by virtue of the

STB's ongoing jurisdiction over the rail line. Appx31. Undoubtedly, the City has the power to take actions necessary to preserve the right-of-way for possible future rail use, but the encroaching improvements mostly coexisted with active rail service, and no evidence was presented that rail service could not be reactivated if the improvements remain. So long as rail use on the line remains dormant, neither the City nor the STB would have any basis for demanding that Plaintiffs cease any existing use of their property because of a conflict with (nonexistent) rail use. It may be that the City could prohibit *new* encroachments with the potential to interfere with future rail use, but that does not imply that the City's preservation obligations also grant it the power to remove encroachments that have coexisted with rail use in the past.

Thus, on the facts of this case, there is nothing to suggest that maintaining the preexisting improvements on Plaintiffs' properties would frustrate any the purpose of the Trails Act. Nor does the text of section 8(d) support the CFC's broad pronouncement that the City obtained "the authority to dictate how much of the corridor it needs, or will need in the future, to construct and operate the recreational trail." Appx30. The CFC thus erred by holding that section 8(d) confers on the City the right, in its discretion, to require the removal of preexisting encroaching improvements.

## III. An award of just compensation must be based on a real-world assessment of fair market value, not hypotheticals.

The CFC erred not only in its holdings on the width of the right-of-way and the City's authority to require removal of encroaching improvements, but also in its assessment of just compensation. Rather than determining the fair market value of the properties on the date of the taking, as the Supreme Court's and this Court's cases require, the CFC based its compensation award on a hypothetical scenario in which any encroaching improvements no longer exist and Plaintiffs are excluded from any use of the easement areas. *See* Appx30. And the court did so despite testimony from City officials that the City has no intention to require the removal of any existing improvements or to prohibit Plaintiffs from putting their properties to existing uses. Appx2017, Appx2021-2022. Compounding its error, the CFC failed to consider evidence of post-NITU sales of other properties affected by the same railbanking agreement. Those sales would have provided real-world data on how the Greensboro real estate market views the effects of railbanking on property values. Because of those errors, the CFC handed Mr. Kotis a windfall: he gets to retain ownership of the improvements and to continue collecting millions of dollars in annual rents, while simultaneously being compensated from the public fisc as though the improvements were destroyed.

44

That result is not "just" compensation. As the Supreme Court has held, a landowner whose property is taken "is entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public." *Bauman v. Ross*, 167U.S. 548, 574 (1897); *accord Olson v. United States*, 292 U.S. 246, 255 (1934).

## A.    Just compensation is measured by fair market value on the date of the taking.

The proper measure of just compensation in a rails-to-trails case is the difference in the fair market value of the property before railbanking and the fair market value of the property after railbanking. *Rasmuson*, 807 F.3d at 1345. Fair market value "is defined as what a willing buyer would pay in cash to a willing seller at the time of the taking." *Id.* (internal quotation marks omitted) (quoting *United States v. 564.54 Acres of Land,* 441 U.S. 506, 511 (1979) and *United States v. Miller,* 317 U.S. 369, 374 (1943)). The plaintiff bears the burden of demonstrating the quantum of compensation owed "with reasonable certainty, which requires more than a guess, but less than absolute exactness." *Gadsden Indus. Park, LLC v. United States*, 956 F.3d 1362, 1371 (Fed. Cir. 2020) (internal quotation marks and alterations omitted).

The CFC did not apply that standard. Instead, the court largely adopted the opinions of Plaintiffs' appraisal expert, Dr. John Kilpatrick.[10] Dr. Kilpatrick did not assess the value of the properties in the "after" condition based on what a willing buyer would have paid for the properties in the condition they were in on the date of the taking. Instead, Dr. Kilpatrick assumed a hypothetical world in which Plaintiffs were required to remove any encroaching improvements and deprived of all ability to use the portions of the properties burdened by the easements. Based on those assumptions, Dr. Kilpatrick assigned zero value to the improvements, and assessed the value of the land as though they did not exist.[11] *E.g.*, Appx2174 (before), Appx2176 (after); *see* Appx9-14 (describing the highest and best use of the properties in the "after" condition without improvements, based on Dr. Kilpatrick's opinions). In doing so, Dr. Kilpatrick rejected the need to inquire into the likelihood that the City would ever exercise its assumed rights to remove encroachments,

---

[10] The court rejected Dr. Kilpatrick's opinion that Plaintiffs should be awarded "severance damages" in addition to the loss of value of the parcel. Appx38. With regard to the value of the properties in the "before" and "after" conditions, the CFC adopted Dr. Kilpatrick's opinions in full. Appx40.

[11] In another rails-to-trails case, a different judge of the CFC rejected similar arguments, supported by expert testimony from Dr. Kilpatrick, that encroaching improvements should be assumed to have no value. *See Loveridge v. United States*, 174 Fed. Cl. 379, 402-03 (2024). An appeal of that judgment to this Court is fully briefed and awaiting oral argument. *Loveridge v. United States*, No. 2025-1244 (Fed. Cir. filed Dec. 4, 2024).

Appx1381-1383, and his opinions do no reflect evidence on how the market viewed the effect of the easements on the properties' value, Appx2304.

