**2025-1884**

# United States Court of Appeals
# for the Federal Circuit

KOTIS ASSOCIATES, LLC, KOTIS HOLDINGS, LLC,
WESTOVER TERRACE II, LLC,

*Plaintiffs-Appellees,*

– v. –

UNITED STATES,

*Defendant-Appellant.*

*On Appeal from the United States Court of Federal Claims
in No. 1:20-cv-00932-LAS*

## BRIEF FOR PLAINTIFFS-APPELLEES

LINDSAY S.C. BRINTON
MEGHAN S. LARGENT
MICHAEL ARMSTRONG
LEWIS RICE, LLC
600 Washington Ave., Suite 2500
St. Louis, Missouri 63101
(314) 444-7723
(314) 612-7723 (fax)
lbrinton@lewisrice.com
mlargent@lewisrice.com
marmstrong@lewisrice.com

*Counsel for Plaintiffs-Appellees*

APRIL 2, 2026



COUNSEL PRESS     (800) 4-APPEAL • (391834)

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-1884

**Short Case Caption** Kotis Associates, LLC v. United States

**Filing Party/Entity** Plaintiffs-Appellees

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/07/2025

Signature: /s/ Lindsay S.C. Brinton

Name: Lindsay S.C. Brinton

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Kotis Associates, LLC | N/A | None |
| Kotis Holdings, LLC | N/A | None |
| Westover Terrace II, LLC | N/A | None |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐       Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑  None/Not Applicable          ☐  Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐  Yes (file separate notice; see below)    ☑  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... vi

STATEMENT OF RELATED CASES ...................................................1

INTRODUCTION ..............................................................................1

STATEMENT OF THE CASE ..............................................................5

    A.    Pursuant to the Trails Act, NSR sold the Corridor to the City for interim trail use and the STB's jurisdiction has been preserved for future rail service. ........................................................5

    B.    The Corridor existed as an active railroad corridor between 1879 until 2019 when NSR abandoned its interest in the line and sold it to the City for trail use. ...........................................6

    C.    Kotis sought compensation for the taking of its land............8

    D.    Additional proceedings before the STB. ..............................13

SUMMARY OF ARGUMENT ............................................................16

STANDARD OF REVIEW ................................................................17

ARGUMENT ................................................................................19

I.    The CFC did not err in its findings as to the width of the Corridor. ............22

    A.    Evidence supported the CFC's finding that the width of the Corridor was synonymous with the 2019 Survey. ............25

    B.    The CFC did not err in rejecting the government's post-trial argument that the dimensions of the Corridor were no greater than the 1927 Valuation Maps. ........................................28

    C.    The government's additional arguments as to the dimensions of the Corridor do not demonstrate clear error. ........................30

        1.    The "direct condemnation theory" articulated by the CFC by way of analogy is irrelevant to the outcome of this matter..............................................................31

2.      The STB was fully aware of the size of the Corridor subject to its NITU....................................................................33

3.      The STB did not grant the City a "new and larger easement unrelated to the easement held be the railroad."........................34

4.      The government's arguments as to judicial estoppel are irrelevant to the CFC's ruling. ...................................................35

5.      The CFC did not err in refusing to reopen the trial record to admit evidence of the STB's clarification of the NITU. ......37

II.     The CFC's holding that the City holds the right to exclude Kotis from the Corridor is correct as a matter of law and fact. .......................................39

A.      The CFC followed established Trails Act jurisprudence. ...................40

B.      Because of the NITU, Kotis lost the fundamental right to exclude..........................................................................................44

III.    An award of just compensation is based upon what the owner lost, not what the government gained...........................................................................48

A.      Fair market value on the date of taking must assume the easement holder can use the full extent of its rights. .........................................49

B.      The CFC did not err in finding evidence relating to post-NITU sales irrelevant and unpersuasive. .......................................................56

1.      The government has waived its argument on the use of post-NITU sales. .................................................................56

2.      The government's post-NITU sales argument, and its discussion of *Florida Rock*, is irrelevant. ................................57

CONCLUSION...............................................................................................60

CERTIFICATE OF COMPLIANCE ...................................................................61

## TABLE OF AUTHORITIES

**Cases**

*Ablan v. United States*,
     162 F.4th 1364 (Fed. Cir. 2025) ..................................................................48

*Agapion v. United States*,
     167 Fed. Cl. 761 (2023) ............................... 12, 13, 28, 29, 30, 53, 54, 57, 58

*Almota Farmers Elevator & Warehouse Co. v. United States*,
     409 U.S. 470 (1973)........................................................................ 21, 51

*Anderson v. Bessemer City*,
     470 U.S. 564 (1985).............................................................. 23, 25, 31, 60

*Anderson v. United States*,
     23 F.4th 1357 (Fed. Cir. 2022) ..................................................................20

*Atlantic Thermoplastics Co. v. Faytex Corp.*,
     5 F.3d 1477 (Fed. Cir. 1993) ......................................................................30

*Barclay v. United States*,
     443 F.3d 1368 (Fed. Cir. 2006) ..................................................................39

*Baros v. Tex. Mexican Ry. Co.*,
     400 F.3d 228 (5th Cir. 2005) ......................................................................39

*Bd. of Cnty. Supervisors of Prince William Cnty. v. United States,*
     276 F.3d 1359 (Fed. Cir. 2002) ..................................................................20

*Birt v. Surface Transp. Bd.*,
     90 F.3d 580 (D.C. Cir. 1996).......................................................................39

*Bitmanagement Software GmBH v. United States*,
     124 F.4th 1368 (Fed. Cir. 2025) .......................................................... 17, 18

*Boston Chamber of Com. v. City of Boston*,
     217 U.S. 189 (1910)....................................................................................21

*Caldwell v. United States,*
     391 F.3d 1226 (Fed. Cir. 2004) .............................................. 5, 6, 33, 39, 44

*Caquelin v. United States*,
959 F.3d 1360 (Fed. Cir. 2020) ........................................................ 40, 41, 43

*Casitas Mun. Water Dist. v. United States,*
708 F.3d 1340 (Fed. Cir. 2013) .............................................................. 17, 20

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021)................................................................................. 43, 48

*Cheshire Hunt, Inc. v. United States*,
158 Fed. Cl. 101 (2022)................................................................... 43, 44, 53

*Childers v. United States*,
116 Fed. Cl. 486 (2013).............................................................................43

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
526 U.S. 687 (1999)....................................................................................21

*Cooper v. Harris*,
581 U.S. 285 (2017).....................................................................................23

*Dana R. Hodges Trust v. United States*,
101 Fed. Cl. 549 (2011)..............................................................................24

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022).....................................................................................24

*Florida Rock Indus. v. United States*,
18 F.3d 1560 (Fed. Cir. 1994) ...................................................................58

*Fresenius USA, Inc. v. Baxter Intern., Inc.*,
582 F.3d 1288 (Fed. Cir. 2009) .................................................................57

*Gadsden Indus. Park, LLC v. United States*,
956 F.3d 1362 (Fed. Cir. 2020) ................................................................51

*Gaylord v. United States*,
678 F.3d 1339 (Fed. Cir. 2012) .................................................................17

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*,
467 U.S. 51 (1984)......................................................................................36

*Howard v. United States*,
106 Fed. Cl. 343 (2012)..............................................................................43

*Jackson v. United States*,
    155 Fed. Cl. 689 (2021)................................................................ 43, 55

*June Med. Servs. L.L.C. v. Russo*,
    591 U.S. 299 (2020)........................................................................24

*Kaiser Aetna v. United States*,
    444 U.S. 164 (1979)........................................................................42

*Ladd v. United States,*
    630 F.3d 1015 (Fed. Cir. 2010) ......................................................41

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)........................................................................42

*Loveridge v. United States*,
    174 Fed. Cl. 379 (2024)............................................................. 53, 54

*McCann Holdings Ltd. v. United States*,
    111 Fed. Cl. 608 (2013)..................................................................43

*Monongahela Navigation Co. v. United States*,
    148 U.S. 312 (1893)........................................................................21

*Monsanto Co. v. Scruggs*,
    459 F.3d 1328 (Fed. Cir. 2006) ......................................................57

*Moore v. United States*,
    54 Fed. Cl. 747 (2002)....................................................................43

*Narramore v. United States*,
    960 F.2d 1048 (Fed. Cir. 1992) ................................................. 33, 34

*Nollan v. California Coastal Comm'n*,
    483 U.S. 825 (1987)........................................................................42

*Norfolk S. Ry. Co. v. Smith*,
    611 S.E.2d 427 (N.C. App. 2005) ..................................................52

*Otay Mesa Prop., L.P. v. United States,*
    670 F.3d 1358 (Fed. Cir. 2012) ................................................. 18, 22

*Otay Mesa Prop., L.P. v. United States*,
    779 F.3d 1315 (Fed. Cir. 2015) ........................................... 29, 56, 58

*Pac. Gas & Elec. Co. v. United States*,
   668 F.3d 1346 (Fed. Cir. 2012) ................................................................49

*Precision Pine & Timber, Inc. v. United States*,
   596 F.3d 817 (Fed. Cir. 2010) ............................................ 30, 31, 37, 49, 58

*Preseault v. United States*,
   494 U.S. 1 (1990) ("*Preseault I*").................................................................42

*Preseault v. United States*,
   100 F.3d 1525 (Fed. Cir. 1996) ("*Preseault II*").................. 34, 35, 41, 43, 58

*Rasmuson v. United States*,
   807 F.3d 1343 (Fed. Cir. 2015) .......................................... 21, 22, 49, 53, 58

*Sauer West LLC v. United States*,
   151 F.4th 1339 (Fed. Cir. 2025) ...............................................................18

*Seaboard Air Line Ry. Co. v. United States*,
   261 U.S. 299 (1923).................................................................................21

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
   948 F.2d 1573 (Fed. Cir. 1991). ................................................................59

*Toews v. United States*,
   376 F.3d 1371 (Fed. Cir. 2004) ...................................................... 34, 42, 43

*Trevarton v. South Dakota*,
   817 F.3d 1081 (8th Cir. 2016) ...................................................................41

*Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States*,
   593 F.3d 1346 (Fed. Cir. 2010) .................................................................36

*United States v. Craft*,
   535 U.S. 274(2002).................................................................................55

*United States v. Dickinson*,
   331 U.S. 745 (1947).................................................................................48

*United States v. U.S. Gypsum Co.*,
   333 U.S. 364 (1948).................................................................................18

*United States v. Virginia Elec. & Power Co.*,
   365 U.S. 624 (1961).................................................................................21

*United States v. Yellow Cab Co.*,
    338 U.S. 338 (1949)............................................................................25

*Walther v. Sec'y of Health & Human Servs.*,
    485 F.3d 1146 (Fed. Cir. 2007) ......................................................21

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969)................................................................. 23, 37

## Constitutional Provisions

U.S. CONST. amend. V .............................................................................3, 19

## Statutes

49 U.S.C. § 10502 ....................................................................................6

49 U.S.C. § 10903 ....................................................................................6

National Trail System Act Amendments of 1983,
    Pub. L. No. 98-11, 97 Stat. 42 (1983)
    (codified as amended at 16 U.S.C. §§ 1241-1251)
    (the "Trails Act") ......................... 2, 5, 6, 16, 18, 21, 32, 39, 40, 41

Act of Feb. 23, 1899, ch. 98, 189 N.C. Sess. Law 196..............................7

Act of Feb. 25, 1879, ch. 67, 1879 N.C. Sess. Laws 75 ............................6

## Other Authorities

*Mo. Pac. R.R.—Abandonment Exemption—in Red River & Bowie Cntys.,
    Tex.*, STB Docket AB-3 (Sub-No. 137X) (served July 29, 2021),
    2021 WL 3235207 ................................................................. 14, 38

*Petition for Rulemaking Prot. of Surveying Benchmarks in R.R.
    Abandonments*, STB Docket No. Ex Parte 511 (served June 2, 1995),
    *available at* 1995 WL 364759 ................................................24

## Rules

Rule 52 of the Federal Rules of Civil Procedure .............................................. 24, 31

Rule 28 of the Federal Circuit Rules ...................................................................5

Rule 47.5 of the Federal Circuit Rules ...................................................................1

Rule 32 of the Rules of the United States Court of Federal Claims ........................12

Rule 52 of the Rules of the United States Court of Federal Claims ............. 4, 18, 23

Appendix A, ¶ 14 of the Rules of the United States Court
    of Federal Claims ................................................................... 9, 11, 28

## Regulations

49 C.F.R. § 1105.8 ...............................................................................................7

49 C.F.R. § 1152.29 .........................................................................................6, 32

## STATEMENT OF RELATED CASES

There have been no prior appeals from the underlying action before the United States Court of Federal Claims.  Additionally, undersigned counsel is unaware of any pending related cases within the meaning of Federal Circuit Rule 47.5.

