No. 25-1884

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

KOTIS ASSOCIATES, LLC, KOTIS HOLDINGS, LLC,
WESTOVER TERRACE II, LLC,
*Plaintiffs-Appellees,*

v.

UNITED STATES,
*Defendant-Appellant.*

Appeal from the United States Court of Federal Claims
No. 1:20-cv-00932-LAS (Hon. Loren A. Smith)

**BRIEF OF MISSOURI FARM BUREAU FEDERATION, ILLINOIS AGRICULTURAL ASSOCIATION, IDAHO FARM BUREAU FEDERATION, OREGON FARM BUREAU, OHIO FARM BUREAU FEDERATION, WYOMING FARM BUREAU FEDERATION, MOUNTAIN STATES LEGAL FOUNDATION, AND PACIFIC LEGAL FOUNDATION
AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Mark S. Wigley
Christopher S. Edwards
Ward and Smith, P.A.
Post Office Box 33009
Raleigh, NC 27636-3009
Telephone: (919) 277-9100
Facsimile: (919) 277-9177
Mswigley@wardandsmith.com
Csedwards@wardandsmith.com

Kathryn D. Valois
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
(561) 691-5000
kvalois@pacificlegal.org

*Counsel for Amici Curiae*

i

**FORM 9. Certificate of Interest**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-1884

**Short Case Caption** Kotis Associates, LLC v. United States

**Filing Party/Entity** (See Addendum) Missouri Farm Bureau Federation, Illinois Agricultural Association, Idaho Farm Bureau Federation, Oregon Farm Bureau, Ohio Farm Bureau Federation, Wyo

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/09/2026

Signature: /s/ Mark S. Wigley

Name: Mark Wigley

**FORM 9. Certificate of Interest**

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Missouri Farm Bureau Federation | | |
| Illinois Agricultural Association | | |
| Idaho Farm Bureau Federation | | |
| Oregon Farm Bureau | | |
| Ohio Farm Bureau Federation | | |
| Wyoming Farm Bureau Federation | | |
| Mountain States Legal Foundation | | |
| Pacific Legal Foundation | | |
| | | |
| | | |
| | | |

☐　Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)    ☐   No    ☑   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

## <u>Addendum to Form 9</u>

**Filing entities:**

Missouri Farm Bureau Federation,

Illinois Agricultural Association,

Idaho Farm Bureau Federation,

Oregon Farm Bureau,

Ohio Farm Bureau Federation,

Wyoming Farm Bureau Federation,

Mountain States Legal Foundation, and

Pacific Legal Foundation

## Table of Contents

Table of Authorities.................................................................. iii

Identification and Interest of Amici Curiae ............................................1

Introduction..................................................................................4

Argument.....................................................................................7

   I.  Congress Creates the Railbanking Process, Which Places New Burdens on Private Landowners. ...............................................7

   II.  This Court's Decision Will Have Far-Reaching Consequences for Private Property Owners Nationwide, and for Farmers in Particular..................................................................10

      A.  Railroad easements frequently burden the land of farmers and individual property owners, and the Trails Act's reach continues to grow.............................................11

      B.  This Court often has the last word on Trails Act takings. ...14

   III.  Landowners' Lived Experiences Confirm That a Trails Act Easement Eliminates Their Right to Exclude from Encumbered Private Property. .....................................................15

      A.  Farmers acutely feel the loss of their ability to exclude from the taken corridor. .............................................16

      B.  Trail sponsors themselves know that property owners have lost the right to exclude. ......................................25

         1.  Sponsors frequently exercise their rights to exclude and eject. ...............................................25

   IV.  The History and Tradition of Anglo-American Property Law Confirm That an Easement's Scope Is Defined by the Legal Rights It Confers, Not by How It's Actually Used......................28

Conclusion ...................................................................................34

Certificate of Service ...........................................................................36

Certificate of Compliance .................................................................37

## <u>Table of Authorities</u>

**Cases**

*2,953.15 Acres of Land, More or Less, in Russell Cnty. v. United States,*
350 F.2d 356
(5th Cir. 1965) ........................................................ 33

*Acceptance Ins. Cos. v. United States,*
503 F.3d 1328
(Fed. Cir. 2007)....................................................... 14

*Albano v. United States,*
152 Fed. Cl. 343 (2021) .................................... 26, 27

*Atkins v. Bordman,*
43 Mass. 457 (1841)............................................... 33

*Caldwell v. United States,*
391 F.3d 1226
(Fed. Cir. 2004)....................................................... 29

*Cedar Point Nursery v. Hassid,*
594 U.S. 139 (2021) ....................................... 3, 16, 28

*Cheshire Hunt, Inc. v. United States,*
158 Fed. Cl. 101 (2022) .................................... 27, 28

*Cockrell v. Hawkins,*
764 N.E.2d 289
(Ind. Ct. App. 2002)............................................... 23

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ..................................... 30, 31, 32

*Illig v. United States,*
58 Fed. Cl. 619 (2003) ............................................ 34

*Jackson v. United States,*
155 Fed. Cl. 689 (2021) ...................................... 16, 34

*Kaiser Aetna v. United States,*
444 U.S. 164 (1979) ................................................ 34

*King Cnty. v. Abernathy,*
2021 WL 3472379
(W.D. Wash. July 26, 2021)................................... 26

*Knick v. Twp. of Scott,*
588 U.S. 180, 189 (2019) ........................................ 3

*Marvin M. Brandt Revocable Tr. v. United States,*
572 U.S. 93 (2014) .................................................. 2

*McIntyre v. Ohio Elections Comm'n,*
514 U.S. 334 (1995) ............................................... 30

*New York State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) ................................................... 30

*PAJ Inv. Grp., LLC v. El Lago N.W. 7th Condo. Ass'n,*
405 So. 3d 401 (Fla. 3d Dist. Ct. App. 2024)............ 31

