**2025-1884**

# United States Court of Appeals for the Federal Circuit

KOTIS ASSOCIATES, LLC, KOTIS HOLDINGS, LLC, WESTOVER TERRACE II, LLC,

*Plaintiffs-Appellees,*

– v. –

UNITED STATES,

*Defendant-Appellant.*

*On Appeal from the United States Court of Federal Claims in No. 1:20-cv-00932-LAS*

## CORRECTED BRIEF OF AMICI CURIAE THE JOHN LOCKE FOUNDATION AND PROFESSOR DANIEL D. BARNHIZER IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

JEANETTE DORAN
DORAN LAW OFFICES
2012 TIMBER DRIVE
RALEIGH, NC 27609
(919) 332-2319
jeanette.k.doran.gmail.com

*Counsel for Amici Curiae*

APRIL 14, 2026

 COUNSEL PRESS   (800) 4-APPEAL • (392096)

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF INTEREST

**Case Number**  25-1884

**Short Case Caption**  Kotis Associates, et al., v. United States

**Filing Party/Entity**  John Locke Foundation and Professor Daniel D. Barnhizeer

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/08/2026

Signature:

Name:        Jeanette K. Doran

i

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☒ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☒ None/Not Applicable |
| John Locke Foundation | | |
| Daniel D. Barnhizer | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☒    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☐   No   ☒   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☒    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

*CERTIFICATE OF INTEREST*......................................................................... *i*

*TABLE OF CONTENTS*.................................................................................*iv*

*TABLE OF AUTHORITIES*.............................................................................*v*

*STATEMENT OF INTEREST OF AMICUS CURIAE*...........................................*1*

*INTRODUCTION AND SUMMARY OF ARGUMENT*.........................................*3*

*ARGUMENT*.................................................................................................*5*

  I.  THE RIGHT TO EXCLUDE IS THE CORNERSTONE OF PROPERTY OWNERSHIP UNDER NORTH CAROLINA LAW AND THE FEDERAL CONSTITUTION....................................................................................**5**

    A.  The Law Has Long Recognized the Right to Exclude as Foundational to Property Rights. .................................................................................5

    B.  The Supreme Court Has Confirmed That Governmental Denial of the Right to Exclude Is a Taking.........................................................................8

    C.  The Trails Act Cannot Be Read to Strip Landowners of the Right to Exclude Without Requiring Just Compensation. ........................................10

  II. NORTH CAROLINA POLICY CONSIDERATIONS COMPEL AFFIRMANCE. ........................................................................................**12**

    A.  The Greensboro Trail Network Provides a Case Study in the Real-World Impact of Trails Act Takings .............................................................12

    B.  Weakening the Right to Exclude Distorts the Property Market and Chills Investment in North Carolina.........................................................13

    C.  The Government's Position Would Create Perverse Incentives That Harm North Carolina Communities. ..........................................................17

*CONCLUSION*...........................................................................................*19*

# TABLE OF AUTHORITIES

CASES

*Ablan v. United States*, 162 F.4th 1364 (Fed. Cir. 2025)------------------------------11

*Armstrong v. United States*, 364 U.S. 40 (1960) ----------------------------------------15

*Caquelin v. United States*, 959 F.3d 1360 (Fed. Cir. 2020)-------------------------10

*Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021) ---------------------------------- 8

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979)------------------------------------ 8

*Nollan v. California Coastal Commission*, 483 U.S. 825 (1987) --------------------- 8

*Norfolk Southern Railway Co. v. Smith*, 611 S.E.2d 427 (N.C. App. 2005)--------- 7

*Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978) ---------------14

*Preseault v. United States*, 100 F.3d 1525, 1550 (Fed. Cir. 1996) (*Preseault II*)--10

*Toews v. United States*, 376 F.3d 1371 (Fed. Cir. 2004) -------------------------------10

STATUTES

N.C. Gen. Stat. § 40A-1 *et seq*------------------------------------------------------------ 6

N.C. Gen. Stat. § 40A-51---------------------------------------------------------------------- 6

National Trails System Act Amendments of 1983 ("Trails Act"), Pub. L. No. 98-11, codified at 16 U.S.C. §§ 1241–1251 -------------------------------------------------- 1