That approach is inconsistent with the law. The Supreme Court long ago rejected an approach to just compensation that is grounded in a "technical legal rights theory," rather than fair market value. *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 471 (1973) (quotation omitted). Thus, by adopting Dr. Kilpatrick's flawed opinions, the CFC committed an error of law, and the case must be remanded for new proceedings on just compensation. *See Rasmuson*, 807 F.3d at 1345.

In *Almota Farmers*, the Court held that just compensation must be measured by what a willing buyer would pay for the property taken, accounting for not just the legal rights at issue but also how those rights are likely to be exercised. In that case, the government took the plaintiff's leasehold, on which the plaintiff had built a grain elevator and other improvements. The government argued that the plaintiff should receive only the value of the remaining term of the lease, without considering the likelihood of renewal, and should receive no compensation for the improvements, which technically remained the plaintiff's property. The Supreme Court rejected that approach. The Court reasoned that although the leaseholder had no right to have its lease renewed, the record indicated that renewal would have been likely had

47

there been no taking. *Id*. at 472. Thus, a willing buyer would have valued the lease with that expectation, including the expectation that the improvements would remain in place. *Id*. The Court held that compensation must be assessed based on "how the market would have valued" the property, *id*. at 478, and the government was "not entitled to the benefit of assumptions, contrary to common experience," *id*. at 475 (quoting *United States v. Certain Property*, 388 F.2d 596, 601-02 (2d Cir. 1967) (en banc) (Friendly, J.)).

The lesson of *Almota Farmers* is that just compensation is measured by what a willing buyer would pay for the property, not by the existence or absence of a "legally protected right." *Id*. at 473; *see also Bos. Chamber of Com. v. City of Bos.*, 217 U.S. 189, 194 (1910) (rejecting the proposition that a condemnor "could be made to pay for a loss of theoretical creation, suffered by no one in fact."). In other words, a court may consider evidence of how the market values property in light of uncertainty, but may not make its own assumptions about how the uncertainty will be resolved in the future. *See also* J.D. Eaton, *Real Estate Valuation in Litigation* 292 (2d ed. 1995) ("Analysis of sales will often show *whether* buyers and sellers in the market believe that the likelihood of future [exercise of the condemnor's rights] is significant enough to affect the current market value of the property in question." (emphasis added)).

48

This Court has similarly held that compensation must be based on the market value of the property as-is, not in some hypothetical state. In *Rasmuson* for example, the Court reversed a compensation award in a rails-to-trails case that had rested on a "counterfactual assumption" that the remnants of the railroad would have been removed had the easement been abandoned, even though there was no evidence that the railroad would have removed them. 807 F.3d at 1345. Instead, the Court held that the property's "before" condition needed to be valued with the physical remnants of the railroad present. *Id.* And in *Florida Rock Industries, Inc. v. United States*, 18 F.3d 1560 (Fed. Cir. 1994), this Court recognized the primacy of fair market value over rigid assumptions based on technical rights. The Court in that case held that the CFC could not ignore evidence of an active market for the plaintiff's land based on the CFC's own view that regulatory restrictions on the land rendered it valueless. *Id.* at 1567 ("[I]t would be inappropriate for a court to substitute its own judgment of value for that of the market.").

In this case, the proper measure of the properties' value in the after condition is what a buyer would have paid for the Kotis properties with their improvements (and leases) in place, but with knowledge of the City's easement and the potential for the City or a future railroad to seek to require their

removal.[12] And the facts suggest that such a buyer would accord the improvements significant value. Although some units were vacant, a summary prepared by Plaintiffs showed that all the encroaching buildings were leased to at least one paying tenant, and Mr. Kotis testified that he continued to receive rents from those tenants after the railbanking. Appx2305-2314; Appx1125, Appx1253-1254, Appx1318-1320, Appx137-1328. According to Plaintiff's summary, total annual rents for properties with encroaching improvements were $3,050,799 in 2019. *See* App2305–2307. Moreover, the City has been "very clear" that it is "not pursuing any existing encroachments."[13] Appx2022, Appx2034. True, the City has also said that it could not guarantee that its position will not change in the future. Appx2023. But real estate investors routinely account for uncertainty, and a reasonable buyer could well find the improvements valuable despite the risk of a future change. "To conclude otherwise would be tantamount to concluding that there could never be a market fueled by speculation—a conclusion at odds ... with common sense." *Fla. Rock*, 18 F.3d at 1567*; see also Almota Farmers*, 409 U.S. at 474-

---

[12] For purposes of this discussion, it is assumed the City would have such authority. *But see* above pp. 38-43.

[13] Nor are the encroachments likely to be affected by future railroad reactivation. No such reactivation is planned, and the property formerly served by the rail line now has a restrictive covenant to deter future rail use. Appx1067-1071.

75 (recognizing that the market assigns values to expectations, not just legal rights); *Fla. Rock Indus., Inc. v. United States*, 791 F.2d. 893, 902 (Fed. Cir. 1986) ("We do not perceive any legal reason why a well-informed 'willing buyer' might not bet that the prohibition of rock mining, to protect the over-lying wetlands, would some day be lifted.").