## INTRODUCTION

William Marshall Kotis, III ("Mr. Kotis") has devoted his career to developing "Midtown," one of the busiest commercial corridors in Greensboro, North Carolina. Created through an assemblage of properties, Mr. Kotis's extensive development includes shopping, dining, and entertainment districts, complimented by an impressive collective of street art.  *See, generally,* Appx1042-54.

Initially, Mr. Kotis was excited about the potential for a greenway adjacent to his Midtown development.  Appx1071-72.  He believed the new greenway would be developed by the City of Greensboro ("City") in a manner similar to the one just north of Midtown.  Previously, Norfolk Southern Railway Company ("NSR") abandoned its right-of-way, and the City acquired a 25-foot greenway from the landowners.  That greenway accommodated adjacent development and often deviated from the former rail line easement.  Appx1054-72.

This time, NSR and the City had other plans.  In 2019, the City entered into a purchase agreement with NSR to acquire a 3.1-mile segment of the former railroad corridor (the "Corridor"), adjacent to and overlying more than ten acres of Mr.

1

Kotis's property (and impacting another twenty acres of adjacent property, including several large development plans).  Appx2088-98; *see also* Appx1047.

The Surface Transportation Board ("STB") issued a Notice of Interim Trail Use or Abandonment ("NITU"), authorizing this sale and invoking the federal Trails Act.  Appx0605-07.  This NITU preempted Mr. Kotis's reversionary property rights under North Carolina law, and instead, imposed two new easements over his property: one for an "interim" public trail, and a new easement allowing the STB to retain jurisdiction for future railroad use (i.e., "railbanking").  The NITU authorized the construction of a public trail across the <u>entire</u> Corridor, the exact dimensions of which were specified by a survey attached to the deed wherein NSR transferred its property interests to the City.  Appx2099-2140.

Thereafter, the City initiated policies governing current and future development within the Corridor.  The City has consistently asserted that it has exclusive control over the Corridor; and anything located within the Corridor is its "responsibility."  Appx4193-94.  It has refused to provide any assurance to adjacent landowners that existing structures (buildings, parking lots, etc.) can remain as located, in perpetuity.  Appx2027-31; Appx2035-36; Appx4059-61; Appx4193-96; Appx4221-22.

Similarly, the City has stated that no new development would be allowed within the Corridor.  Appx2027-31; Appx2035-36; Appx4059-61; Appx4193-96;

Appx4221-22. That restriction decimated Mr. Kotis's development plans across Midtown, including a contract to construct a national chain grocery store. Appx1153-64; Appx1193-99; *see also* Appx4225.

But for the STB's issuance of this NITU, Mr. Kotis would have complete control over his property within the Corridor. Instead, the NITU effected the taking of more than ten acres of Mr. Kotis's valuable Midtown property and destroyed the development potential for his adjacent properties.

Mr. Kotis, through his entities, Kotis Associates, LLC, Kotis Holdings, LLC, and Westover Terrace II, LLC ("Kotis"),[1] brought suit in the United States Court of Federal Claims ("CFC") for the government's violation of his rights under the Fifth Amendment of the United States Constitution through its uncompensated taking of his property via the STB's issuance of its NITU.

After the government agreed to its liability for this taking, the parties proceeded through discovery and ultimately to a five-day valuation trial. The CFC weighed the considerable evidence before it and issued a lengthy post-trial Opinion on April 22, 2025, (the "Opinion"), finding in favor of Kotis and ordering the government to pay $42.6 million, plus interest. Appx0001-41.

---

[1] Mr. Kotis is the majority owner of the three Appellees. Appx1043.

On appeal, the government asserts that the CFC's Opinion was "extraordinary" and resulted in a "windfall" for Kotis. While the government contends the decision "contained numerous errors," and "[j]ettison[ed] decades of precedent," Appellant's Br. at 1-2, it fails to articulate a <u>single case</u> the CFC failed to follow or disregarded. Nor does it cite any countervailing evidence that undermines the CFC's decision. Moreover, despite challenging factual findings, the government makes <u>no mention</u> of the considerable deference owed to the CFC as factfinder. *See, e.g.,* Rule 52(a) of the Rules of the United States Court of Federal Claims ("RCFC").

As supported by trial evidence and prevailing case law, the CFC correctly valued the loss of Kotis's property rights; rights now possessed by the City and the STB in perpetuity over more than ten acres of Kotis's land. The CFC correctly held this taking resulted in a loss of $42.6 million. The magnitude of compensation does not render the judgment a "windfall"; it reflects the fair market value of the valuable property rights taken from Kotis. The CFC correctly applied the law, it weighed the evidence before it in a manner that was reasonable and sound, and its conclusion should be affirmed.

## STATEMENT OF THE CASE

Pursuant to Federal Circuit Rule 28(b), Kotis limits this section to specific areas of disagreement with the Appellant's Brief.

**A.     Pursuant to the Trails Act, NSR sold the Corridor to the City for interim trail use and the STB's jurisdiction has been preserved for future rail service.**

In 1983, Congress enacted the National Trail System Act Amendments of 1983, Pub. L. No. 98-11, 97 Stat. 42 (1983) (codified as amended at 16 U.S.C. §§ 1241-1251) (the "Trails Act").  The Trails Act created a means by which railroads may, with STB permission, transfer their interests in "established railroad rights-of-way" to trail sponsors, who "establish appropriate trails" while "preserv[ing] established railroad rights-of-ways for future reactivation of rail services."  16 U.S.C. § 1247(d).  Relevant to this case:

> [I]f such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.

*Id.*  This process, known as "railbanking," *see, e.g., Caldwell v. United States,* 391 F.3d 1226, 1229 (Fed. Cir. 2004), does not create "a new option for railroads seeking to discontinue service on a rail line," as suggested by the government, Appellant's Br. at 6, but "provides an alternative to abandoning a railroad right-of-way." *Caldwell,* 391 F.3d at 1229.

5

A railroad that wishes to railbank must file: (1) an application to abandon the rail corridor, 49 U.S.C. § 10903; or (2) a Notice of Exemption ("NOE"), 49 U.S.C. § 10502. *Caldwell*, 391 F.3d at 1228. Thereafter, a trail sponsor may request interim trail use. Where a trail sponsor is willing to assume responsibility for the corridor, acknowledges that rail service could resume in the future, 49 C.F.R. § 1152.29(a), and the railroad agrees to negotiate with the trail sponsor, the STB "will issue a [NITU] to the railroad and to the interim trail sponsor for the portion of the right-of-way as to which both parties are willing to negotiate." 49 C.F.R. § 1152.29(d)(1). Because of this NITU, the STB maintains jurisdiction over the former railroad corridor for possible future railroad reactivation. 16 U.S.C. § 1247(d).

**B. The Corridor existed as an active railroad corridor between 1879 until 2019 when NSR abandoned its interest in the line and sold it to the City for trail use.**

The Corridor was developed by the Cape Fear & Yadkin Valley Railway (the "CF&YV"). Appx0523. CF&YV was chartered in 1879 as a combination of the Mount Airy Railroad Company and Western Railroad Company ("Western"). Act of Feb. 25, 1879, ch. 67, 1879 N.C. Sess. Laws 75. Appx4001-05. Pursuant to its charter, CF&YV was given the same corporate powers as Western, Appx4001, chartered in 1852, Appx4006-15, including authorization to acquire a 200-foot wide right of way (100-feet on either side of the railroad centerline). Appx4013. CF&YV was acquired by the Atlantic & Yadkin Railway Company ("A&Y"). Act of Feb.

6

23, 1899, ch. 98, 1899 N.C. Sess. Law 196. Appx4017-18. The line then became part of the Southern Railway, and later NSR—the last railroad to operate over the Corridor. Appx0523.

On April 12, 2019, NSR and the City entered into an Agreement of Purchase and Sale ("Agreement"), by which the City agreed to pay $8.5 Million to purchase NSR's rights to the Corridor. Appx2088-98. The Agreement called for a survey of the land. Appx2089. As "conditions of performance for the Agreement," NSR and the City acknowledged the need for STB approval to permit NSR to abandon the Corridor and to authorize a transfer of NSR's rights to the City via the NITU. Appx2094.

NSR filed its petition to abandon the Corridor on August 26, 2019. Appx0501-83. Per 49 C.F.R. § 1105.8(d), NSR provided a "written description of the right-of-way (including approximate widths …)":

> The right-of-way width ranges from 50 feet to 200 feet along the main track centerline.

Appx0532.

With the Agreement already in hand, the City and NSR proceeded quickly:

- The City filed its Request for Interim Trail Use on September 13, 2019, Appx0588-91, noting that the right-of-way at issue was the "same as

that described in the Verified [NOE] filed with the [STB] on August 26, 2019," Appx0589; and

- NSR stated that it did "not object to the issuance of a NITU." Appx0595.

In its Environmental Assessment, the STB once more stated that the "right-of-way width ranges from 50 to 200 feet along the main track centerline." Appx0596. On October 11, 2019, the STB issued the NITU. Appx0605-07.

Per the Agreement, Appx2091, NSR executed a Non-Warranty Deed transferring its interests to the City, Appx2099-2102, which incorporated the required survey ("2019 Survey"), including a detailed legal description of the Corridor, Appx2103-11, and corresponding maps. Appx2112-40. This deed was recorded in Guilford County, North Carolina. Appx2019. The 2019 Survey is consistent with the repeated description in the STB of a Corridor ranging from "50 to 200 feet along the main track centerline." *See, e.g.,* Appx2103-11 (describing the Corridor boundaries variably between 25.00 and 100.00 feet from the centerline).

### C.     Kotis sought compensation for the taking of its land.

The Corridor includes more than ten acres across thirteen of Kotis's properties. Appx0009-14. On July 30, 2020, Kotis filed a Complaint, seeking just compensation for the government's taking. Appx0066-78. Less than five months

8

later, the government stipulated to all elements of liability, Appx5001-02 and the parties proceeded to valuation.  Appx5003.