*Preseault v. I.C.C.,*
494 U.S. 1 (1990) ................................................ 8, 9

*Sears v. United States,*
132 Fed. Cl. 6 (2017) ............................................ 23

*Spinner v. State,*
167 N.Y.S.2d 731
(N.Y. App. Div. 3d Dep't 1957)................................ 33

*Toews v. United States,*
376 F.3d 1371 (Fed. Cir. 2004).......................... 17, 18

*Tyler v. Hennepin Cnty.,*
598 U.S. 631 (2023) ........................................... 3, 30

iv

*United States v. Mitchell,*
  463 U.S. 206 (1983) .................................................. 14

*Wallace v. Harmstad,*
  44 Pa. 492 (1863) ..................................................... 31

*Wilkins v. United States,*
  598 U.S. 152 (2023) .................................................. 3

**Statutes**

National Trails System Act,
  16 U.S.C. §§ 1241–51 ............................................ 7, 8

**Other Authorities**

*40 Years of United America by Trail*, Rails to Trails
  Conservancy (last visited Apr. 9, 2026) ................... 12

Brian Hill,
  *Atlanta Beltline Project Illegally Grabbed Land,*
  *Judge Rules; Fed Ordered to Pay 32 Landowners,*
  Fox5 Atlanta (Feb. 8, 2022)..................................... 27

Byron K. Elliott,
  *A Treatise on the Law of Railroads* (2d ed. 1907)..... 7

Edward Coke,
  *Institutes of the Laws of England* (1628) ................. 32

*Freight Rail Facts & Figures*, Ass'n of Am. R.Rs, (last
  visited Apr. 9, 2026) ............................................. 12

*Frequently Asked Questions – Rock Island Trail*, Mo.
  State Parks (last visited Apr. 9, 2026)..................... 23

*Graves Introduces Bill to Protect Landowner Rights*,
  Congressman Sam Graves (Aug. 8, 2025) ............... 22

Hannah Ray Lambert,
   *Farmers Sow Opposition to Wine Country Multi-Use*
   *Trail*, KOIN (Apr. 21, 2020) ..................................... 21

Headwaters Econs., *Legal Issues Associated with*
   *Trails: An Introduction* (2016) ............................... 18

*Hearing on H.R. 2438 and H.R. 1995: Hearing Before*
   *the Subcomm. on Nat'l Parks & Pub. Lands of the H.*
   *Comm. on Res.*,
   105th Cong. 76–79 (1997) .................19, 20, 22, 25, 26

James Kent,
   *Commentaries on American Law* (1829) .................. 33

Jiani Wang et al., *Global Average Socio-Economic*
   *Farm Size May Triple by 2100*, Nature Commc'n
   (Oct. 17, 2025) ........................................................ 19

Kirk Teska,
   *The Dark Secrets of Rail Trails*, Found. of Econ.
   Educ. (Dec. 1, 2004) .................................................. 8

Mark F. (Thor) Hearne II et al.,
   *The Trails Act: Railroading Property Owners and*
   *Taxpayers for More Than a Quarter Century*, 45 Real
   Prop., Trust & Est. L.J. 115 (2010).................... 21, 27

*Premodern to Modern America Jurisprudence:*
   *The Onset of Positivism*, 50 Vand. L. Rev. 1387
   (1997) ...................................................................... 32

Rose Hansen, *Katy Trail Landowners: Then and Now*,
   Mo. Life (Dec. 15, 2019)........................................... 12

Ruben N. Lubowski et al., Econ. Rsch. Serv., U.S. Dep't
   of Agric., Econ. Info. Bull. No. 14, *Major Uses of*
   *Land in the United States, 2002* (2006) ................... 12

Ryan Benjamin, *How Much Pasture Do I Need and What Are AUMS?*, Univ. of Nebraska—Lincoln Inst. of Agric. & Nat. Res. (Feb. 1, 2023) .......................... 18

U.S. Dep't of Transp., *Rails with Trails: Best Practices and Lessons Learned*(2021),.................................... 18

*Wheat Farms, Flour Mills, and Railroads: A Web of Interdependence (Teaching with Historic Places)*, Nat'l Park Serv. (last updated Mar. 30, 2023) ........ 13

William Blackstone, *Blackstone's Commentaries* (St. George Tucker ed., 1803)................................. 32

William Blackstone, *Commentaries on the Laws of England* (1765)........ 31

*Zoonotic Disease in Agriculture*, AgriSafe Network (last visited Apri. 9, 2026)....................................... 22

## Identification and Interest of Amici Curiae[1]

Missouri Farm Bureau Federation, Illinois Agricultural Association (also known as Illinois Farm Bureau), Idaho Farm Bureau Federation, Oregon Farm Bureau, Ohio Farm Bureau Federation, and Wyoming Farm Bureau Federation are non-profit membership organizations dedicated to supporting agricultural efforts throughout their home states, offering benefits to hundreds of thousands of members. Most members of their respective Farm Bureaus are actively engaged in agricultural pursuits. But even those who are not so engaged nevertheless support the rural way of life and recognize the vital role agriculture plays across the state and the globe. Farm Bureau amici have

[1] All parties have consented to the filing of this brief, which was not authored, in whole or part, by any party's counsel. No party, party's counsel, or person, other than amici or its counsel, contributed money intended to fund the preparation or submission of this brief. The Missouri Farm Bureau Federation, Illinois Farm Bureau Federation, Idaho Farm Bureau Federation, Oregon Farm Bureau, Ohio Farm Bureau Federation, and Wyoming Farm Bureau Federation all authorized the filing of this brief on their behalf. Mountain States Legal Foundation has authorized the filing of this brief on its behalf, including authorization given by Mountain States' general counsel. Pacific Legal Foundation's Board of Trustees authorized the filing of this brief on behalf of Pacific Legal Foundation.