OTHER AUTHORITIES

2 William Blackstone, *Commentaries on the Laws of England* 2 (1766) ------------ 5

James Madison, *Property,* Nat'l Gazette, Mar. 29, 1792, reprinted in 14 The Papers of James Madison 266 (Robert A. Rutland et al eds. 1983) ----------------------5-6

John Locke, S*econd Treatise of Government §§ 27–28 (1690)* ---------------------- 5

Thomas W. Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 730 (1998). ----------------------------------------------------------------------------------- 6

## CONSTITUTIONAL PROVISIONS

N.C. CONST. art. I, § 19 --------------------------------------------------------------- 3

U.S. CONST. amend. V --------------------------------------------------------------- 3

**STATEMENT OF INTEREST OF AMICUS CURIAE**

The John Locke Foundation ("Locke") is a nonpartisan, nonprofit public policy think tank headquartered in Raleigh, North Carolina. Founded in 1990, it conducts research and analysis on state and federal policy questions affecting North Carolina residents and businesses. The John Locke Foundation's mission includes the protection of constitutional liberties—including, centrally, the right of private property—against governmental overreach. It regularly participates as amicus curiae in cases presenting significant constitutional or property rights questions affecting North Carolinians.

This case is of direct concern to the John Locke Foundation and to North Carolina property owners. The Kotis properties adjoin the former Norfolk Southern Railway corridor running through Greensboro, North Carolina—a corridor that has been railbanked pursuant to the National Trails System Act Amendments of 1983 ("Trails Act"), Pub. L. No. 98-11, codified at 16 U.S.C. §§ 1241–1251 for the construction of a public trail across the entire corridor. Dozens of North Carolina commercial and residential landowners whose properties border railbanked corridors across the state face the same legal uncertainty that the government's arguments would perpetuate: namely, whether the Trails Act strips them of the right to exclude, without full compensation, for an indefinite period.

1

Professor Daniel D. Barnizer is teaches and writes in the areas of contract law & theory, conservation law, comparative law, and the jurisprudence associated with the rule of law. Currently the Bradford Stone Faculty Scholar at Michigan State University College of Law, and a coauthor of casebooks in the fields of Contracts and Commercial Transactions, Professor Barnhizer also directs the Conservation Law Program and the Journals Program at the Law College, as well as the MSU College of Law Institute for Comparative Law & Jurisprudence at the University of Bialystok Faculty of Law in Poland. His research, writing, and speaking engagements include a variety of legal topics, including property law and conservation.

The John Locke Foundation and Professor Barnhizer submit this brief to underscore the foundational character of the right to exclude under North Carolina law and constitutional tradition, and to highlight the policy consequences—particular to North Carolina—that would flow from acceptance of the government's arguments on appeal. No party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money intended to fund its preparation or submission.

All parties consent to the filing of this brief.

2

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This appeal turns on a single constitutional question: whether the government may take a landowner's right to exclude while paying less than full compensation. The government asks this Court to hold that a landowner like Mr. Kotis—deprived of all meaningful authority over more than ten acres of his commercial property by operation of the Trails Act's railbanking mechanism—should nonetheless receive less than full compensation because the City of Greensboro has not yet exercised its legal right to remove his improvements from the corridor. That argument is wrong as a matter of constitutional law, wrong as a matter of settled Trails Act jurisprudence, and wrong as a matter of property-rights policy.

The Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. CONST. amend. V. Likewise, North Carolina's own constitution commands that no person shall "be deprived of his life, liberty, or property, but by the law of the land." N.C. CONST. art. I, § 19. Both provisions rest on a foundational understanding: property ownership is not merely a bundle of economic interests but an exercise of sovereignty over one's own domain. At the center of that sovereignty sits the right to exclude others.

When the government—through a Notice of Interim Trail Use ("NITU")—compels a landowner to yield the right to exclude in perpetuity, it has taken that property, and the owner is entitled to be made whole for what has been lost, not

3

merely for what the government has chosen, for the moment, to exercise. The Court of Federal Claims correctly applied this principle, and this Court should affirm.

The John Locke Foundation writes separately to emphasize two points that warrant particular attention. First, the right to exclude is not merely a federal constitutional construct; it is deeply embedded in North Carolina's own property-law tradition, tracing back to the state's founding. Second, the practical and policy consequences of the government's position are significant. Weakening the requirement of full compensation for the loss of the right to exclude would chill investment, impair property values, and undermine the expectations of landowners who relied on the legal protections that the law has historically afforded them.