Indeed, Mr. Kotis's own behavior suggests that a buyer would likely find the improvements valuable. Mr. Kotis either acquired the encroaching improvements or built them himself while NSR still held an active railway easement across the properties. *See* sources cited above, p. 12 n.2. Mr. Kotis is a sophisticated real estate investor, and it stands to reason that he expected the improvements he invested in to have value, despite the possibility that NSR might have tried to eject the improvements from the easement area (as Plaintiffs claim NSR had the right to do while the railroad was operating). Having invested in the encroaching improvements when they were subject to similar risks, it is disingenuous for him now to plead that the improvements are valueless simply because he may lack a legal right to maintain them in perpetuity.

The unreliability of Dr. Kilpatrick's methodology is illustrated by his opinion on the "after" value of 1715 Battleground Avenue (the Take 5 Oil property). Mr. Kotis leases that parcel to his tenant for $59,400 annually and

owns a billboard on the property from which he derives $144,000 in annual income.[14] Appx2305. Yet the CFC adopted Dr. Kilpatrick's opinion that 1715 Battleground Avenue has no value following the railbanking. Appx41. The CFC thus effectively found that a knowledgeable buyer would not pay a single dollar for that property, even though it is currently generating income of $203,400 annually, and the City, as easement holder, has indicated that it has no intention of disturbing the existing improvements. That finding defies all sense. "There is a reality test in takings law," *Toews*, 376 F.3d at 1381, and Dr. Kilpatrick's opinions do not pass it. The CFC's findings on just compensation were "derived from the application of an improper legal standard," and the case "must be remanded for new factual findings." *Rasmuson*¸ 807 F.3d at 1345.

**B.    The CFC erred by rejecting evidence of post-NITU sales of other properties affected by the NITU.**

There is good reason to believe, as a matter of economics and common sense, that Dr. Kilpatrick drastically undervalued the Kotis properties in the "after" condition by assigning no value to the area of the parcel burdened by the easements or to any encroaching improvements. But the question need not be resolved on the basis of theory. Market evidence exists in the form of

---

[14] The lease on 1715 Battleground Avenue is a ground lease. The leaseholder, Take 5 Oil, improved the property with an oil change facility. Appx1138.

sales of properties burdened by the same railroad right-of-way at issue in this case. Dr. Kilpatrick refused to consider that evidence, however, and the CFC approved that refusal. Appx40. The exclusion of market evidence fundamentally undermines the reliability of Dr. Kilpatrick's (and the CFC's) estimation of market value.

The government proffered evidence of post-railbanking sales of other properties burdened by the same railbanked easement. Appx2298-2304; Appx1675-1686. As the government's expert explained, those sales provide a basis on which an appraiser could assess how the Greensboro real estate market viewed the effect of the easements on property value. Appx2304.

The CFC ruled that Dr. Kilpatrick properly excluded those sales "for the reasons articulated in the *Agapion* case." Appx40. In *Agapion*, the CFC agreed that post-railbanking sales of affected properties could be excluded because the court found "no basis to presume the post-NITU market in Greensboro was adequately informed of the City's full authority to control use and order removal of structures within the easement." 167 Fed Cl. at 778. Rather than accept the sales as evidence of the market's view of the effect of the easements on property values, the CFC required "testimony explaining why these post-NITU sales reflect the fair market value of plaintiffs'

property" before it would question Dr. Kilpatrick's decision to exclude them. *Id*. at 779.

The CFC's rulings in both *Agapion* and this case are inconsistent with this Court's decision in *Florida Rock*. In that case, the CFC accepted the testimony of an expert assessor who rejected comparable sales "on the principle that none of the purchasers were sufficiently sophisticated and knowledgeable." 18 F.3d at 1566. This Court reversed and held that the comparable sales should have been considered. The Court expressed doubt that any legal conclusions should be drawn from buyers' lack of knowledge regarding the effect of land use regulation because "long term market trends in real estate values are not necessarily correlated to Government controls." *Id*. Instead, it held that "evidence of an active real estate market compels the conclusion that the typical 'willing buyer-willing seller' requirement of fair market value" is met and that an assessor "may not discard an *entire* market as aberrational." *Id*. at 1567. But that is exactly what the CFC approved in this case—rejection of all post-NITU sales based on speculation that the buyers did not understand the effect of the easements. That error further undermined the reliability of Dr. Kilpatrick's opinions and is another reason why the judgment should be reversed.

## CONCLUSION

For the foregoing reasons, the judgment of the CFC should be reversed and the case remanded for new findings on the width of the easements burdening the subject properties and on the amount of compensation due.

Respectfully submitted,

/s/ *Christopher Anderson*

ADAM R.F. GUSTAFSON
  *Principal Deputy Asst. Attorney General*
ROBERT N. STANDER
  *Deputy Attorney General*
CHRISTOPHER ANDERSON
  *Attorney*
Environment and Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-1971
christopher.anderson3@usdoj.gov

November 24, 2025
90-1-23-16101

55

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,477 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Georgia font.

*/s/ Christopher Anderson*
CHRISTOPHER ANDERSON

Counsel for Appellant