In August 2022, the Parties filed their Memoranda of Contentions of Fact and Law ("Pre-Trial Memos").  *See* Appx5004-72 (Kotis's Pre-Trial Memo) and Appx5073-94 (government's Pre-Trial Memo).  The Kotis Pre-Trial Memo placed its entire case before the Court as required under the rules, *see* RCFC App'x A, ¶ 14(a), including:

- evidence the easement was up to 200 feet in width, Appx5011, n.1; Appx5052-54;

- the City's restrictions as to utilization of any portion of the Corridor, Appx5016-17, Appx5054, Appx5059-61;

- the factual and legal bases for the City's (and the STB's) exclusive control over the Corridor (including portions which overlay the Kotis properties), Appx5043-44, Appx5046, Appx5054-68; and

- a fulsome discussion of its expert's opinions.  Appx5017-39, Appx5052, Appx5054-57; Appx5068-71.

Kotis also included exhaustive details as to the portion of each property encumbered by the former railroad easement, based upon the 2019 Survey, including aerial GIS imagery ("Snapshots") showing the location of the Corridor over Kotis's properties:

**TABLE 1**

| Property Address | Parcel | Area of Overlap | Citation Paragraphs[2] | Width | Snapshot |
|---|---|---|---|---|---|
| 1715 Battleground Ave. ("Take 5 Oil/Billboard") | 12251 | 28,685 sq.ft. | 77-79 | 100 ft. | Appx2148 |
| 2414 Battleground Ave. ("Texas Roadhouse") | 35205 | 51,849 sq.ft. | 34-36 | 100 ft. | Appx2141 |
| 1430 Westover Terrace ("Core Life") | 12246 | 13,800 sq.ft. | 45-47 | 100 ft. | Appx2142 |
| 601-623 Spring Street[3] ("Billboard Leasehold") | 1443 | 42,755 sq.ft. | 161-163 | 100 ft. | Appx2153 |
| 1424 Westover Terrace ("Brixx Pizza") | 12249 | 16,100 sq.ft. | 55-57 | 100 ft. | Appx2143 |
| 1310 Westover Terrace ("Publix") | 12262 | 63,300 sq.ft. | 97-99 | 100 ft. | Appx2146 |
| 1410 Westover Terrace ("Orange Theory") | 12264 | 28,000 sq.ft. | 86-88 | 100 ft. | Appx2145 |
| 1420 Westover Terrace ("Chipotle") | 12250 | 13,700 sq.ft. | 66-68 | 100 ft. | Appx2144 |
| 1500 Mill Street ("Saffron") | 12261 | 29,989 sq.ft. | 108-110 | 100 ft. | Appx2147 |
| 1305 Battleground Ave. ("Red Cinema") | 6645 | 98,259 sq.ft. | 118-121 | 100 ft. | Appx2149 |

---

[2] Appx5017-39.

[3] Although the NITU applies to this property, Appx0512, Appx0605-07, it was not included in the Agreement between NSR and the City. Appx2088-2140.

| Property Address | Parcel | Area of Overlap | Citation Paragraphs[2] | Width | Snapshot |
|---|---|---|---|---|---|
| 1209 Battleground Ave. ("Burger Warfare") | 6679 | 12,250 sq.ft. | 139-142 | 50 ft.[4] | Appx2151 |
| 1201 Battleground Ave. ("Midtown Financial") | 6647 | 14,750 sq.ft. | 151-153 | 50 ft. | Appx2152 |
| 1211 Battleground Ave. ("Marshal Free House") | 6646 | 13,089 sq.ft. | 130-132 | 50-100 ft. | Appx2150 |

By contrast, the government's Pre-Trial Memo did not discuss any dispute as to the easement width, despite its requirement to do so under the RCFC App'x A, ¶ 14, and limited its argument to issues of exclusivity of the easement (and the effects of exclusivity on value). Appx5073-94. A separately filed Motion for Summary Judgment was equally narrow in scope. Appx5095-5123.[5]

On September 27, 2022, the Parties filed Joint Stipulations, Appx5124-29, stipulating to the admission of:

- the historical railroad documents discussed above, Appx4001-18;

- the Non-Warranty Deed, Appx2099-2140; and

---

[4] This is the correct area of overlap and right-of-way width. *See* note 6, *infra.*

[5] Filed one month before trial was to start and without leave to do so, the Court held any ruling as to summary judgment in abeyance; the matters were ultimately addressed at trial, reset for December 2022. Appx0017.

- the A&Y Valuation Maps V27-17 to V27S18b-2 (the "1927 Valuation

  Maps").  Appx3001.

The Parties also stipulated to the amount of overlap between the various Kotis

properties and the land subject to the Non-Warranty Deed as shown in the above

chart, Appx5125-28, ¶¶ 7-33,[6] and to the admission into evidence of the

aforementioned "Snapshots."  Appx5129, ¶¶ 34f, 35.

On December 13, 2022, the Parties jointly sought the admission of certain

depositions and prior testimony, pursuant to RCFC 32.  Appx5130-34.  This

included the following joint exhibits:

- Deposition testimony of Charles Watts, City Attorney for the City, May

  16, 2022, Appx4019-4152;

- Deposition testimony of Christian Wilson, former Interim Manager for

  the City ("Mr. Wilson"), taken in *Agapion v. United States*, No. 19-cv-

  1956-LAS  ("*Agapion*"),[7] Sept. 9, 2021, Appx4153-4218;

---

[6] With one exception:  between the time of the Kotis Pre-Trial Brief and the filing of the stipulations, it was determined that the width of the right-of-way for the 1209 Battleground Ave. was fifty feet, with an overlap of 12,250 sq.ft.  This is accurately reflected in the parties' stipulations, Appx5128, ¶ 29, and the CFC's ruling.  Appx0013.

[7] *Agapion* is a companion case to the instant matter, involving the same NITU, Corridor, NSR, the City, and the same trial judge, the Honorable Loren A. Smith, but separate Plaintiffs.  The first trial in *Agapion* occurred in March 2022, and the CFC issued its ruling as to just compensation on Sept. 5, 2023.  The government appealed the ruling but thereafter dismissed the appeal.  *See Agapion v. United*

- Trial testimony of Mr. Wilson in *Agapion*, Tr. Vol. 2, Mar. 17, 2022, Appx2001-37;

- Declaration of Mr. Wilson, Dec. 9, 2022, Appx4219-24; and

- A site plan for a Publix grocery store. Appx4225-42.

On the first day of trial, the Court admitted into evidence these joint exhibits, along with those discussed above. Appx1008-10. Trial was conducted across five days, beginning December 14, 2022 and concluding February 22, 2023. Mr. Kotis testified, as did Dr. John Kilpatrick, an expert on property valuation, who offered expert testimony as to the value of the property both before and after the government's taking. Appx0018.

For its case-in-chief, the government offered the opinions of Stephen Roach. Mr. Roach offered no independent valuation opinions and only limited rebuttal of Dr. Kilpatrick's methodology. Appx0018. The parties filed Post-Trial Briefs on February 28, 2023. *See* Appx5135-59 (Kotis's) and Appx5160-79 (government's). Closing arguments were held on March 1, 2023.

### D. Additional proceedings before the STB.

On December 7, 2022, three years after the 2019 Survey was recorded, and days before the trial began, the City petitioned the STB for a "Clarification of Notice

---

*States*, 167 Fed. Cl. 761 (2023), *appeal dismissed sub nom*, *Burger v. United States*, Nos. 24-1249, 24-1250, 2024 WL 1092511 (Fed. Cir. Mar. 13, 2024).

of Interim Trail Use" seeking to narrow a 264-foot portion of the Corridor over 1310 Westover Terrace, the "Publix" property, Appx0618-88, requesting the width "be narrowed from a width of 100 feet from [the] centerline to at most 50 feet … in connection with a land sale to Kotis." Appx0619.[8] The Petition included the 2019 Survey. Appx0630-71.

On June 28, 2023, the STB stated, over NSR's objection, that it was not necessary to vacate the prior issued NITU, but would instead:

> issue a decision clarifying the width of the right-of-way and explaining that the portion of the right-of-way that the trail sponsor has demonstrated is not needed to reactivate rail service is no longer part of the NITU.

Appx0691 (citing *Mo. Pac. R.R.—Abandonment Exemption—in Red River & Bowie Cntys., Tex.*, STB Docket AB-3 (Sub-No. 137X) (served July 29, 2021), 2021 WL 3235207. Ultimately, NSR agreed that the right-of-way along the 264-foot section of the Corridor could be narrowed to sixty-five feet, as this reduction would not interfere with future rail service. Appx0695-97.[9]

---

[8] At trial, Mr. Kotis made clear that the City "did not ask [his] opinion before they [filed the Clarification] and they certainly didn't tell [him] that they were looking to sell [him his] own property rights for an easement[,]" adding that "unless this narrowing goes all the way down to zero feet, it doesn't solve the problem completely." Appx1863-64; Appx1874.

[9] The narrowing to sixty-five feet was as to the entire width of this 264-foot section—thirty-nine-nine feet north of the centerline and twenty-six feet to the south. Appx0701. This is distinct from the government's position that the Corridor was no

On January 4, 2024, the STB issued its Decision, clarifying the right-of-way subject to the NITU was narrowed to sixty-five feet in total width over the 264-foot portion of the Corridor. Appx0700-02. There is no evidence that the Agreement between the City and NSR has changed, nor is there any evidence of any modification to the 2019 Non-Warranty Deed from NSR to the City, or that Kotis has regained any property rights over this segment of the Corridor.

On January 9, 2024, nearly <u>one year after</u> trial concluded, the government sought to reopen the record, *see* Appx5180-87, seeking to admit the STB's June 28, 2023 Decision, Appx0689-94, and the STB's January 4, 2024 Decision, clarifying the width of a 264-foot portion of the 3.1-mile long Corridor. Appx0700-02. The government argued that the decision to narrow the easement "materially affect[ed] just compensation[,]" not just for the one affected parcel, but somehow, for "*all* parcels[,]" Appx5184 (emphasis original), despite no evidence to support any assertions of value, let alone a lower value. Kotis opposed reopening the trial record. *See* Appx0018, Appx5188-98.

On April 22, 2025, the Court issued its Opinion, Appx0001-41, awarding Kotis $42,641,740 plus interest for the government's taking. Appx0041. The CFC

---

more than sixty-five feet <u>on each side</u> of the centerline <u>at all points</u>. Appellant's Br. at 32.

15

denied the government's motion to reopen the trial record and provided considered bases for that decision.  Appx0028-29.  The government's appeal followed.

## SUMMARY OF ARGUMENT

The government makes three arguments as to why this matter should be reversed and remanded, all of which obfuscate the proper standard of review in an attempt to re-try this case.

The government first raises an issue of fact—which it identified for the first time *after* trial.  The government claims the CFC erred in concluding the size of the easement was synonymous with the 2019 Survey attached to the 2019 Non-Warranty Deed transferring NSR's easement to the City.  In doing so, the government ignores the considerable deference the CFC is afforded in weighing that evidence at trial.  The overwhelming evidence supports the CFC's decision.

Second, the government argues that the City does not possess the right to exclude Kotis from the Corridor.  It argues that the Trails Act "does not confer on the City authority to remove improvements that existed at the time of railbanking," Appellant's Br. at 18-19, and that it was error for the CFC to rule that the City could control Kotis's use of the Corridor.  *Id.* at 38-43.  The government, citing no legal support for its position, is incorrect.  The CFC applied relevant precedent.