1

a vital interest in the outcome of this case. Because railroad and Trails Act easements so frequently run through farmland, farmers feel the impact of this Court's decisions about the scope of Trails Act takings with particular force.

Mountain States Legal Foundation is a nonprofit, public-interest legal foundation organized under the laws of the State of Colorado. Founded in 1977, Mountain States is dedicated to individual liberty, the right to own and use property, limited and ethical government, and free enterprise. Mountain States regularly litigates and participates as amicus curiae in cases involving the proper limits of federal regulatory authority and the protection of private property rights. *See, e.g.*, *Marvin M. Brandt Revocable Tr. v. United States*, 572 U.S. 93 (2014) (holding in favor of Mountain States clients that when a railroad abandoned its easement, the property reverted to the landowner rather than to the federal government). In particular, Mountain States has a longstanding interest in ensuring that when the federal government burdens private property for public use, the government complies with the Constitution's requirements, including the obligation to provide just compensation.

Pacific Legal Foundation is a nonprofit corporation organized for the purpose of litigating matters affecting the public interest in private property rights, individual liberty, and economic freedom. Pacific Legal has argued and won many cases before the U.S. Supreme Court and other courts in defense of property rights. *See, e.g., Tyler v. Hennepin Cnty.*, 598 U.S. 631 (2023) ("private property" in the Fifth Amendment is not entirely defined by state law); *Wilkins v. United States*, 598 U.S. 152 (2023) (Quiet Title Act's statute of limitations is not jurisdictional); *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021) (state granting union representatives access to private property is a taking); *Knick v. Twp. of Scott*, 588 U.S. 180, 189 (2019) (reopening federal courts to takings claimants).

This case presents issues of exceptional importance to property owners nationwide, especially those whose land is subject to railroad easements and potential conversion under the Trails Act. The Court's resolution of the case will have significant implications for how courts determine the scope of property interests taken by the federal

government and how compensation is measured. Amici have a strong interest in ensuring that courts apply clear, administrable rules that protect property owners from the expansion of federal power beyond established legal boundaries, and that they hold the government to the property interests it has defined and taken. Accordingly, amici submit this brief to underscore the real-world consequences of Trails Act conversions and to support a framework that respects both settled property principles and constitutional protections.

## **<u>Introduction</u>**

A central tenet of our democracy is that the government has to pay for what it takes. That hadn't always been true for early Americans. When the King wanted to take private land, he did it with relative ease and without any obligation to compensate whoever owned it. The Framers responded to that problem with the Fifth Amendment's Takings Clause, which prohibits our government from taking private property for public use "without just compensation." Now, private individuals can purchase real property with the assurance that if the government elects to use eminent domain, they will be compensated for their loss. To be

sure, the government can take your land. But it has to pay you fairly for it. Our whole conception of private property stands atop that premise.

This case tests whether that promise is worth any more than the paper it's written on. A few years ago, a former railroad corridor running through Marty Kotis's property was converted into a public trail under the National Trails System Act. Everyone agrees that was a "taking" under the Fifth Amendment. But the government says it was an infinitesimally small one, that the taking deprived Mr. Kotis of his property only to the extent the trail sponsor *actually* prevented him from pursuing a particular use. For his part, Mr. Kotis maintained that the correct scope of a taking must encompass *all* of the legal rights he lost, not just those the sponsor has chosen to restrict at a particular moment. The Court of Federal Claims agreed with him, recognizing the full extent of his property rights and awarding him a substantial judgment. There are a host of reasons that was the right decision. The bulk of them are in Mr. Kotis's brief.

But amici write to underscore several additional reasons this Court should affirm. From the outset, because railroad rights-of-way burden so

much farmland, this Court's Trails Act jurisprudence carries particular weight for those in the agriculture industry, and this Court should take care to craft rules that recognize the full extent of their losses. And farmers' firsthand accounts of those losses confirm what the trial court's opinion recognized: landowners whose property is subject to Trails Act easements lose all ability to exclude from their property. Finally, that result is consistent with the history and tradition of American property law, which make clear that a taking by easement must be judged by the legal burdens it places on the landowner, not just the specific burdens the trail sponsor has decided to impose at any given time.

If the Takings Clause is to mean anything, it must mean at least this: when the government takes private property, it pays for *all* of it. That obligation doesn't shrink simply because one kind of easement ends and another begins. The Court of Federal Claims recognized as much, and this Court should affirm.

<u>**Argument**</u>

**I.    Congress Creates the Railbanking Process, Which Places New Burdens on Private Landowners.**

In the last few decades, the tension between the government's power to take and the individual's right to be compensated has come to a particular head with the passage of the National Trails System Act, colloquially known as the "Trails Act." 16 U.S.C. §§ 1241–51. Although it was originally enacted in 1968, Congress amended the statute in 1983 to create a procedure known as "railbanking." *Id.* § 1247(d).[2] By that time, many railroads had fallen into disuse and were on the verge of being (or had already been) abandoned. To provide a bailout to railroad companies and encourage development of those corridors at the same time, Congress allowed railroads to enter into "railbanking" agreements with other

---

[2] When a railroad forcibly acquires an interest in an owner's property for a rail line, it may only take what is necessary to accomplish its public use or purpose. *See* 2 Byron K. Elliott, *A Treatise on the Law of Railroads* § 954 (2d ed. 1907) ("The legislature is the sole judge of the estate to be taken in lands required for the construction of a public work, and may authorize the taking of the fee, or of any less interest. *But where, as is usually true in the case of railroads, an easement is only required, no greater estate can be taken unless the power to take the fee is expressly conferred.*" (emphasis added)).

parties known as "sponsors." *See Preseault v. I.C.C.*, 494 U.S. 1, 5–6 (1990); *see also* Kirk Teska, *The Dark Secrets of Rail Trails*, Found. of Econ. Educ. (Dec. 1, 2004), https://dub.sh/jfXrWc0.