This brief proceeds in two parts. Part I explains that the right to exclude is a foundational attribute of property ownership and that its appropriation effects a categorical taking requiring full compensation. Part II demonstrates that, in the context of Trails Act railbanking, weakening compensation based on a trail sponsor's present intentions would distort property markets, undermine investment-backed expectations, and impose unfair burdens on North Carolina landowners.

**ARGUMENT**

**I. THE RIGHT TO EXCLUDE IS THE CORNERSTONE OF PROPERTY OWNERSHIP UNDER NORTH CAROLINA LAW AND THE FEDERAL CONSTITUTION.**

**A.  North Carolina Has Long Recognized the Right to Exclude as Foundational to Property Rights.**

The philosophical and legal heritage of North Carolina property law begins, as it does in most Anglo-American jurisdictions, with the proposition that ownership of land confers upon the owner the exclusive authority to determine who may and who may not enter. William Blackstone described property as "that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe." 2 William Blackstone, *Commentaries on the Laws of England* 2 (1766). John Locke—whose name this Amicus bears—likewise grounded property rights in the labor and enterprise of the individual: by mixing one's labor with the land, the owner acquires a right good against the world, one that government exists not to create, but to secure. John Locke, S*econd Treatise of Government §§ 27–28 (1690).* James Madison carried these Lockean premises into the American constitutional order, warning that a government that indirectly withholds from a man what belongs to him violates property no less than one that seizes it directly. James Madison, *Property,* Nat'l

Gazette, Mar. 27, 1792, reprinted in 14 The Papers of James Madison 266 (Robert A. Rutland et al. eds., 1983).

These principles were not abstract theory. They formed the intellectual foundation of the American understanding of property at the Founding and informed the constitutional protections that followed. The right to exclude, central to both Blackstone's conception of dominion and Locke's theory of natural right, was understood as the mechanism by which ownership is made meaningful. As the leading scholarly treatment of the subject observes, the right to exclude is the "sine qua non" of property: "Give someone the right to exclude others from a valued resource . . . and you give them property. Deny someone the exclusion right and they do not have property." Thomas W. Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 730, 730 (1998). Without the ability to exclude others, property is reduced to a revocable privilege rather than a protected right.

North Carolina's eminent domain statutes codify the same principle. The North Carolina Eminent Domain Act, N.C. Gen. Stat. § 40A-1 et seq., requires that any taking of private property—including any restriction on its use—be accompanied by just compensation. Section 40A-62 provides a private right of action for inverse condemnation whenever a governmental entity's action amounts to a taking without formal proceedings. The North Carolina General Assembly has never suggested that a landowner who is stripped of the right to exclude others from

his land, but who has not yet been physically displaced, is entitled to less than full compensation. To the contrary, North Carolina has consistently treated legal impairment of property rights as compensable even where the government has not yet exercised the full extent of its legal authority.

North Carolina courts applying state property law have also recognized that the scope of an easement holder's rights is determined by the nature and purpose of the easement, not by the easement holder's present intentions. In *Norfolk Southern Railway Co. v. Smith*, 611 S.E.2d 427, 430 (N.C. App. 2005), the North Carolina Court of Appeals confirmed that the servient owner's use of land subject to a railroad right-of-way is "subject to the railroad's easement," and that the railroad "may expand its use of the right-of-way" at any time for any legitimate purpose "as determined by the railroad's sound business judgment." The court did not ask whether the railroad had yet chosen to expand its use; the legal subordination of the servient owner's rights was complete at the moment the easement attached, irrespective of the railroad's present conduct or intentions. The same logic applies here. The City's legal authority over the Corridor is complete; that it has not yet chosen to exercise the full extent of that authority does not diminish Kotis's loss one iota.

**B.  The Supreme Court Has Confirmed That Governmental Denial of the Right to Exclude Is a Taking.**

The Supreme Court has long treated the right to exclude as a non-negotiable attribute of property ownership whose impairment triggers mandatory compensation under the Fifth Amendment. In *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979), the Court identified "the right to exclude others" as "one of the most essential sticks in the bundle of rights that are commonly characterized as property." And in *Nollan v. California Coastal Commission*, 483 U.S. 825, 831 (1987), the Court reiterated that the right to exclude "is one of the most essential sticks in the bundle that are commonly characterized as property." That is because without it, the property owner cannot enjoy several of the other sticks.