Third, the government argues that the CFC erred in its determination of the amount of just compensation by accepting some, but not all, of the opinions of

16

Kotis's expert, Dr. Kilpatrick. The government argues that because Dr. Kilpatrick's opinions as to the value of the properties in the "after" condition assumed the City and STB possessed the right to exclude over the Corridor, reliance on these opinions was an error of law. This is directly tied to the government's prior argument as to exclusivity and likewise conflicts with precedent.

The government further alleges that the CFC erred by accepting Dr. Kilpatrick's opinions, because he did not discuss sales that occurred <u>several years after</u> the NITU—sales the government's expert testified were not necessarily comparable to Kotis's properties. Appellant's Br. at 19; *see id.* at 18-19; 44-54; Appx1754-59, Appx1765-69. The government fails to show how consideration of these sales was necessary to determining just compensation. The CFC's reliance on Dr. Kilpatrick's opinions as to the "after" value was proper.

All of the government's arguments on appeal fail to demonstrate reversable error; and accordingly, this Court should affirm the CFC's ruling in its entirety.

## STANDARD OF REVIEW

This Court reviews legal conclusions *de novo* and factual findings for clear error. *Bitmanagement Software GmBH v. United States*, 124 F.4th 1368, 1373 (Fed. Cir. 2025). *See also Casitas Mun. Water Dist. v. United States,* 708 F.3d 1340, 1351 (Fed. Cir. 2013); *Otay Mesa Prop., L.P. v. United States,* 670 F.3d 1358, 1363

17

(Fed. Cir. 2012).[10] *See also* RCFC 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.")  Clear error is illustrated when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Bitmanagement*, 124 F.4th at 1373 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

The *Bitmanagement* Court also discussed the standard of review for damages awarded by the CFC:

> We review damages awarded by the Court of Federal Claims for an abuse of discretion.  A court abuses its discretion when:
>
> (1)  the court's decision is clearly unreasonable, arbitrary or fanciful;
> (2)  the decision is based upon an erroneous construction of the law;
> (3)  the trial court's factual findings are clearly erroneous; or
> (4)  the record contains no evidence upon which the court could have rationally based its decision.

*Id.* (quoting *Hi-Shear Tech. Corp. v. United States*, 356 F.3d 1372, 1377-78 (Fed. Cir. 2004) (citation modified)).

---

[10] The government's reliance on *Sauer West, LLC v. United States*, 151 F.4th 1339 (Fed. Cir. 2025) is misplaced.  Appellant's Br. at 19.  While *Sauer West* does concern the Trails Act, it addressed the CFC's grant of summary judgment for the government, finding no liability for a temporary taking, *id.* at 1341, not valuation for a permanent taking.  It is for this reason that Kotis separately offers its standard of review.

**ARGUMENT**

After a five-day trial, and hundreds of exhibits entered into a record, the CFC conducted a detailed review of the evidence and determined the amount of compensation owed to Kotis for the government's uncompensated taking of Kotis' property, in violation of the Fifth Amendment, to be $42.6 million, plus interest. Appx0041. On appeal, the government describes the CFC's actions as "hand[ing] a windfall to [Kotis] at the public's expense," Appellant's Br. at 2, and asks this Court to retry this case, because the amount of compensation is too much. Appellant's Br., *passim*. Stated another way: the government has taken all beneficial and productive use of more than ten acres of Kotis' valuable commercial property, and now complains that the taking of that property is too expensive.

As has already been noted, the government is wrong for a variety of reasons. The government has ignored the deference the CFC has to weigh the factual evidence before it and to reach a reasonable conclusion based upon that evidence. The CFC did precisely that as to its determination of the width of the Corridor (and the portion of Kotis' land affected by the government's taking), aided by the parties' stipulations. The government has failed to show any legal basis for its view that the CFC erred in finding the City (and the STB) to have exclusive control over the Corridor. In doing so, the government has ignored decades worth of precedent to support the CFC's holding that Kotis has lost the right to exclude others from the

19

portions of his property subject to the City's trail use easement (and the STB's easement for future railroad use). For these reasons, and for the reasons provided through expert testimony (which the CFC carefully considered and weighed), the loss of value to the Kotis properties must take the loss of Kotis's right to exclusive use of the Corridor into consideration; the CFC did so. Finally, and to the extent that the government has not waived its argument, the CFC weighed the evidence as to the use of post-NITU sales and, within its deference, concluded that Kotis' expert, Dr. Kilpatrick, had properly calculated the "after" value of each property. The CFC considered the limited opinions offered by the government's expert and did not find them persuasive. This Court should reach the same conclusions.

The central question is: What amount of just compensation must the government pay Kotis for taking his property? Calculating just compensation is a two-step process. First, a court must determine the scope of a compensable property interest—a question of law. *Anderson v. United States*, 23 F.4th 1357, 1361 (Fed. Cir. 2022) (citing *Casitas*, 708 F.3d at 1351). Second, the property taken must be valued—a question of fact. *See Bd. of Cnty. Supervisors of Prince William Cnty. v. United States,* 276 F.3d 1359, 1364 (Fed. Cir. 2002). Value must be determined by the application of the proper legal standard to the facts, or the matter "must be remanded for new factual findings for application of the correct legal standard."

20

*Rasmuson v. United States*, 807 F.3d 1343, 1345 (Fed. Cir. 2015) (citing *Walther v. Sec'y of Health & Human Servs.*, 485 F.3d 1146, 1152 (Fed. Cir. 2007)).

The compensation owed a landowner for a Trails Act taking is measured by "what has the owner lost, not what has the taker gained." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 710 (1999) (quoting *Boston Chamber of Com. v. City of Boston*, 217 U.S. 189, 195 (1910)). *See also United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 635 (1961); *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 304 (1923). The Supreme Court has held:

> Just compensation means the full monetary equivalent of the property taken. The owner is to be put in the same position monetarily as he would have occupied if his property had not been taken.

*Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473-74 (1973) (citation modified); *see also Monongahela Navigation Co. v. United States,* 148 U.S. 312, 326 (1893).

In 2015, this Court summarized the primary methodology for calculating the amount of just compensation owed in Trails Act cases, which does not differ from any other scenario in which the government takes an easement interest over and owner's land:

> A landowner subject to a taking is entitled to be put in as good a position pecuniarily as if his property had not been taken. The landowner must be made whole but is not entitled to more. Landowners are therefore generally entitled to the fair market value of their land, which is defined as what a willing buyer would pay in cash to a willing seller at the time of the taking. And in the easement context, the conventional method of

21

valuation is the before-and-after method, i.e., the difference between the value of the property before and after the Government's easement was imposed.

*Rasmuson*, 807 F.3d at 1345 (citation modified).  The CFC applied the same standard, Appx0020, and the government does not contest this point.  Appellant's Br. at 44-45.

The CFC detailed its analysis as discussed above:  scope, *see* Appx0021-37, then valuation.  Appx0037-41.  Scope is bifurcated further into a discussion of the "after" condition of the property as to the width of the easements, Appx00021-29, and as to exclusivity of the easements, Appx00029-31.

## I.    The CFC did not err in its findings as to the width of the Corridor.

The government notes the "parties dispute the width of the right-of-way," with Kotis arguing that the width of the easement is synonymous with the 2019 Survey, and the government arguing that the easement is "no more than sixty-five feet across the properties." Appellant's Br. at 20.[11]

The parties agree the width of the right-of-way is a question of fact. Appellant's Br. at 31.  Factual findings are reviewed for clear error.  *See, e.g., Otay Mesa,* 670 F.3d at 1363.  When a matter is tried as a bench trial:

---

[11] As shown in the chart above, this argument applies to only ten of the thirteen properties.  The properties at 1201, 1209, and 1211 Battleground Avenue would have larger areas encompassed by the Corridor if using the government's claimed width. *See* Table 1, *supra.*

the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.

RCFC 52(a)(1). The CFC did precisely that by providing a detailed factual background for its Opinion, Appx0006-16, Appx0018-20, before properly concluding that the Corridor "is up to 100 feet wide either side of the centerline, as depicted in the [2019] Survey[]." Appx0021. The CFC reached this conclusion, based on the evidence in the record, including the 1927 Valuation Maps. Appx0021-22 (noting the government's reliance on the 1927 Valuation Maps).

> Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.

RCFC 52(a)(6). As the Supreme Court stated regarding the identically worded rule in the Federal Rules of Civil Procedure to acts of a district court:

> In "applying [this] standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*." *Anderson v. Bessemer City*, 470 U.S. 564, 573[] (1985) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123[] (1969)). Where "the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson,* 470 U.S. at 573–74[]. "A finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern." *Cooper* v. *Harris*, 581 U.S. [285, 293] (2017).

23

*June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299, 322 (2020) (citing FED. R. CIV. P. 52(a)(6)), *abrogated on other grounds, Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).

The government has not pointed to any "clear error" by the CFC. The CFC considered:

- the relevant railroad charters;

- the Agreement between NSR and the City;

- the 2019 Survey;

- the proceedings before the STB;

- testimony from City officials;

- testimony from Mr. Kotis; and

- the Valuation Maps,[12]

---

[12] The government strictly adheres to the veracity of the 1927 Valuation Maps, drafted almost a century before the NITU, while simultaneously avoiding any reliance on the 2019 Survey, which were drafted contemporaneous with and in expectation of the NITU. Valuation maps are useful tools to identify relevant rail corridors and as a starting point for establishing property subject to a NITU. However, they are of variable accuracy, *see Petition for Rulemaking Prot. of Surveying Benchmarks in R.R. Abandonments*, STB Docket No. Ex Parte 511 (served June 2, 1995), *available at* 1995 WL 364759, at *2, *2 n.6, and while at times they are the best evidence available. *see, e.g., Dana R. Hodges Trust v. United States*, 101 Fed. Cl. 549, 559-60 (2011), they are so only "[i]n the absence of any indication or evidence to the contrary[.]" *Id*. at 560. Here, there was substantial evidence "to the contrary."

24

and concluded that the width of the easement was as shown in the 2019 Survey, which was "up to 100 feet wide either side of the centerline[.]" Appx0021.

This Court, in light of the appropriate standard of review, should not reverse, even if it might "have weighed the evidence differently." *Anderson,* 470 U.S. at 574. Stated another way, as the *Anderson* Court did: "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id*. (citing *United States v. Yellow Cab Co*., 338 U.S. 338, 342 (1949)). This remains true even when the trial court's findings are "based instead on physical or documentary evidence or inferences from other facts." *Id.*

The CFC's holding as to the dimensions of the easement, as determined by the CFC, should be affirmed, as it is not clearly erroneous.

## A.    Evidence supported the CFC's finding that the width of the Corridor was synonymous with the 2019 Survey.

Kotis was the only party at trial to put forth evidence regarding the dimensions of the Corridor. In contrast, the government, after trial, simply argued either that the Corridor was smaller than the NSR Corridor or that the NSR Corridor is different than what NSR thought it to be, Appx5167-68. The government never put forth evidence of the dimensions of the Corridor over Kotis's parcels.

After weighing the evidence, the CFC concluded that the width of the Corridor was synonymous with the 2019 Survey, as this was the width:

25

- acknowledged by the City, which clarified at multiple points that it "has responsibility for" the entirety of the Corridor as shown by the 2019 Survey, up to 100 feet on each side of the track, and would not allow any encroachments within any portion of the right-of-way (up to one-hundred feet), Appx2027-31, Appx2035-36, Appx4059-61, Appx4193-96, Appx4221-22;

- stated through Mr. Kotis's testimony, Appx1087-90;

- depicted in the Non-Warranty Deed, including the 2019 Survey, Appx2099-2140; and

- shown in STB filings:

  o seeking the NITU, Appx0532, Appx0589, Appx0596; and

  o "clarifying" the NITU, Appx0623, Appx0630-71, Appx0690.