Railbanking gives railroad companies a way to cede control of these corridors without abandoning them, thus preventing their rail easement from reverting to the fee owner. Under the railbanking mechanism, the railroad transfers its interest to a sponsor which then ostensibly develops the easement into a recreational trail. 16 U.S.C. § 1247(d). All the while, the railroad retains ("banks") the right to restore rail service in the future. *Id.* That process involves three parties: the railroad and putative sponsor enter into an agreement, and the federal Surface Transportation Board approves or denies it. *Id.* Property owners do not get a seat at that table.

With the advent of railbanking came some considerable growing pains for owners of property subject to these new trail easements. Where before their easements had generally only permitted railroads and their personnel to enter the property, now their land was suddenly accessible to the public at large. And at first, it was not even clear that owners had

to be compensated for these new easements under the Fifth Amendment. So the Trails Act drew a swift wave of opposition in the 1980s and 90s. *See infra* pp 19–22, 25–26. Fortunately, the Supreme Court has strongly implied that railbanking is indeed a taking, *Preseault*, 494 U.S. at 13, and the federal government has since adopted that view when litigating Trails Act cases.

With that more or less settled, more recent Tucker Act cases have centered on the proper *dimensions* of a particular Trails Act easement— both physical as a matter of metes and bounds, and legal as a matter of property rights. Those dimensions matter because a larger trail corridor means a larger taking, which can mean substantially greater compensation. That's what is at issue here: the parties sharply dispute the dimensions of the rail corridor in question. And as amici explain below, this Court should recognize that our Constitution requires compensation for the whole bundle of legal rights the government takes from a property owner via a Trails Act easement.

## II. This Court's Decision Will Have Far-Reaching Consequences for Private Property Owners Nationwide, and for Farmers in Particular.

This case ostensibly involves a single commercial developer in North Carolina. But the interests at stake extend well beyond Mr. Kotis, his property, and the city of Greensboro. At the center of this case lie a number of critical, and critically unresolved, questions about how to calculate a landowner's loss when the government takes his land through the Trails Act. Given the sheer mileage of property that has already been, or could yet be, subject to a Trails Act taking in the United States, and given this Court's unique position as the near-final arbiter of Tucker Act cases, the Court's decision in this case will reverberate far beyond the individual property interests at issue here. It's thus crucial that this Court craft rules that recognize the full extent of what property owners across the country lose when the government takes their land via the Trails Act.

**A.    Railroad easements frequently burden the land of farmers and individual property owners, and the Trails Act's reach continues to grow.**

Railroad rights-of-way crisscross our country. Beginning in the mid-nineteenth century, the nation's rail network expanded at a breathtaking pace, growing from 35,000 miles of track at the end of the Civil War to a peak of about 254,000 miles by 1916. *Freight Rail History: Key Milestones from 1804 to Today*, Ass'n of Am. R.Rs., https://dub.sh/XMdFMz4 (last visited Apr. 9, 2026). Railroads obtained the right to use that land through a few different mechanisms. The first was through land grants, in which the government effectively gave property it owned over to railroads to encourage investment. The second was by purchasing the land outright in fee simple from whoever owned the property. And third was through paying either the federal government or private landowners not for total ownership of the property, but only for an easement through which the company could run its track. The scope of those easements depended on the terms of the particular grant, but many of them stated that the land could be used "for a railroad, and for no other purposes." Rose Hansen, *Katy Trail*

11

*Landowners: Then and Now*, Mo. Life (Dec. 15, 2019), https://dub.sh/ymUGKmG.

Although railroads by no means enjoy the same centrality to our country's shipping industry as they once did, most of that track still remains in place today. The freight rail network alone, for instance, still spans nearly 140,000 miles. *Freight Rail Facts & Figures*, Ass'n of Am. R.Rs, https://dub.sh/ecVOwod (last visited Apr. 9, 2026); *see also* Ruben N. Lubowski et al., Econ. Rsch. Serv., U.S. Dep't of Agric., Econ. Info. Bull. No. 14, *Major Uses of Land in the United States, 2002*, at 31–33 (2006), https://dub.sh/0KVBmpf (as of 2003, railroads occupied over 3 million acres). Yet only a relatively small percentage of that mileage has been converted to public trails since the amendment of the Trails Act in 1983. Only about 18% of the freight rail network, or roughly 26,000 miles, has been railbanked. *40 Years of United America by Trail*, Rails to Trails Conservancy, https://dub.sh/MHMhHsx (last visited Apr. 9, 2026). That means that many thousands of miles of our country's expansive railroad system could be subject to new Trails Act easements in the future.

In all likelihood, farmers will disproportionately bear the impact of those takings. So many of railroads' easements run through agricultural land because the flat, open terrain was ideal for construction. *E.g.*, *Wheat Farms, Flour Mills, and Railroads: A Web of Interdependence (Teaching with Historic Places)*, Nat'l Park Serv., https://dub.sh/c3UYCgC (last updated Mar. 30, 2023). And the railroads in turn brought promise of more work, more customers, and more industry, so many farmers were more than happy to sell railroad easements. What emerged was the picture we have today. Although railroads own some of their underlying land outright, much of the land their tracks run through belongs to private owners. Given the historical prevalence of railroad easements through agricultural land, farmland no doubt accounts for a substantial share of that property.

Any decision, then, that sets precedent about the scope of Trails Act takings will be felt with particular force by farmers and other rural landowners.

13

**B.** **This Court often has the last word on Trails Act takings.**

Compounding the impact on farmers and private property owners, any Trails Act precedent this Court sets will likely be the final word on the subject.