The Court's most recent and comprehensive statement on this question came in *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021) (holding that a regulation granting third parties the right of physical access to private property constitutes a *per se* taking. There, the Court reaffirmed that the right to exclude is "universally held to be a fundamental element of the property right" and that any government action that "appropriates for the enjoyment of third parties" the right to physically access or occupy private property is a taking. *Id.* at 148–50. Critically, the Court rejected the argument—closely analogous to the government's argument here—that the taking should be assessed based on what the government has actually done rather than on the legal authority it has arrogated to itself. A regulation that grants a right

8

of access over private property effects a categorical taking the moment that right is granted, not merely when it is exercised.

The NITU granted the City of Greensboro a legal right to occupy and control the Corridor, to the exclusion of Kotis, for an indefinite period. That right exists now. The City can exercise it tomorrow, or next year, or in a decade. But Kotis cannot sell, develop, or improve the encumbered land without the City's consent. He cannot exclude the City from his property. He cannot exclude the public from the Greenway. He cannot, in the words of Blackstone, enjoy "that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe." That is a taking, and it was a taking on the day the NITU issued.

The government's contrary argument—that compensation should be discounted because the City has "disclaimed" an intention to remove Kotis's improvements—asks this Court to substitute the City's present preferences for the legal rights the NITU conferred. But the government does not pay just compensation based on what it intends to do with the property it has taken; it pays based on what it has taken. What the government has taken here—the right to exclude—is complete, absolute, and of indefinite duration.

9

**C.  The Trails Act Cannot Be Read to Strip Landowners of the Right to Exclude Without Requiring Just Compensation.**

The government's statutory argument fares no better. It contends that the Trails Act does not "confer" on trail sponsors the authority to remove pre-existing improvements, and therefore the City lacks the legal right to exclude Kotis from his buildings and parking lots within the Corridor. But this Court has already rejected the premise on which that argument rests.

In *Preseault v. United States*, 100 F.3d 1525, 1550 (Fed. Cir. 1996) (*Preseault II*), this Court held that the Trails Act creates "a new easement for the new use" of trailways. In *Toews v. United States*, 376 F.3d 1371, 1376 (Fed. Cir. 2004), it elaborated that the trail easement and the historic railroad easement serve "different uses" that "create different burdens." And in *Caquelin v. United States*, 959 F.3d 1360, 1367 (Fed. Cir. 2020), this Court confirmed that the NITU effects a "categorical taking" by "allowing occupation by someone other than the landowner." These cases recognize that trail use is not merely different in degree but different in kind—transforming a transportation easement into a public access corridor.

The government's argument that the City lacks the right to exclude Kotis is thus doubly wrong. First, it ignores the consistent line of authority holding that the NITU confers on the trail sponsor a new and exclusive easement that displaces the servient owner's rights. Second, and more fundamentally, it misidentifies the

10

relevant legal question. The question is not whether the City has announced an intention to exercise every right the NITU confers; the question is whether the NITU has stripped Kotis of the ability to exclude others from his property. It has. The CFC correctly so held.

The government's preferred reading would produce an absurd result. Under its view, a trail sponsor who publicly announces that it will never interfere with existing improvements would owe the landowner less compensation than one that announces plans to clear the corridor. The landowner's actual legal situation—unable to control the use of his land, unable to exclude the public, unable to guarantee to a buyer that any improvements will remain—would be identical in both cases. Just compensation does not fluctuate based on the government's current intentions. It is fixed by reference to what the owner has lost. *See Ablan v. United States*, 162 F.4th 1364, 1381 (Fed. Cir. 2025) ("the government bears the risk" when it chooses not to condemn land directly but instead "bring[s] about a taking by a continuing process of physical events").

## II. MARKET CONSIDERATION AND PUBLIC POLICY COMPEL AFFIRMANCE.

### A. The Greensboro Trail Network Provides a Case Study in the Real-World Impact of Trails Act Takings on North Carolina Landowners.