Appx0008-9, Appx0016, Appx0019, Appx0021-29.

In addition to the foregoing, Mr. Kotis testified that NSR enforced its control of the Corridor on his property, notably when it threatened to remove all encroachments within this portion of the Corridor unless Mr. Kotis paid a lease. Appx4272-75; *see* Appx1217-21.

The parties stipulated to the dimensions of the Corridor as depicted in the 2019 Survey, Appx5125-28, and as visually depicted in the Snapshots, Appx2141-52, including the example below for 1715 Battleground Avenue:

26



Appx2148.    *See* Appx5125, ¶¶ 7-8 (stipulations of overlap between 1715

Battleground and Corridor as shown in 2019 Survey).

**B.    The CFC did not err in rejecting the government's post-trial argument that the dimensions of the Corridor were no greater than the 1927 Valuation Maps.**

For the first time, in its Post-Trial Brief, the government claimed the width of the Corridor was confined to the dimensions depicted in the 1927 Valuation Maps. *See* Appellant's Br. at 32 (citing Appx3001).

As the CFC noted in its Opinion:

> The government argues that the true width of the former railroad ROW was either "65 feet or less" at every subject property, as depicted in the 1927 valuation map, or "50 feet" or less at every subject property, based on [NSR]'s alleged "historical use" of plaintiffs' property.

Appx0022.  Prior to trial, the government did not put forward <u>any evidence</u> or make <u>any argument</u> disputing the width of the Corridor shown in the 2019 Survey, despite ample opportunities (and an obligation, RCFC App'x A, ¶ 14) to do so.  Nor did it do so at trial, beyond eliciting testimony from Mr. Kotis that he had at one point believed the right-of-way for a single property was sixty-five feet, but later changed that view.  Appx1313-14.  The government otherwise made no attempt before or during trial to offer any alternative to the facts submitted by Kotis.

In discussing the Opinion, the government derides the CFC for adding "almost as an afterthought" a footnote ruling in Kotis's favor as to the dimensions of the Corridor "for the reasons explained in *Agapion*[.]"  Appellant's Br. at 20-21; *see* Appx0027 n.16.  The government returns to this point some twelve pages later,

28

asserting that the conclusions in *Agapion* are not supported by the record in the instant case.  Appellant's Br. at 33.

As noted herein, *see* note 7, *supra*, *Agapion* is a companion case, involving the same taking.  In *Agapion* as here, the government did not dispute the width of the Corridor until its Post-Trial Brief and offered no testimony regarding the width of the Corridor.  Appellant's Br. at 33-34 (citing *Agapion,* 167 Fed. Cl. at 773-774).  There, as here, plaintiffs offered into evidence the Non-Warranty Deed (and attached 2019 Survey), as well as the 1927 Valuation Maps, and testimony by the City illustrating its assertions that it controls the entirety of the Corridor as shown in the 2019 Survey.  *See Agapion,* 167 Fed. Cl. at 774.  There, as here, the CFC noted its requirement to "consider the 'entire evidence' presented by the parties when making factual determinations," *Id.* (quoting *Otay Mesa Prop., L.P. v. United States*, 779 F.3d 1315, 1321 (Fed. Cir. 2015)), before it did precisely that, holding:

> In view of all the evidence presented by the parties, the Court finds that plaintiffs have met their burden of proving that the survey attached to the non-warranty deed governs the dimensions of the new easement obtained by the [City] and thus reflects the taking of Plaintiffs' property.

*Id.*

While the government discusses its perceived flaws with the CFC's holdings in *Agapion* (while ignoring that the time to raise those arguments ended when it dismissed its appeal), it concludes with its more "fundamental[]" concern that "the

29

CFC's findings in *Agapion* cannot support its judgment in this case because this case involves different properties with different evidence," Appellant's Br. at 35, adding "the CFC was bound to consider the government's evidence *in this case* and 'find the facts specifically' based on *that* evidence." *Id*. (emphasis original).

The government ignores the very essence of its own argument: it is challenging the width of the entire 3.1-mile Corridor, not the specific dimensions over Kotis's properties. The CFC considered the entirety of the evidence in this case and based upon this evidence (which it acknowledged was "not exactly the same" as in *Agapion*), concluded that Kotis was correct as to the dimensions of the Corridor, for the reasons stated in *Agapion*. Appx00027 n.16.

The government's reliance on *Atlantic Thermoplastics Co. v. Faytex Corp.* is unavailing. 5 F.3d 1477, 1479 (Fed. Cir. 1993) (noting that the appellate court "must review factual findings made by the district court; it may not guess at findings left unmade. Fact-finding by the appellate court is simply not permitted.") The CFC did not leave anything for this Court to guess at. The CFC's Opinion as to the width of the Corridor should be affirmed.

**C.     The government's additional arguments as to the dimensions of the Corridor do not demonstrate clear error.**

That should be the end of the discussion. The CFC reviewed the evidence before it and reached its ruling. As discussed in *Precision Pine & Timber, Inc. v. United States:*

> In a bench trial, … the trial court sits as both judge and jury. As the jury, the trial court weighs the evidence and reaches a verdict. A major difference between verdicts rendered by a judge and by a jury is what we know on appeal. … A judge frequently says more, explaining … how any damages award was calculated. *See* Fed.R.Civ.P. 52(a). The fact that a judge says more, however, does not alter that judge's discretion to weigh the evidence or our standard of review. As the fact finder in the bench trial, the judge is responsible for deciding what evidence to credit or reject and what result to reach.

596 F.3d 817, 832-33 (Fed. Cir. 2010). Nevertheless, the government dedicates nineteen pages to asking this Court to ignore its standard of review for questions of fact, Appellant's Br. at 31, and the deference owed to the CFC as to such questions. The CFC reached a conclusion that is not clearly erroneous, but merely one the government does not share. Mere disagreement, whether by the government or this Court, with the CFC's factual findings is not a basis for reversal. *Anderson,* 470 U.S. at 573–74. Nevertheless, Kotis will address the government's other arguments.

### 1.    The "direct condemnation theory" articulated by the CFC by way of analogy is irrelevant to the outcome of this matter.

The government points to what it characterizes as the CFC's "novel view that railbanking transactions are properly analyzed as direct condemnation actions for the taking of a new easement[,]" opining "that view has never previously been articulated in a judicial decision[.]" Appellant's Br. at 21. The government describes this "novel view" as either a "direct condemnation approach" or "direct condemnation theory" which "is without basis in statute or precedent, and the [CFC's] reliance on it fatally undermines its opinion." *Id.*

31

The CFC's Opinion made an analogy to direct condemnation. Beginning on the second page of its Opinion, the CFC discussed the goal of the Trails Act. Appx0002-04. The CFC cited relevant statutory and regulatory provisions of the Trails Act, Appx0004-05 (citing 16 U.S.C. § 1247(d); 49 C.F.R. § 1152.29), as well as several cases interpreting the Trails Act. Appx0005. The CFC then noted that proceedings under the Trails Act "resemble[] a direct condemnation action in some respects[,]" with direct condemnation actions involving a single third party, while Trails Act matters proceed "[a]nalogously … by two parties working together to exercise the federal government's condemnation power: the railroad and the sponsor." Appx0005. The CFC then distinguished the two proceedings, noting that unlike direct condemnation (where property owners are part of the proceedings, third parties pay condemnation damages, and a district court approves the condemnation and awards damages), Trails Act takings start before the STB (a federal agency) and generally proceed without the involvement of the underlying property owners, with the CFC operating retrospectively to determine the value of just compensation (to be paid by the government), with the STB analogized as the "condemnation" court. Appx0005-06.

The CFC returned to this analogy, noting that "Trails Act takings are markedly *similar* to direct condemnations" in that they both concern proceedings which outline and approve the taking. Appx0023 (emphasis original). The CFC pointed

to the holding in *Narramore v. United States* for the limited conclusion that the CFC cannot "expand or contract" the scope of the government's taking. 960 F.2d 1048, 1050 (Fed. Cir. 1992). Appx0022-23. All of this to illustrate the well-established law of this Circuit that the STB's NITU is "the only *government* action in the railbanking process that operates to prevent abandonment[;]" and is thus the "appropriate triggering event for any takings claim[,]" *Caldwell*, 391 F.3d at 1233-35 (emphasis original), and therefore serves to define the scope of the taking. Appx0023.

### 2. The STB was fully aware of the size of the Corridor subject to its NITU.

The STB issued a NITU describing the Corridor with a width up to 200 feet. This width was described several times across multiple filings prior to the issuance of the NITU. *E.g.,* Appx0532, Appx0596, Appx0619. By contrast, at no point did the government (i.e., the STB), NSR, or the City ever discuss the 1927 Valuation Maps or a narrower easement.

Nor is the government's argument improved when discussing the STB proceedings in 2022-2024 to clarify the NITU. The City's Petition included the Non-Warranty Deed, which included the 2019 Survey, which illustrated the dimensions of the Corridor. Appx0630-71. The STB has, at no point, been confused about the width of the Corridor.

33

### 3. The STB did not grant the City a "new and larger easement unrelated to the easement held be the railroad."

The government criticizes the CFC's conclusion that "railbanking takes an entirely new easement separate from the railroad's easement." Appellant's Br. at 23-24 (citing Appx0004). Railbanking does <u>precisely that</u>, where an "easement for railroad purposes [is] converted into a new and different easement." *Toews v. United States*, 376 F.3d 1371, 1381 (Fed. Cir. 2004). "The taking of possession of the lands … for use as a public trail was in effect a taking of a new easement for that new use, for which the landowners are entitled to compensation." *Preseault v. United States*, 100 F.3d 1525, 1550 (Fed. Cir. 1996) ("*Preseault II*").

But railbanking does not convert the easement and "confer on a trail sponsor a new and larger easement unrelated to the easement held by the railroad," as the government opines, Appellant's Br. at 24, nor did the CFC find that the "STB approved the taking of a larger easement when it issues the NITU," as the government concludes. *Id.* (citing Appx0023). In fact, the CFC specifically held that it is not permitted to "expand or contract" the scope of the NITU. Appx0023 (citing *Narramore*, 960 F.2d at 1250). This notion that the STB somehow enlarged the NITU only holds if one incorrectly assumes (as the government has) that NSR and its predecessors-in-interest only ever held an easement as defined by the 1927 Valuation Maps. The record is void of any such evidence, and the CFC held that was not the case, based upon the evidence before it.

34

The NITU authorized the conversion of NSR's easement for railroad purposes to an easement of equivalent scope for interim trail use, and a separate easement for railbanking. *Preseault II*, 100 F.3d at 1550. Thus, the government is correct to the extent it states: "The easements now held by the City can be no larger than the easements formerly held by NSR." Appellant's Br. at 31. Only the government has suggested that NSR possessed anything other than the Corridor as depicted in the 2019 Survey.