When the government takes private property, the owner generally only has one procedural mechanism available. He can file a case against the government under the Tucker Act, which waives the federal government's sovereign immunity and lets private individuals sue it for constitutional violations, breaches of contract, and the like. *E.g.*, *United States v. Mitchell*, 463 U.S. 206, 218 (1983). If a Tucker Act plaintiff seeks more than $10,000 in damages—as almost all of them do—he has to file suit in the Court of Federal Claims, and can only appeal to this Court. *See, e.g.*, *Acceptance Ins. Cos. v. United States*, 503 F.3d 1328, 1336 (Fed. Cir. 2007). In that way, the Tucker Act funnels almost all affirmative takings cases generally (and Trails Act claims in particular) first to the Court of Federal Claims, and then up to this Court—meaning this Court generates almost all Tucker Act rails-to-trails jurisprudence.

Thus, whatever precedent this Court sets will have significant ramifications. A ruling here will affect private property owners across the country whose land sits in the path of a former rail corridor, with an especially acute impact on those involved in agriculture. Given these stakes, this Court should take care to shape principles that reflect what private property owners have long understood: Trails Act easements significantly burden the property owner, and the Constitution requires they be adequately compensated.

## III. Landowners' Lived Experiences Confirm That a Trails Act Easement Eliminates Their Right to Exclude from Encumbered Private Property.

This case turns in large part on a question inherent in most Tucker Act suits: how much has a property owner actually lost? The answer, of course, depends on how much the new trail easement interferes with the owner's existing property. Below, the Court of Federal Claims agreed with Mr. Kotis that he had "effectively los[t] all property rights within the corridor," including the right to build and maintain improvements on the land, because he "undoubtedly lack[ed] th[e] right" to exclude others from the property. Kotis Br. 39–40.

15

That's the right decision on the merits, as Mr. Kotis explains in his brief. The Trails Act "creates a new easement for a new use," and that new use undermines the owner's right to exclude under North Carolina law, Kotis Br. 41 (internal quotation marks omitted), which the Supreme Court has characterized as "one of the most essential sticks in the bundle of [property] rights." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149–50 (2021).[3]

And as any farmer whose land is burdened by a trail easement will tell you, that's also the only conclusion that reflects their lived reality.

### A.    Farmers acutely feel the loss of their ability to exclude from the taken corridor.

Farmers whose land is subject to a trail easement feel the loss of their right to exclude every day. Often, a trail will cut a farmer's land in half, preventing her from using it as one contiguous parcel. Or a trail will wind so close to a farmer's facilities that she's effectively forced to relocate her livestock. And that is all to say nothing of the ever-present specter of

---

[3] It's also in line with overwhelming precedent in the Court of Federal Claims. *E.g.*, *Jackson v. United States*, 155 Fed. Cl. 689, 702 (2021) (collecting cases).

16

trespassers, who pose risks to crops, livestock, and the safety of landowners themselves, as well as carry the threat of liability. Whatever the particular impact looks like on any given day, farmers whose land is encumbered by a trail easement know—and feel—firsthand that they have lost the ability to exclude the public from the trail corridor or otherwise do *anything* that could be "inconsistent" with trail usage.

Start with perhaps the most obvious problem when it comes to trail easements that run through farmland: they can for all intents and purposes cut a single property owner's land in half. When a railroad owned the easement, that was usually not a problem because the landowner could still "cross[] over the tracks" when a train wasn't coming. *Toews v. United States*, 376 F.3d 1371, 1376 (Fed. Cir. 2004). So notwithstanding that easement, a farmer could still walk or move equipment across to get to his crops; his cattle could graze on both sides; and he could otherwise treat his land as one unified tract. Not so once that corridor becomes a trail. At that point, the new easement imposes new and "different burdens." *Id.*

Chief among these new burdens are public access rights. Where in the past only railroad personnel had a right to be on the land, now *anyone* can access the trail. And to facilitate public access to trails, sponsors often take actions that make it difficult if not impossible for property owners to cross them. For instance, they often put up fencing and park benches. *Id.* They might install vegetation barriers or bollards. U.S. Dep't of Transp., *Rails with Trails: Best Practices and Lessons Learned* 54–55 (2021), https://dub.sh/IWBvSGe; Headwaters Econs., *Legal Issues Associated with Trails: An Introduction* 6 (2016). They might even put up the "occasional billboard[]." *Toews*, 376 F.3d at 1376.

In practice, that all makes it exceptionally difficult for a landowner to move from one end of his property to another. That's a problem for any property owner. But it's especially troublesome for farmers, who so often need ready access to their full tract to make sensible use of it. Cattle, for instance, need continuous acreage to graze. Ryan Benjamin, *How Much Pasture Do I Need and What Are AUMS?*, Univ. of Nebraska—Lincoln Inst. of Agric. & Nat. Res. (Feb. 1, 2023), https://dub.sh/3Cj3Rdo. Farmers need to transport machinery to harvest their crops. And a farmer needs

18

to be able to make use of all of his available property to maximize production. *See* Jiani Wang et al., *Global Average Socio-Economic Farm Size May Triple by 2100*, Nature Commc'n (Oct. 17, 2025) https://dub.sh/kAilfNy ("Farm size is vital for food production . . . .").