The Kotis properties are not abstract hypotheticals. They are real commercial parcels—a Publix grocery store, a Chipotle restaurant, a CoreLife Eatery, an Orangetheory Fitness studio, a Brixx pizza restaurant, and other active or developing businesses—situated along Battleground Avenue and Westover Terrace in Greensboro. These properties sit within or adjacent to the former Norfolk Southern Railway corridor that now forms the backbone of the Greensboro Urban Trail Network.

The Greensboro's planned multi-modal trail and greenway system is designed to connect neighborhoods across the city. The City of Greensboro has promoted the greenway as a public amenity and economic development tool. Those goals are not in dispute here; Amicus does not question the public value of greenways or trail systems. But the benefits of such systems cannot be secured by imposing their costs entirely on the private landowners whose property is encumbered by the federal railbanking mechanism—particularly where, as here, those landowners developed their properties in reliance on the legal framework that existed before the NITU issued.

The Kotis properties illustrate the real burden that the railbanking mechanism imposes on servient owners. Mr. Kotis and his companies maintained thriving

commercial enterprises. But. when the NITU issued, his legal landscape changed overnight: NSR's right to use and control the Corridor transferred to the City, and Kotis's ability to control his own land was suspended indefinitely. He cannot add new development within the corridor. He cannot provide buyers with legal assurances that existing improvements will be permitted to remain. He is left with rights held by the general public—which are no property rights at all.

Other North Carolina landowners face similar situations. The state has numerous former railroad corridors that have been or may be railbanked under the Trails Act. Each such corridor borders private land whose owners' rights are legally subordinated to the trail sponsor's authority the moment a NITU issues. If this Court accepts the government's argument that landowners are entitled to reduced compensation whenever the trail sponsor has not yet chosen to exercise its rights to the full, those landowners will be consigned to a legal limbo: their property burdened by an effective servitude, their compensation diminished by the government's own forbearance, and their ability to plan, sell, or develop their land permanently impaired.

## B. Weakening the Right to Exclude Distorts the Property Market and Chills Investment.

The government's proposed rule would have significant consequences for the North Carolina property market, consequences that fall heavily on the landowners whose property happens to sit adjacent to a railbanked corridor.

13

Dr. John Kilpatrick, an expert on property valuation, found that the effect of the City's exclusive easement on the value of the Kotis properties was 100 percent of the value of the encumbered parcel. That finding reflects a straightforward market reality: a prudent buyer, knowing that the City holds an indefinite legal right to control the corridor—to decide whether improvements remain, whether access is permitted, and how the land is used—will not pay for those portions of the property as if they were freely owned. Markets price legal control and certainty. The NITU eliminates both.

The government dismisses this as a "technical legal rights theory" rather than an accurate reflection of fair market value. Appellant's Br. at 47. But the government has it backwards. Fair market value is not what the government intends to do with the rights it has taken; it is what a willing buyer would pay in an arm's-length transaction for property as legally encumbered on the date of the taking. *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (identifying "the extent to which the regulation has interfered with distinct investment-backed expectations" as a central factor in the just-compensation calculus). The City's oral assurances about its present intentions are not a deed, an easement release, or a legally binding covenant running with the land. They bind no future City Council. They do not appear in any title document a buyer would receive at closing. They are

14

precisely the kind of legally unenforceable comforts that the market discounts —

and that just-compensation doctrine requires courts to discount as well.

Any sophisticated purchaser performing due diligence on the Kotis properties would discover a straightforward and damning legal picture: the Corridor is subject to a NITU; the City holds an exclusive interim trail use easement over it; no document in the chain of title guarantees that existing improvements may remain, be repaired, be maintained, or be replaced; and the City's own witnesses conceded at trial that they could not bind future Councils to any such assurances. See Appx2023, Appx2029–31. A buyer who discovers that the seller's property sits within a corridor over which a third party holds indefinite legal authority will discount the encumbered land accordingly, or walk away from the transaction entirely. Dr. Kilpatrick did not invent this discount; he measured it. The CFC credited his methodology as "credible and methodologically sound," Appx0038–39, and nothing in the government's appeal disturbs that finding.

The distributional concern runs still deeper. The Takings Clause exists precisely to prevent the government from "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). Greenways and trails generate public benefits — recreation, connectivity, economic activity along its route — and those benefits are real. But they arise from the appropriation of private property

15

rights, including Kotis's right to exclude. The Constitution requires that the cost of those public benefits be borne by the public through the fisc, not extracted from individual landowners through undercompensation. The government's rule breaks that guarantee: it allows the public to enjoy the benefits of the trail while requiring Mr. Kotis to subsidize it at a discount measured by the degree to which the City has, for the moment, chosen not to act on its legal authority.