**4.    The government's arguments as to judicial estoppel are irrelevant to the CFC's ruling.**

The Opinion makes clear: the STB was clearly aware of the dimensions of the Corridor. Appx0022-25. The CFC explained that the government (here, the DOJ) was estopped from taking a position contrary to a prior position taken by the government (previously, the STB) with regard to the width of the Corridor. Appx0025-27. The government argues that this is not possible, in part because the STB never "determine[d] the width of the right-of-way," and in part because the CFC "raised this issue *sua sponte*," leaving the government "unable to correct the CFC's misunderstandings[,]" and questioning whether judicial estoppel can be applied against the federal government. Appellant's Br. at 27-31.

Judicial estoppel can be applied against the federal government; even the government admits that such equitable doctrines can be applied, albeit "cautiously," Appellant's Br. at 28 (quoting *Heckler v. Cmty. Health Servs. of Crawford Cnty.*,

35

*Inc.*, 467 U.S. 51, 60 (1984)), and it applies equally where one of the tribunals is an administrative agency. *Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States*, 593 F.3d 1346, 1354 (Fed. Cir. 2010).

Yet <u>this</u> is not the issue. The CFC made clear that its holding as to judicial estoppel was merely an alternative basis for its established findings as to the width of the Corridor. Appx0025.

The evidence shows the STB <u>did</u> take a position as to the width. It <u>was aware</u> of the width of the Corridor when it issued the NITU. Appx0532, Appx0589, Appx0596. It was aware of the width when the City filed its request for clarification. *See, e.g.,* Appx0623 n.3 (discussing how the proposed encroachment would only use fifty-six of the 100-foot right-of-way from the centerline); Appx0630-0671 (attaching the Non-Warranty Deed, including the 2019 Survey); Appx0690 (STB's acknowledgment of the 100-foot width). It was aware that the government disagreed with the width. Appx0690 n.3 (citing Appx5167-68). With full understanding of the dimensions of the Corridor, the STB granted the clarification, <u>as requested</u>, and without modification to a different set of measurements. Appx0700-02. The STB took a position, and in its Opinion, the CFC's explanation was straightforward:

> The government is thus simultaneously claiming (through the STB) that it *took* a wide easement, but (through the Department of Justice) that it need only *pay* for a narrow easement.

36

Appx0026 (emphasis original).  Per the CFC, the government is estopped from doing so.  The CFC is correct in that conclusion.

### 5. The CFC did not err in refusing to reopen the trial record to admit evidence of the STB's clarification of the NITU.

The government contends the CFC erred by denying its motion to reopen the record to admit evidence of the STB's decision to clarify the NITU as to a 264-foot section of the Corridor.  Appx0028-29.  The government argued to the CFC, Appx5180-87, and now to this Court, Appellant's Br. at 35-38, that the STB's decision to clarify the width of a portion of the Corridor released a portion of Kotis's property (specifically a portion of 1310 Westover Terrace) from federal jurisdiction, "render[ing] any taking temporary" and, by extension, affecting Dr. Kilpatrick's analysis of just compensation for the property.

The CFC acknowledged its discretion to reopen the trial record.  Appx0028 (citing *Zenith*, 401 U.S. at 331).  In deciding whether to admit additional evidence, courts consider "the probative value of the evidence proffered, the explanation for why it was not offered earlier, and the likelihood of undue prejudice." *Precision Pine*, 596 F.3d at 833-34.  The CFC considered the government's arguments, and within its discretion, denied both.  Appx0028-29.  The CFC noted, correctly, that the STB's decision "does not restore any rights to [Kotis,]" Appx0028, and instead places that property in the hands of the City until it decides to dispose of it.

37

Appx0029.[13]  The City's Petition was aimed at clarifying the NITU "in connection

with a land sale to Kotis."  Appx0619.  The STB opted to clarify the width of the

Corridor citing its decision in *Mo. Pac. R.R.*  2021 WL 3235207, at \*2-\*4 (clarifying

NITU to permit sale of property to third-party).  As a result, the land, which was

subject to the original NITU, and which was outside the metes and bounds of the

clarified NITU, remains in the hands of someone <u>other than</u> Kotis per the recorded

Non-Warranty Deed.  The land, thus, remained just as taken as any other portion of

the Corridor, and as such, the evidence of the clarification lacked probative value as

to the amount of just compensation owed to Kotis.

Regardless, this Court has been exceptionally clear:

> After a final trail use agreement is reached, the NITU remains in effect
> indefinitely and abandonment cannot be accomplished under the NITU
> until trail use terminates (without restoration of rail service)….

---

[13] Kotis is puzzled by the government's suggestion that this outcome was somehow invented by the CFC and "was not briefed by any party."  Appellant's Br. at 36.  In opposing reopening the record, testimony from Mr. Kotis was quoted in which he stated that in seeking the clarification of the NITU, the City sought to "sell me my own land to eliminate the easement[,]" Appx5190 (citing Appx1202).  This was quite clearly the City's intent as it stated to the STB.  Appx0619.  In arguing that reopening the record for this evidence would be prejudicial to Kotis, it was noted that "[t]he City still has control of [Kotis's] land for the indefinite future[,]" Appx5193, and that the property:

> was and still remains an uncompensated permanent taking.  The City
> still has exclusive rights to the land and can do with it as they wish,
> including as they have suggested they might:  seek to sell Mr. Kotis'
> property back to him, on whatever terms they may wish.

Appx5196-97.

38

> Thus, the NITU operates as a single trigger to several possible outcomes. It may, as in this case, trigger a process that results in a permanent taking in the event that a trail use agreement is reached and abandonment of the right-of-way is effectively blocked.

*Caldwell*, 391 F.3d at 1234 (citation modified). Thereafter, this Court stated that later modification of a NITU does not change the taking or give rise to new claims.

*Barclay v. United States*, 443 F.3d 1368, 1375–76 (Fed. Cir. 2006) (citing *Baros v. Tex. Mexican Ry. Co.*, 400 F.3d 228, 236 (5th Cir. 2005); *Birt v. Surface Transp. Bd.*, 90 F.3d 580, 585 (D.C. Cir. 1996)). To treat the land subject to the STB's clarification different from the remainder of the NITU would have prejudiced Kotis, given that the outcome from his perspective (his continued loss of any use of the affected land) is no different. The denial of the government's Motion to reopen the record was not based upon erroneous conclusions and thus was not an abuse of discretion.

## II.    The CFC's holding that the City holds the right to exclude Kotis from the Corridor is correct as a matter of law and fact.

The CFC held that "a fee simple landowner effectively loses all property rights within the corridor of a Trails Act easement." Appx0030. The government considers this statement an error, adding that the CFC erred in assuming the City possessed the right "to require Plaintiffs to remove any preexisting improvements that may encroach on the easements not held by the Cit[y] [sic]." Appellant's Br. at 38. The government is incorrect on both counts.

39

**A.    The CFC followed established Trails Act jurisprudence.**

The government relies upon the language within the Trails Act, claiming:

Nothing in section 8(d), however, confers a right on trail sponsors to prohibit servient landowners from using their properties in ways that do not interfere with either trail use or the potential for railroad reactivation.

Appellant's Br. at 39. Implicit in this statement is the acknowledgement that the City can prohibit servient landowners from using their properties in ways that interfere with either trail use or the potential for railroad reactivation. Yet even this analysis misses the larger point, as courts have consistently held that the Trails Act confers upon trail sponsors (like the City) the right to exclude others, including the servient landowners (like Kotis) from the portions of property burdened by an interim trail easement and a future railroad easement.

The CFC correctly observed that "[t]o build or maintain overlying structures on a portion of the Corridor, the Kotis Entities must have the legal right to exclude the City and the railroad from that portion in the event of a conflicting use, now and in the future." Appx0030 (citing *Caquelin v. United States*, 959 F.3d 1360, 1367 (Fed. Cir. 2020). The CFC held, Kotis "undoubtedly lack[s] that right." Appx0030.

The CFC's holding is neither a "jettisoning of precedent" nor a novel question before this Court. Appellant's Br. at 1, 38 ("this Court has not previously considered the extent of that right"). The government's argument rests entirely on the statute's language; language which this Court has interpreted on numerous occasions over the

40

past thirty years beginning with its holding in *Preseault II,* finding that the Trails

Act creates "a new easement for a new use." 100 F.3d at 1550.

Then, in 2020, this Court elaborated:

It is important to identify the nature of the government action at issue. The NITU in this case, as in similar cases, was a government action that compelled continuation of an easement for a time; it did so intentionally and with specific identification of the land at issue; and it did so solely for the purpose of seeking to arrange, without the landowner's consent, to continue the easement for still longer, indeed indefinitely, by an actual trail conversion. The government seems to accept, and in any event has not meaningfully contradicted, the foregoing characterization of the NITU as *allowing occupation by someone other than the landowner*.

It is likewise not meaningfully disputed before us that, if the negotiations for a trail conversion had succeeded, the resulting indefinite federal-law continuation of the easement would have been a categorical taking, … *providing a right of occupation by someone other than the landowner and, the trial court found, barring the landowner from using the ground burdened by the easement.*

*Caquelin*, 959 F.3d at 1367 (citing *Ladd v. United States,* 630 F.3d 1015, 1019 (Fed.

Cir. 2010)).[14]   *Caquelin* represents the cornerstone of the CFC's well-reasoned

decision.  Appx0030.

The government acknowledges that the Supreme Court recognized

Congress's intent in passing the Trails Act was to create trails <u>and</u> preserve rights-

---

[14] *See also Trevarton v. South Dakota*, 817 F.3d 1081, 1087 (8th Cir. 2016) ("as a matter of federal law [the Trails Act] granted 'a new easement for a new use' … the 'new easement' [the trail user] acquired under the Trails act [is] an interest which authorized [the trail user] to use the Trail for Trails Act purposes.")

of-way for future railroad reactivation. Appellant's Br. 40 (citing *Preseault v. United States*, 494 U.S. 1, 17 (1990)) ("*Preseault I*"). However, the government contends that "[n]either of those purposes suggest Congress intended to confer broad power on trail sponsors to transform established rights-of-way in a manner inconsistent with the right-of-way's use during railroad operations or to displace the rights of servient owners unnecessarily." Appellant's Br. at 40-41. Yet this Court has acknowledged the easement for the trail is new, and "[t]he different uses create different burdens." *Toews*, 376 F.3d at 1376.

As the CFC observed, the NITU allowed the occupation of Kotis's land by someone other than Kotis—the City and, by extension, the public. Appx0030. This right of occupation has long been regarded by the Supreme Court as one of the most fundamental rights of property ownership:

> We have repeatedly held that, as to property reserved by its owner for private use, the right to exclude others is one of the most essential sticks in the bundle of rights that are commonly characterized as property.

*Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831 (1987) (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 433 (1982) and *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)) (citation modified).

> [T]he very idea of property entails that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe … the right to exclude is universally held to be a fundamental element of the property right, and is one of the most essential sticks in the bundle of rights that are commonly characterized as property.

42

*Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149-50 (2021) (citation modified).

In addition to this Court's pronouncements in *Preseault II*, *Toews*, and *Caquelin*, the CFC relied on its own unbroken string of holdings that landowners whose property is encumbered by easements created by the Trails Act effectively have no rights in the affected land, Appx0030, including *Jackson v. United States*:

> In Rails-to-Trails cases, the Court has consistently held that the owners of land subject to a trail easement retain virtually no rights in the encumbered land and awarded the plaintiffs the fee simple value of the encumbered parcel.