Even where a trail doesn't chop an owner's land into separate parcels, its presence can still interfere with the owner's productive use of his land. Take the Glosemeyer family from Missouri, who ended up becoming early property-right champions in the fight over Trails Act takings. After the Missouri River flooded in 1986, the Missouri-Kansas-Texas Railroad pulled up its tracks, some of which cut through the Glosemeyers' farmland. Hansen, *supra*. That trail ran "*two feet* from [their] livestock pens and sheds." *Hearing on H.R. 2438 and H.R. 1995: Hearing Before the Subcomm. on Nat'l Parks & Pub. Lands of the H. Comm. on Res.*, 105th Cong. 76–78 (1997) (Statement of J. Glosemeyer) (emphasis added), https://dub.sh/z2jhGUN [hereinafter "Glosemeyer Testimony"]. Now that the general public could traverse their property, the Glosemeyers suddenly had to worry about "the potential for liability

19

and disease from human contact with [their] livestock" given the facilities' proximity to the trail. *Id.*

As a result, the Glosemeyers had to rent livestock facilities on someone else's land—*two miles* from their own farm. *Id.* Ms. Glosemeyer succinctly explained the irony in her congressional testimony: "Just imagine, owning plenty of land to operate and expand [y]our farm . . . only to have [the] government . . . force [you] to rent land because the program has made [y]our land unfit." *Id.* Post-Trails Act, that's the world that many farmers find themselves in.

Setting aside the fact that a trail easement so often inhibits a farmer's productive use of his land, landowners still have to reckon with the ever-present danger of trespassers, now compounded by opening up the land to the public. For one thing, any public access to one's land, authorized or not, invites privacy concerns. *See id.* (explaining the "privacy [she'd] lost because of the trail"). It's one thing for the occasional train or maintenance crew to go through your property periodically; it's a different matter entirely for any member of the public to be able to walk through it at virtually any time, any day. For another, hikers often leave

20

trash behind that the landowner then has to ensure is cleaned up on a regular basis. But the dangers of unauthorized access run much deeper than that. Trespassers pose very real risks to the safety of property owners. In one instance in Arizona, a farmer counted "more than 300 people" crossing onto his land. Mark F. (Thor) Hearne II et al., *The Trails Act: Railroading Property Owners and Taxpayers for More Than a Quarter Century*, 45 Real Prop., Trust & Est. L.J. 115, 133–34 (2010). Tragically, one trespasser likely shot and killed a neighboring rancher. *Id.*

Trespassers also threaten the health of a farmer's crops and livestock. When it comes to crops, people and domesticated animals might contaminate them by leaving behind trash or feces.  Hannah Ray Lambert, *Farmers Sow Opposition to Wine Country Multi-Use Trail*, KOIN (Apr. 21, 2020), https://dub.sh/t46oPns. When it comes to livestock, folks not in the agriculture industry often don't know how to behave around farm animals. Ms. Glosemeyer recounted one such example. One afternoon, she "returned home to find a woman, off of her bicycle, sitting in the shade of [their] shed, while her child chased one of [her] piglets

21

around [her] field." Glosemeyer Testimony, *supra*, at 78. She "shudder[ed] to think" what might've happened if the piglet's 600-pound mother had come to rescue her baby. *Id.* And that's to say nothing of the diseases that farm animals might pass onto unsuspecting hikers. *Zoonotic Disease in Agriculture*, AgriSafe Network, https://dub.sh/gyGPQOV (last visited Apri. 9, 2026). All of these dangers, of course, also carry with them the attendant risk of liability for farmers who own the land.

This kind of interference has grown to be so pervasive that it has attracted congressional attention. In 2025, Representative Sam Graves of Missouri introduced the Rails to Trails Landowner Rights Act, which would require landowner consent before a railroad easement could be converted to a trail. He echoed a sentiment those in the agriculture industry have felt for years: The "right to own property, to farm, and to provide for [one's] famil[y] is sacred." *Graves Introduces Bill to Protect Landowner Rights*, Congressman Sam Graves (Aug. 8, 2025), https://dub.sh/b15VwwS. All too often, rails-to-trails projects impinge upon that right.

22

To their credit, some trail sponsors have tried to solve these problems. For instance, to soften the blow when a trail cuts a farmer's land in half, sponsors have created "gate crossing system[s]" that temporarily "close off the trail to allow the movement of cattle from one side to the other." *Frequently Asked Questions – Rock Island Trail*, Mo. State Parks, https://dub.sh/p5pTwG3 (last visited Apr. 9, 2026).[4] And to deter trespassers, some sponsors have marked the corridor's boundaries at regular intervals and provided signage at trailheads, and will install fencing free of charge on adjacent property owners' land. *Id.* Admirable as those efforts are, they are by no means a complete fix. When it comes to discrete crossing points, cattle still can't make use of a full parcel, and a farmer doesn't enjoy frictionless traversal between both sides of his own

---

[4] Some states' property law also recognizes an inherent right-of-way when the easement would make one of the pieces of land inaccessible. *E.g.*, *Sears v. United States*, 132 Fed. Cl. 6, 25 (2017). But the second parcel must be truly *inaccessible*; it's not enough that it is extremely hard to get to. *E.g.*, *Cockrell v. Hawkins*, 764 N.E.2d 289, 293 (Ind. Ct. App. 2002). And in any event, even if a landowner technically has the right to cross over the trail, sponsors often will still try to prevent farmers from doing so, which invites a lengthy legal or administrative battle that individual landowners are not able to take on.

land. When it comes to trespassers, that's as simple as ignoring a sign and hopping a fence.

But the more fundamental problem brings us back to where we began. Even if a sponsor at the present moment seems willing to cooperate with landowners who've lost the right to exclude from the corridor, there's nothing to stop the sponsor from reversing course. It could at any moment decide to remove crossing stations, tear down its fencing, or destroy encroaching structures—it has the right to under the terms of its trail easement. Kotis Br. 44, 52–54. That problem is particularly acute where, as here, the sponsor is a municipality whose leadership changes every few years.

Landowners, farmers especially, must be compensated for all permissible uses they have lost, not just those the government claims it intends to exercise. Chief among those is the right to exclude others. Farmers whose land is burdened by a trail easement experience the loss of that right every day.