The government's alternative—appraising the property based on the government's present intentions rather than on its legal rights—is not a market standard; it is a fiction. Appraisal methodology requires valuation based on legally enforceable interests, including those that may be exercised at any time. An encumbrance of indefinite duration, controlled by a third party with discretionary authority, is one that the market fully prices, regardless of whether that authority has yet been exercised. The systemic consequences for North Carolina would be significant. If this Court were to hold that compensation for a NITU taking should be measured not by the legal rights the government has acquired but by the government's current intentions regarding the exercise of those rights, then every commercial developer, retailer, or investor considering property adjacent to a railbanked corridor in North Carolina would face a structurally unstable compensation regime. The value they paid for their land could be taken from them at any time the trail sponsor chose to act — and the compensation they would receive

16

would depend not on what was taken but on how aggressively the sponsor had previously signaled its intentions. That is not a property market; it is a lottery. The predictable result is reduced investment, lower property values, and diminished economic activity in the very communities that rails-to-trails conversions are designed to benefit.

### C. The Government's Position Would Create Perverse Incentives That Harm Communities.

Beyond its immediate impact on the Kotis properties, the government's proposed rule would create incentive structures that are deeply at odds with sound property-rights policy—and with basic fairness.

Under the government's theory, the amount of just compensation owed to a Trails Act landowner would depend not on the legal extent of the government's taking, but on the aggressiveness with which the trail sponsor pursues its rights. A trail sponsor that promptly asserts its authority to clear encroachments would owe more compensation than one that permits encroachments to remain while preserving its legal right to address them later. This creates a perverse incentive for trail sponsors to move slowly, make reassuring statements, and avoid exercising their legal rights—not because they have relinquished those rights, but because doing so reduces the compensation that would otherwise be owed to the landowner.

This is precisely the dynamic that played out in this case. The City's witnesses testified that they had not given "any assurances" that overlying structures would

not be removed, that such assurances would be inappropriate because they would "bind future City Councils," and that design plans could change. Appx2023, Appx2034 The City was simultaneously telling Mr. Kotis that his improvements could coexist with the trail—for now—while preserving every legal right to change course at any time. The government then asks this Court to treat the City's forbearance as evidence that the taking was less severe than the law provides.

The relevant question is not how the government has chosen to exercise its rights, but what rights it has acquired. Here, the government has taken an indefinite easement that strips the landowner of the right to exclude and subordinates his property to public use. Allowing compensation to fluctuate based on a trail sponsor's present preferences would transform a constitutional guarantee into a matter of administrative convenience, leaving property owners to bear the risk of future governmental action without full remuneration. The Fifth Amendment does not permit such a result.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in Appellees' brief, the John Locke Foundation and Professor Daniel D. Barnhizer respectfully urge this Court to affirm the judgment of the Court of Federal Claims in its entirety. The right to exclude is the cornerstone of North Carolina property law, of federal constitutional protection, and of sound public policy. The government took that right from Mr. Kotis and his companies when the NITU issued. When the government takes the right to exclude, it has taken a fundamental attribute of ownership, and it must pay for that loss. The CFC correctly measured the loss, and this Court should affirm.

Respectfully submitted,

/s/ Jeanette K. Doran

**Jeanette K. Doran**

Doran Law Offices
2012 Timber Drive
Raleigh, North Carolina 27609
919-332-2319
jeanette.k.doran.gmail.com

*Counsel for Amici Curiae*

*John Locke Foundation and Professor Daniel D. Barnhizer*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g) and Federal Circuit Rule 32(b)(3), the undersigned certifies:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), as modified by Federal Circuit Rule 32(b)(1), because it contains 4,158 words, not including those parts excluded pursuant to Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2). Amicus notes that, pursuant to Federal Circuit Rule 29(a)(5), an amicus brief may not exceed one-half the length of the principal brief it supports.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman, and complies with the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

/s/ Jeanette K. Doran

Jeanette K. Doran

Attorney for Amici Curiae John Locke Foundation and Professor Daniel D. Barnhizer