155 Fed. Cl. 689, 702 (2021) (citing *Moore v. United States*, 54 Fed. Cl. 747, 751 (2002) (holding "the right of way parcel should be diminished 100% in the 'after' analysis because the landowners had no effective remaining use of the property."). *Jackson*, in turn, relies on several other CFC matters, reaching the same conclusions. 159 Fed. Cl. at 702 (citing *Childers v. United States*, 116 Fed. Cl. 486, 524 (2013); *McCann Holdings Ltd. v. United States*, 111 Fed. Cl. 608, 626 (2013); *Howard v. United States*, 106 Fed. Cl. 343, 367 (2012)). A similar discussion occurred in *Cheshire Hunt, Inc. v. United States,* where the Court held:

> [T]he Trails Act serves two purposes – i.e., the reactivation of rail use and interim trail use. The lawful use of the burdened property under a trail use easement is not necessarily the same as it was under the rail easement *because an encroachment that does not interfere with rail use may well interfere with trail use.*

158 Fed. Cl. 101, 108 (2022) (emphasis added), before adding:

43

> It is important to understand what the easement is in this case. … The NITU makes no exception for any encroachments; it authorizes converting the 'right-of-way' into a recreational trail without any limitation. Deeds between third parties do not define the scope of the easement–the NITU does.

*Id*. at 111. The CFC then reiterated the "common sense understanding that an easement holder may use the entirety of the burdened property for the purpose of the easement." *Id*.

Here, the CFC found that Kotis's land was also burdened by a second layer of exclusivity: the STB's continuous right to regulate any use of the right-of-way that may conflict with railroad use. Appx0031 (citing 49 U.S.C. § 10501(b); *Caldwell*, 391 F.3d at 1230). The government argues that NSR's willingness to allow Kotis's overlying structures (or its lease of use to Kotis) means there is unequivocally "no need to remove those improvements to preserve the right-of-way for possible future rail use." Appellant's Br. at 41. The government ignores, however, that the STB's authority to regulate the use of the right-of-way extends to <u>future</u> railroad uses.

**B.    Because of the NITU, Kotis lost the fundamental right to exclude.**

Apart from 601 Spring Street, every one of Kotis's properties had improvements in the Corridor, such as parking, on the date of the NITU. Eight of these properties also had portions or complete buildings within the Corridor:

44

**TABLE 2**

| Property Address | Snapshot Citation | Map Citation |
|---|---|---|
| 1430 Westover Terrace ("Core Life") | Appx2142 | Appx2122 |
| 1424 Westover Terrace ("Brixx Pizza") | Appx2143 | |
| 1715 Battleground Ave. ("Take 5 Oil/Billboard") | Appx2148 | Appx2123 |
| 1410 Westover Terrace ("Orange Theory") | Appx2145 | |
| 1420 Westover Terrace ("Chipotle") | Appx2144 | |
| 1310 Westover Terrace ("Publix") | Appx2146 | Appx2124 |
| 1500 Mill Street ("Saffron") | Appx2147 | |
| 1305 Battleground Ave. ("Red Cinema") | Appx2149 | Appx2128 |

The government contends there is a lack of evidence as to whether these buildings could coexist with current trail use or future railroad use. *See* Appellant's Br. at 43 ("Thus, on the facts of this case, there is nothing to suggest that maintaining the preexisting improvements on Plaintiffs' properties would frustrate any … purpose of the Trails Act."). As discussed above, Kotis's rights in his land burdened

45

by the trail easement are fundamentally different as a result of the Trails Act; he no longer has the right to control the use or enjoyment of this portion of his land, but is only allowed to use his land subject to the City's superior right of use and possession for trail use (and a future railroad's superior right to use it for railroad purposes). This is a matter of decided law, not a question of fact; the CFC appropriately held as such.

The facts demonstrate the same result: the City, and not Kotis, controls the land within the Corridor. The government relies on testimony that "representatives of the City expressly disclaimed any need or intention to remove existing improvements in the right-of-way." Appellant's Br. at 41, citing Appx2022, Appx2034. But, the City also testified that it has not given any assurances that overlying structures will not be removed; and that such assurances would be inappropriate because they would bind future City Councils, Appx2023, admitting that its design plans (as of 2022) could change. Appx2034. Testimony further confirmed the City:

- has an easement for an interim trail in the right-of-way, Appx2035;

- can authorize the public to use the Greenway, Appx2035;

- can authorize how the Greenway may be used, Appx2035-36;

- has "responsibility" for buildings that encroach on the right-of-way, Appx2027-28;

46

- can address these encroachments in the future, Appx2028;

- has not provided any legal documentation to landowners that their encroachments could stay, be repaired, be maintained, or replaced, Appx2029-30; and

- confirmed no document exists that landowners could provide a purchaser of their property:

  o guaranteeing that existing encroachments could stay, be repaired, be maintained, or be replaced, Appx2030-31; or

  o showing that future encroachments could be made, adding that future encroachments were not allowed under the terms of the City's Agreement with NSR. Appx2030-31.

Of particular importance, the City testified that it has a policy of not allowing any future development to be placed within the Corridor. Appx2029-31, Appx2035-36, Appx4059-61, Appx4193-96, Appx4221-22. Given the extensive development NSR may have tolerated within the Corridor, this alone is a profound deviation from any historic use of the corridor by NSR. During trial, Kotis also put forward evidence, Appx1030-35, of other federally railbanked corridors in which the trail sponsors had demanded existing encroachments into the new trail easement be removed. Appx4243-71.

47

The evidence demonstrated that, so long as the Corridor is used as a trail, the City controls all decisions regarding the use of Kotis's land within the Corridor, not Kotis.

This Court recently held that, "when the government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the government bears the risk." *Ablan v. United States*, 162 F.4th 1364, 1381 (Fed. Cir. 2025) (quoting *United States v. Dickinson*, 331 U.S. 745, 749 (1947)). Quite simply, "[t]he government must pay for what it takes." *Cedar Point*, 594 U.S. at 148.

### III. An award of just compensation is based upon what the owner lost, not what the government gained.

The government's final argument is that the CFC erred "in its assessment of just compensation." Appellant's Br. at 44. The government claims that the CFC did not determine the "fair market value of the properties on the date of taking," but instead "based its compensation award on a hypothetical scenario" while also ignoring evidence of post-NITU sales. *Id.* The gravamen of the government's viewpoint is that the CFC weighed the evidence before it, made its determination, and this Court should unwind that finding because "the CFC handed Mr. Kotis a windfall[.]" *Id.* The cornerstone of the government's claims is that the CFC accepted the opinions of Kotis's appraisal expert, Dr. Kilpatrick, over those of the government's expert, Mr. Roach.

48

The CFC considered all the evidence, including the credibility of the experts' opinions, before rendering its Opinion.  The trial court gets considerable deference in assessing witness credibility and the weight to give evidence.  *See Precision Pine*, 596 F.3d at 833.  Where:

> a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Pac. Gas & Elec. Co. v. United States*, 668 F.3d 1346, 1353 (Fed. Cir. 2012) (quoting *Anderson*, 470 U.S. at 575)).

Such is the case here.  This Court should affirm the CFC's holdings.

## A.    Fair market value on the date of taking must assume the easement holder can use the full extent of its rights.

Kotis agrees with the government's statement of law as to what constitutes just compensation in a Trails Act case.  Appellant's Br. at 45; *see generally Rasmuson*, 807 F.3d at 1345.  However, despite specifically referencing these standards, Appx0020, Appx0037-38, the government concludes that the CFC failed to apply those standards, and instead "largely adopted"[15] Dr. Kilpatrick's opinions as to a:

---

[15] Immediately after noting that the CFC "largely adopted" Dr. Kilpatrick's opinions, the government immediately references an opinion of Dr. Kilpatrick's that the CFC rejected.  Appellant's Br. at 46 n.10.

hypothetical world in which [Kotis was] required to remove any encroaching improvements and deprived of all ability to use the portions of the properties burdened by the easements[,]

Appellant's Br. at 46, where Dr. Kilpatrick "assigned zero value to the improvements and assessed the value of the land as though they did not exist." *Id.*

The government concludes this is in error, as it stated in its Post-Trial Brief, in which the government argued that Dr. Kilpatrick:

> assumes *incorrectly* that the City's trail easement is exclusive and that the City is planning to exclude Plaintiffs from the entire width of the right-of-way for any reason; on that basis, Dr. Kilpatrick concludes that Plaintiffs have lost all beneficial interest in the land and improvements within the right-of-way.

Appx5175 (emphasis original). According to the government, this "incorrect assumption" is based upon a "misunderstanding" of the City's use of the Corridor. Appx5175-76. Per the government, Dr. Kilpatrick simply "rejected the need to inquire into the likelihood that the City would ever exercise its assumed rights to remove encroachments," Appellant's Br. at 46, citing Appx1381-83, before stating that Dr. Kilpatrick's opinions "do not reflect evidence on how the market viewed the effect of the easements on the properties' value," Appellant's Br. at 46-47—an opinion which relies solely on a single page within Mr. Roach's rebuttal report. Appx2304.

The government opines that Dr. Kilpatrick's approach is an example of a "technical legal rights theory" rather than an example of "fair market value" and thus

50

is inconsistent with the law and must be ejected. Appellant's Br. at 47 (citing *Almota*, 409 U.S. at 471). The government reads *Almota* far too broadly. *Almota*, an eminent domain case regarding the acquisition of land subject to leases, stands for the unremarkable proposition that, for just compensation purposes, improvements to a leasehold should be assessed at their fair market value over their life, without regard to the remaining term on the lease. *Gadsden Indus. Park, LLC v. United States*, 956 F.3d 1362, 1371-72 (Fed. Cir. 2020) (discussing the holding of *Almota,* 409 U.S. at 473).

The government ignores that the City's easement over the Kotis properties is neither "technical" nor "theoretical." Appellant's Br. at 46-48. It is not "some hypothetical state," *id.* at 49, but a very real prohibition on Kotis' use of his own land. Still, *Almota* can be somewhat instructional, though not in the way the government has characterized it. The Supreme Court clarified that any consideration of value of a property should include the effects of improvements over their useful life; rather than as of the date of taking. 409 U.S. at 473-78. The important inquiry: "what a willing buyer would have paid for the improvements." *Id.* at 474. Applied here, the appropriate question is what a willing buyer would have valued the Kotis properties <u>subject to</u> the City's control of the Corridor, when as already discussed, that control is absolute. Dr. Kilpatrick provided that answer. There is no value to any portion of the property within the Corridor.

51

As the CFC noted in its Opinion, subservient landowners with properties burdened by an interim trail use easement effectively lose all property rights within the former railroad corridor. Appx0030-31 (collecting cases). North Carolina courts have made clear that while:

> Areas of a right-of-way not required for railroad purposes may be used by the servient owner in manners not inconsistent with the right-of-way[,]

*Norfolk S. Ry. Co. v. Smith*, 611 S.E.2d 427, 430 (N.C. App. 2005) (collecting cases),

> the owner's use is subject to the railroad's easement. Further appropriation and use by the railroad of the right of way for necessary railroad business may not be destroyed or impaired by reason of the occupation of it by the owner or any other person. The railroad may expand its use of the right-of-way, to the extent of its statutory right, for any legitimate purpose as determined by the railroad's sound business judgment.

*Id.* (citation modified). The CFC cited to an array of other decisions adopting this same conclusion. Appx0030-31 (collecting cases). Prior to the NITU, NSR had the <u>exclusive</u> right to use of the Corridor and could, <u>at any time</u>, restrict or remove any use by the subservient landowners within the Corridor. *See, e.g.*, Appx2333-46 (lease assignment to Plaintiff Westover Terrace II, in which Westover Terrace II, which owned the land, was obligated to pay NSR in excess of $8,600/year); Appx1217-21 (Mr. Kotis testifying that if he failed to assume these payments, all improvements within the Corridor would be ordered removed by NSR); Appx4272-75. After the NITU, the City possessed that <u>exclusive</u> control for interim trail use,

52

and even where a use may not have burdened rail use, it may still burden trail use. *Cheshire Hunt*, 158 Fed. Cl. at 108.