24

**B.    Trail sponsors themselves know that property owners have lost the right to exclude.**

Sponsors' own behavior confirms that landowners can no longer exclude others from their property. For one thing, sponsors often exercise their right to exclude and eject uses that don't align with trail use. For another, some sponsors have even gone so far as to sell or lease the property owner's rights *back* to him. The government is hard-pressed to argue that trail sponsors do not obtain the right to "remove improvements in existence at the time of railbanking," Gov. Br. 38, given that the sponsors themselves think they can.

**1.    Sponsors frequently exercise their rights to exclude and eject.**

To begin, despite efforts by some sponsors to work with landowners, many don't take nearly as cooperative an approach. Take the example of Howard Woodbury, a farmer from Kansas. When a discontinued railroad that ran through his property was being developed into a trail, he worried that he wouldn't be able to make full use of his land to graze his cattle. *Hearing on H.R. 2438 and H.R. 1995: Hearing Before the Subcomm. on Nat'l Parks & Pub. Lands of the H. Comm. on Res.*, 105th Cong. 79 (1997)

25

(Statement of H. Woodbury), https://dub.sh/z2jhGUN [hereinafter "Woodbury Testimony"]. Unfortunately, he was right. When he talked to the trail's manager about it, the manager relayed that anyone who attempted to even *use* the land "could be arrested." *Id.*

In addition to prohibiting certain types of access or traversal, many sponsors choose to remove overlying structures they deem out of step with trail use. In *King County. v. Abernathy*, for example, individual landowners had constructed and maintained "docks, boat lifts, decks, fences, and other structures" that overlay a railroad easement. 2021 WL 3472379, at *1 (W.D. Wash. July 26, 2021). As soon as the railroad ceded its interest and King County obtained a trail easement, however, the county sued to eject the improvements. *Id.* at *1, *20. It succeeded, because the court found that the county had obtained the right to exclude the owners from the corridor. *Id.* at *23–24. Something similar happened in Georgia. When an Atlanta rail development group obtained a trail easement for its BeltLine project, it discovered that dozens of landowners had fences, sheds, and other improvements that encroached on the right-of-way. *See Albano v. United States*, 152 Fed. Cl. 343, 346 (2021)

26

(recounting this history in a related case); Brian Hill, *Atlanta Beltline Project Illegally Grabbed Land, Judge Rules; Fed Ordered to Pay 32 Landowners*, Fox5 Atlanta (Feb. 8, 2022), https://dub.sh/QTd6zcQ. It promptly sued to eject, and won. *Albano*, 152 Fed. Cl. at 346. Trail sponsors know they have the right to exclude from the corridor—they exercise it every day.

They also often try to turn that right into profit. "All too often the Trails Act serves, not to build trails, but as a tool for a private or public 'trail group' to acquire rights to profit from the land." Hearne et al., *supra*, at 131. Sponsors, frequently municipalities, will acquire a trail easement for pennies on the dollar from the railroad (after all, the railroad was probably going to abandon the right-of-way anyway) and then turn around and charge rent from the property owner in exchange for a promise not to eject improvements to the corridor. *See, e.g.*, *Cheshire Hunt, Inc. v. United States*, 158 Fed. Cl. 101, 112 (2022) (observing that the county sponsor "allows encroachments in the corridor—it just licenses their presence"). Sometimes they'll even try to *sell* the land back to the owner—in fact, that's what occurred in this case. Gov. Br. 37.

27

Greensboro petitioned for a clarification from the Surface Transportation Board, which would have narrowed the corridor, precisely because it had tried to sell the land outside the narrowed corridor *back* to Mr. Kotis. *Id.*

All told, the Court of Federal Claims was right to find that Greensboro's easement eliminated all meaningful property rights of Mr. Kotis in the encumbered land. Not only is that the correct result as a matter of law, it's also consistent with the real-world experiences of farmers and landowners across the country. The Supreme Court has repeatedly held that, as to property reserved by its owner for private use, "[t]he right to exclude is . . . one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Cedar Point Nursery*, 594 U.S. at 149–50 (internal quotation marks omitted). As private property owners know all too well, when a Trails Act easement strips that right away and replaces it with near-constant access by the public, that is a severe loss. And the Constitution requires that the landowner be compensated for it.

**IV.  The History and Tradition of Anglo-American Property Law Confirm That an Easement's Scope Is Defined by the Legal Rights It Confers, Not by How It's Actually Used.**

28

In an effort to minimize that point, the government claims that the value of an easement turns not on the bundle of legal rights it encumbers, but on how the government or sponsor *actually* chooses to exclude a property owner at any particular moment. It frames this as a "real-world assessment of fair market value." Gov. Br. 44. And it contends that because the City stated it would not remove Mr. Kotis's improvements or "prohibit [him] from putting [his] properties to existing uses," Gov. Br. 44, the government took less of his property and he's entitled to less compensation. That is wrong. As Mr. Kotis ably explains in his merits brief, the Fifth Amendment demands that landowners be compensated for the entire bundle of legal rights the government takes. Kotis Br. 49–56.[5] Amici write separately to emphasize that the history and tradition of American property rights confirm as much.

---

[5] To be clear, a new "actual use" would not be a fresh taking that would trigger the Fifth Amendment anew. It is well-settled that the taking occurs when the Surface Transportation Board issues its Notice of Interim Trail Use, not when the government or sponsor uses the corridor in any particular way. *Caldwell v. United States*, 391 F.3d 1226, 1229 (Fed. Cir. 2004).

29

"Constitutional rights are enshrined with the scope they were understood to have when the people adopted them[.]" *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008). To determine that scope, courts look to "text and history." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 22 (2022). And "[w]here the meaning of a constitutional text . . . is unclear, the widespread and long-accepted practices of the American people are the best indication of what fundamental beliefs it was intended to enshrine." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 378 (1995) (Scalia, J., dissenting).