The government's citations to other matters miss the mark entirely. *Rasmuson* concerned a situation where landowners sought to have property appraised as though all remnants of the prior railroad easement, including earthen embankments, were removed, despite the railroad having no legal obligation to do so, and no evidence was presented that the railroad would have done so. 807 F.3d at 1345-46. This Court rejected that "counterfactual assumption" and required appraisals to account for the actual physical conditions. *Id*. The situation before the Court is about the legal burden on the property, i.e., an exclusive easement, and not a physical condition. Kotis is not seeking to rely on a "counterfactual assumption" as to existing features, but existing legal impediments to what a "willing buyer" would pay for property, knowing it was burdened by an easement which the City could utilize at any time.

*Loveridge v. United States*, 174 Fed. Cl. 379 (2024) is even less relevant. There, unlike here, the trial court concluded that the likelihood "of an actual trail is slim" and specifically distinguished its holding from matters like *Agapion*, which examined "the actual use of the easements and potential interference with the planned trail," and where the City (through Mr. Wilson) indicated that encroaching

53

structures "might be removed in the future if they do interfere with the trail." *Loveridge*, 174 Fed. Cl. at 403 (quoting *Agapion*, 167 Fed. Cl. at 769).

The same testimony, as to the City's rights to limit Kotis's use of the land, was entered into the record, Appx2027-31, Appx2035-36; Appx4059-61, Appx4193-96, Appx4221-22, and the City repeatedly clarified its position as to its rights to use the Corridor. Dr. Kilpatrick appraised the properties in the "after" condition as he did based upon what a "ready, willing, and able and prudent buyer might pay for a piece of property," Appx1380; *see* Appx1381-87, which was in turn based on the City's exclusive right to the Corridor and its effect on the value. When presenting his calculations as to the percent of value to the remainder, Dr. Kilpatrick found that, "it would appear that the economic impact of the easement will be 100% of the value of the part taken, plus any severance damages to the remainder."[16] *See, e.g.*, Appx5293.[17] Dr. Kilpatrick's calculations reflect the reality that Kotis's rights in the encumbered trail corridor are limited to rights enjoyed by the general public, and "rights held by the general public, however, are clearly not rights that define

---

[16] As already discussed, note 15, *supra*, the CFC did not agree with Dr. Kilpatrick as to severance damages. Appellant's Br. at 46, n.10 (citing Appx0038).

[17] Although Kotis has cited to Dr. Kilpatrick's expert report as to 1310 Westover Terrace, i.e., the "Publix" property, *see* Appx5276-5375, Dr. Kilpatrick made this same statement in each of his expert reports.

54

individual property ownership." *Jackson*, 155 Fed. Cl. at 701 (citing *United States v. Craft*, 535 U.S. 274, 278 (2002)).

Importantly, Mr. Roach, the government's expert, <u>did not disagree</u>, having also reviewed the City's testimony and other relevant documents in this case, as he indicated during cross examination. Appx1722, Appx1743; *see generally* Appx1714-16; Appx1721-29. In fact, Mr. Roach did not offer any opinion of value of the Kotis properties to counter Dr. Kilpatrick's findings. Appx1806-07.

Given the foregoing, the CFC weighed the evidence, assessed the credibility of the experts, and held that Kotis had lost all property rights to the Corridor, and found Dr. Kilpatrick's calculation of the value of the properties in the after condition was "credible and methodologically sound." Appx0038-39. The government's arguments to the contrary are without merit and are, for the most part, non-existent. Statements by the government in its brief as to what Mr. Kotis did or might have done are not evidence. *See, e.g.,* Appellant's Br. at 51 (discussing what Mr. Kotis's purchasing behavior "suggests" as to the value of property by a buyer).[18] The government had the opportunity to present further evidence and argument to the CFC. It opted not to, and the CFC reached its ruling based upon the evidence before it. "When a trial court provides a damages award that is within the range of credible

---

[18] Mr. Kotis has testified that he has decided not to purchase property because of the impact of the Corridor on the property. Appx1850-52.

testimony, it is not an appellate court's role to reweigh the evidence or second-guess the finder of fact." *Otay Mesa*, 779 F.3d at 1327.

This Court should affirm the CFC's findings as to just compensation.

**B.    The CFC did not err in finding evidence relating to post-NITU sales irrelevant and unpersuasive.**

The government concludes by asking this Court to find that Dr. Kilpatrick and the CFC improperly excluded "[m]arket evidence … in the form of sales of properties burdened by the same" Corridor, arguing that this "exclusion of market evidence fundamentally undermines the reliability of Dr. Kilpatrick's (and the CFC's) estimation of market value." Appellant's Br. at 52-53. The government's argument is fundamentally flawed.

**1.    The government has waived its argument on the use of post-NITU sales.**

The government's efforts to support its "argument" before the CFC are almost non-existent. The government's expert drafted a 115-page report (plus addenda), and dedicated a total of <u>seven pages</u> to this issue—more than half of which consists of pictures. Appx2298-2304. At trial, Mr. Roach briefly testified that "Dr. Kilpatrick did not look at any sales that may have occurred within the corridor … after the date of valuation[,]" Appx1675, noting properties which Dr. Kilpatrick "could have [] analyzed and compared with other properties that are not affected by the corridor to determine what the market's reaction is." Appx1677; *see* Appx1675-

88; Appx1809-11. The government's Post-Trial Brief dedicates <u>a single sentence</u> to its suggestion that Dr. Kilpatrick did not consider post-NITU sales. Appx5177.

Where a party "presents only a skeletal or undeveloped argument to the trial court," this Court can deem that argument waived on appeal. *Fresenius USA, Inc. v. Baxter Intern., Inc.*, 582 F.3d 1288, 1296 (Fed. Cir. 2009) (collecting cases). "Moreover, merely stating disagreement with the trial court does not amount to a developed argument." *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1341 (Fed. Cir. 2006). The government has done as much here; the argument should be deemed waived.

### 2. The government's post-NITU sales argument, and its discussion of *Florida Rock*, is irrelevant.

Even if the government did not waive this argument, it still fails. The government contends that:

- Mr. Roach provided "evidence of post-railbanking sales of other properties burdened by the same railbanking easement";

- These sales "provide a basis on which an appraiser could assess how the Greensboro real estate market viewed the effect of the easements";

- Dr. Kilpatrick did not consider these sales; and

- The CFC incorrectly "ruled that Dr. Kilpatrick properly excluded those sales 'for the reasons articulated in the *Agapion* case.'"

Appellants Br. at 53 (citing Appx0040) (citing *Agapion*, 167 Fed. Cl at 778-79).

In *Agapion*, the government offered evidence of post-NITU sales, which the CFC considered, 167 Fed. Cl. at 778, and then rejected, *id.* at 778-79, arguing that the government had failed to illustrate that post-NITU sales should have been considered in the "after" analysis of the property. *Id.*

Here, the government argues that this conclusion is inconsistent with *Florida Rock*, which the CFC discussed in its *Agapion* decision and, in turn, relied upon here. Appx0040 (citing *Agapion*, 167 Fed. Cl. at 778-79) (citing *Florida Rock Indus. v. United States*, 18 F.3d 1560 (Fed. Cir. 1994)). Respectfully, *Florida Rock* concerns a <u>regulatory</u> taking, rather than a <u>physical</u> taking; takings pursuant to the Trails Act are the latter, and this Court has made clear for at least the last thirty years that the government's attempt to inject regulatory takings analysis into a physical takings case is improper. *See, e.g., Preseault II*, 100 F.3d at 1540.

Kotis does not challenge the idea of calculating "fair market value" using the "before-and-after method," *see Rasmuson*, 807 F.3d at 1345, with the trial court using its "flexibility to tailor a fair and reasonable result *based on the evidence it credits or rejects*." *Otay Mesa*, 779 F.3d at 1326 (emphasis added) (citing *Precision Pine*, 596 F.3d at 832-33). However, this demonstrates the final reason the government's argument fails. The government claims that the CFC "refused" to consider evidence of post-NITU sales; this is untrue. Mr. Roach presented his opinions to the Court, including his limited opinions on Dr. Kilpatrick's failure to

58

discuss post-NITU sales.[19]  He could have, but <u>did not</u>, offer opinions on whether the consideration of these sales would have affected Dr. Kilpatrick's "after" values or the amount of just compensation owed to Kotis for each property.  The CFC did not "refuse" to consider this evidence.  It weighed Mr. Roach's opinions and testimony—testimony which clarified that the post-NITU sales which Mr. Roach considered <u>were not</u> comparable to the Kotis properties, Appx1754-59, Appx1765-69—against those of Dr. Kilpatrick's and found Dr. Kilpatrick's more credible.[20]  That is the trial court's job: "The weighing of conflicting evidence is a task within the special province of the trial judge who, having heard the evidence, is in a better position than we to evaluate it." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 948 F.2d 1573, 1577 (Fed. Cir. 1991).

The government cannot claim the CFC failed to consider evidence it actually considered simply to evade the CFC's right to weigh evidence before it.  In that

---

[19]  Including his opinions as to five separate post-NITU sales which had limited, if any, relevance as to the "market's reaction to the character and nature of the taking," because they had objectively distinct characteristics to the Kotis properties.  Appx1769; *see* Appx1765-70.

[20] It is worth noting:  there is no evidence that Dr. Kilpatrick did not "consider" these post-NITU sales; he simply did not use them as comparables.  Despite ample opportunity to do so, the government never asked Dr. Kilpatrick why he did not; it just complains that he should have.

situation, the CFC's finding "can virtually never be clear error." *Anderson,* 470 U.S. at 575.

The CFC's ruling should be affirmed.

## CONCLUSION

The CFC correctly reviewed the extensive evidence before it, applied the guiding precedent, and used its discretion to award Kotis $42.6 million for the government's taking of ten acres of valuable property in Greensboro, North Carolina. For the aforementioned reasons, this decision should be affirmed.

Respectfully submitted,

**LEWIS RICE, LLC**

*/s/ Lindsay S.C. Brinton*
Lindsay S.C. Brinton
Meghan S. Largent
Michael Armstrong
600 Washington Ave., Suite 2500
St. Louis, Missouri 63101
(314) 444-7723
(314) 612-7723 (fax)
lbrinton@lewisrice.com
mlargent@lewisrice.com
marmstrong@lewisrice.com

***ATTORNEYS FOR PLAINTIFFS-APPELLEES***

60

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g)(1) of the Federal Rule of Appellate Procedure and Federal Circuit Rule 32(b)(3), the undersigned certifies that:

1.     The foregoing brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) (as modified by Federal Circuit Rule 32(b)(1)), as it contains 13,791 words, not including those portions of the foregoing excluded pursuant to Federal Rule of Appellate Procedure 32(f) and/or Federal Circuit Rule 32(b)(2).

2.     The foregoing brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), as it has been prepared in Microsoft Word using 14-point Times New Roman (a proportionally spaced typeface), and complies with the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

/s/ Lindsay S.C. Brinton
Lindsay S.C. Brinton
Attorney for Plaintiffs-Appellees