The Takings Clause is no exception. To identify the contours of a property interest that has been taken, courts look not only to state law as it existed at the time of the taking, but also to "traditional property law principles" and "historical practice." *Tyler*, 598 U.S. at 638. The Court traced those principles in *Tyler* from the Magna Carta through Blackstone and into the founding era, concluding that "[h]istory and precedent" foreclosed the state's attempt to redefine away a property interest rooted in centuries of common law. *Id.* at 639.

By a similar token, the Founding-era understanding of property rights underscores that a taking by easement must be measured by the legal burden imposed, not the actual disruption in use. Early American scholars understood that an easement is by definition coterminous with the legal rights and burdens it confers.

An easement is what the English common law called an "incorporeal hereditament"—a property right that exists "merely in idea and abstracted contemplation," apart from the physical land it burdens. 2 William Blackstone, *Commentaries on the Laws of England* 21 (1765);[6] *see also PAJ Inv. Grp., LLC v. El Lago N.W. 7th Condo. Ass'n*, 405 So. 3d 401, 407 (Fla. 3d Dist. Ct. App. 2024). The common law distinguished those kinds of intangible interests from "corporeal" (physical) property, which could pass from one person to another through "livery," or a traditional handover. *Wallace v. Harmstad*, 44 Pa. 492, 495 (1863) (citing Blackstone and Lord Coke). Unlike a particular tract of land for instance, an easement has no physical dimensions. Its scope, then, began and

---

[6] Blackstone's works were "the preeminent authority on English law for the founding generation." *Heller*, 554 U.S. at 593–94.

31

ended with the legal grant, whether it be express or implied. And because in the case of incorporeal hereditaments there was nothing physical to hand over from one person to another, transfer of this kind of interest could only pass "by deed," and not "by livery." 1 Edward Coke, *Institutes of the Laws of England* § 9 (1628). At English common law, then, an easement was coterminous with its legal definition. There was no distinction between how it operated as a matter of law and how it existed in the real world.

The Framers adopted that conception of an easement wholesale, as post-ratification sources confirm. "[T]he most important early American edition of Blackstone's Commentaries," written by St. George Tucker, reproduced and adopted Blackstone's view of rights-of-way without substantive objection. *Heller*, 554 U.S. at 594; *accord* 1 William Blackstone, *Blackstone's Commentaries* 35 (St. George Tucker ed., 1803).[7] Early American scholar Chancellor James Kent made the concept even

---

[7] Another scholar has observed that Tucker's commentaries "fixed the Blackstone tradition in this country." Stephen M. Feldman, *From Premodern to Modern America Jurisprudence: The Onset of Positivism*, 50 Vand. L. Rev. 1387, 1396 n.23 (1997).

more explicit. In his writing on easements, he outlined the "general rule" that "when the use of a thing is granted, every thing is granted by which the grantee may have and enjoy such use." 3 James Kent, *Commentaries on American Law* 175–76 (1829). In other words, the scope (and therefore value) of an easement is defined by what it *legally* permits, not only by what it's actually used for on any given occasion. A host of nineteenth century decisions carried that understanding forward. *E.g.*, *Atkins v. Bordman*, 43 Mass. 457, 467 (1841).

Those principles have made their way into more modern case law as well. In the condemnation context, for example, courts routinely measure a taking by the legal rights lost and not the factual burden imposed by the government at any particular moment. The Fifth Circuit for instance has observed that "landowners are entitled to assume in [a] condemnation suit that the Government will make the full use physically possible of any easement described in the complaint." *2,953.15 Acres of Land, More or Less, in Russell Cnty. v. United States*, 350 F.2d 356, 360 (5th Cir. 1965); *see also Spinner v. State*, 167 N.Y.S.2d 731, 733 (N.Y. App. Div. 3d Dep't 1957) ("If the State wishes to limit its rights under the

33

easement . . . it should do so by formal action, by deed, release or otherwise."). The Court of Federal Claims has repeatedly held as much too. *See, e.g.*, *Jackson*, 155 Fed. Cl. at 702 (collecting cases); *Illig v. United States*, 58 Fed. Cl. 619, 631 (2003). So has the Supreme Court. *See Kaiser Aetna v. United States*, 444 U.S. 164, 179–80 (1979).

This Court should follow that well-worn tradition here. As British common law, Founding-era scholars, and more recent cases around the country all make clear, the measure of a taking by easement is based on the legal rights lost, not actual use interfered with at any given time.

## Conclusion

The Takings Clause means what it says: the government has to pay a fair price for everything it takes from a private property owner. The Court of Federal Claims correctly recognized that that applies to legal rights too. This Court should affirm.

Respectfully submitted, this the 9th of April 2026

**WARD AND SMITH, P.A.**

*/s/ Mark S. Wigley*
Mark S. Wigley
Christopher S. Edwards
Post Office Box 33009
Raleigh, NC 27636-3009
Telephone: (919) 277-9100
Facsimile: (919) 277-9177
Mswigley@wardandsmith.com
Csedwards@wardandsmith.com

Kathryn D. Valois
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
(561) 691-5000
kvalois@pacificlegal.org
*Counsel for Amici Curiae*

## **<u>Certificate of Service</u>**

I hereby certify that on April 9, 2026, I caused the foregoing to be electronically filed with the Clerk of this Court using CM/ECF, which will send notifications of such filing to all registered participants.

<u>*/s/ Mark S. Wigley*</u>
Mark S. Wigley

*Counsel for Amici Curiae*

## <u>Certificate of Compliance</u>

1. This brief complies with the type-volume limit in Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) and Federal Circuit Rules 29(b) and 32(g), because, exclusive of the portions of the documents exempted by Federal Rule 32(f) and Federal Circuit Rule 32(b), this document contains 6,589 words.

2. Further, this document complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportional-width typeface using Microsoft Word 2016 in 14-point Century Schoolbook.

*/s/ Mark S. Wigley*
Mark S. Wigley

*Counsel for Amici Curiae*